## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

RUSSELL FROST,                                    )
                                                  )
TAMMIE FROST,                                     )
                                                  )
AMANDA DOSS,                                      )
                                                  )
CRYSTAL FROST,                                    )          Case No. 1:17cv603
                                                  )
M.F. a minor, by and through his parent           )
and natural guardian, RUSSELL FROST,              )
                                                  )          JURY DEMANDED
WAIEL EL-MAADAWY,                                 )
                                                  )
BILQIS AIDARA,                                    )
                                                  )
A.G. a minor, by and through his parent           )
and natural guardian, WAIEL                       )
EL-MAADAWY,                                        )
                                                  )
M.E. a minor, by and through his parent           )
and natural guardian, WAIEL                       )
EL-MAADAWY,                                        )
                                                  )
G.E a minor, by and through his parent            )
and natural guardian, WAIEL                       )
EL-MAADAWY,                                        )
                                                  )
ZEINAB EL-MAADAWY,                                )
                                                  )
IHAB EL-MAADAWY,                                  )
                                                  )
TAMER EL-MAADAWY,                                 )
                                                  )
MOHAMMED EL-MAADAWY,                              )
                                                  )
MUSTAFA EL-MAADAWY,                               )
                                                  )
AMR MOHAMED,                                       )
                                                  )
BRENDA MOHAMED,                                   )
                                                  )
LORI WENDEL,                                       )
                                                  )

| | |
|---|---|
| **MEGAN MARTIN,** | ) |
| | ) |
| **and** | ) |
| | ) |
| **DREW ROWE** | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| **v.** | ) |
| | ) |
| **THE ISLAMIC REPUBLIC OF IRAN** | ) |
| **Serve: Foreign Minister Mohammed Zarif** | ) |
| **Ministry of Foreign Affairs** | ) |
| **Khomeini Avenue** | ) |
| **United Nations Street** | ) |
| **Tehran, Iran** | ) |
| | ) |
| **and** | ) |
| | ) |
| **MUQTADA AL-SADR** | ) |
| **Serve: The Private Office of His Eminence** | ) |
| **Sayyid Muqtada al-Sadr** | ) |
| **Najaf, Iraq** | ) |
| | ) |
| **Defendants.** | ) |

## <u>COMPLAINT</u>

Plaintiffs, by counsel, bring this action seeking damages arising out of the January 15, 2016 hostage taking of Russell Frost ("Russell"), Waiel El-Maadawy ("Waiel"), and Amr Mohamed ("Amr") at the hands of the Saraya al-Salam militia in Baghdad, Iraq. Plaintiffs move for judgment against Defendants, the Islamic Republic of Iran and its Ministries, Agencies, and Instrumentalities (collectively referred to herein as "Iran"), for providing material support to Saraya al-Salam, and Muqtada al-Sadr, the founder and leader of Saraya al-Salam, and in support thereof alleges as follows:

## JURISDICTION AND VENUE

1.      Jurisdiction over the subject matter of this case arises under 18 U.S.C. § 2331, et seq., 28 U.S.C. §§ 1330(a), 1331, 1332(a)(2), and 1367.

2.      Despite its status as a foreign state, Iran is subject to suit in the courts of the United States pursuant to the Foreign Sovereign Immunities Act, as amended, specifically 28 U.S.C. § 1605A, due to Iran's formal designation as a "State Sponsor of Terrorism."

3.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(f)(4).

4.      Upon information and belief, Muqtada al-Sadr was domiciled in the Republic of Iraq ("Iraq") at the time of the hostage taking.

5.      Russell was domiciled in the State of Kansas at the time of his hostage taking.

6.      Waiel was domiciled in the State of Florida at the time of his hostage taking.

7.      Amr was domiciled in the State of Arizona at the time of his hostage taking.

8.      Russell, Waiel, and Amr were citizens and nationals of the United States, working as employees of Blue Light LLC ("Blue Light"), performing a contract on behalf of the United States Government at the time of their hostage taking. Blue Light is a subsidiary of The Macalan Group and, at that time, was acting as a subcontractor of General Dynamics Corporation.

9.      The hostage taking of Russell, Waiel, and Amr occurred at the direction of and/or with the material support of Iran and Muqtada al-Sadr, and, as a direct and intentional result of that hostage taking, harmful effects occurred within the territory of the United States.

## THE PARTIES

10.     Plaintiffs, Russell and his immediate family, Waiel and his immediate family, and Amr and his immediate family (collectively referred to herein as "Plaintiffs"), are all United States citizens.

11.      Plaintiff Tammie Frost is the spouse of Russell and domiciled in the state of Kansas.

12.      Plaintiffs Crystal Frost and M.F., are the natural born children of Russell and Tammie Frost, and are domiciled in the state of Kansas.

13.      Amanda Doss is the adopted daughter of Russell, the natural born daughter of Tammie Frost, and is domiciled in the state of Kansas.

14.      Plaintiff BilQis Aidara is the wife of Waiel and domiciled in the state of Florida. She was engaged to be married and living with Waiel at the time of the hostage taking.

15.      Plaintiffs A.G., M.E., and G.E. are the natural born children of Waiel, and domiciles of the state of Florida.

16.      Plaintiff Zeinab El-Maadawy is the mother of Waiel, and is a domicile of the state of New York.

17.      Ihab El-Maadawy is the brother of Waiel, and domiciled in the state of New York.

18.      Tamer El-Maadawy is the brother of Waiel, and is domiciled in the state of Florida.

19.      Mohammed El-Maadawy is the brother of Waiel, and is domiciled in the state of Georgia.

20.      Mustafa El-Maadawy is the brother of Waiel, and is domiciled in the state of New York.

21.      Plaintiff Brenda Mohamed is the wife of Amr and domiciled in the state of Arizona.

22.      Lori Wendel is the stepdaughter of Amr, and natural born daughter of Brenda Mohamed, and is domiciled in the state of Texas.

23.     Megan Martin is the stepdaughter of Amr, and natural born daughter of Brenda Mohamed, and is domiciled in the state of Kansas.

24.     Drew Rowe is the stepson of Amr, and natural born son of Brenda Mohamed, and is domiciled in the state of Kansas.

25.     Defendant, Iran, is a foreign state. Since January 19, 1984, Iran has been designated as a state sponsor of international terrorism pursuant to Section 6(j) of the Export Administration Act of 1979, 50 U.S.C. § 2405(j), and the Foreign Assistance Act of 1961, 22 U.S.C. § 2371(b).

26.     Muqtada al-Sadr is a citizen of Iraq, a prominent Shia cleric, as well as the founder and leader of the Saraya al-Salam militia.

## FACTUAL ALLEGATIONS

**a.     Deep Roots of Sectarian Tension**

27.     The religion of Islam is primarily split between two sects, Shia and Sunni. Despite many similarities, key differences in doctrine, law, and theology have caused political and military conflict throughout the Middle East.

28.     Sunnis make up approximately ninety-percent of the one-billion five-hundred-million Muslims worldwide.

29.     The nations of Egypt, Saudi Arabia, Jordan, and Syria, among others, are overwhelmingly populated by Sunni Muslims.

30.     Iran is overwhelmingly populated by Shia Muslims.

31.     Iraq, positioned between these two regions geographically, is approximately thirty-five percent Sunni and sixty-five percent Shia.

**b.**      **The Rise of the Sadrist Movement in Iraq**

32.      Muqtada al-Sadr was born in 1973 in the Shia holy city of Najaf, Iraq.

33.      In 1979, Saddam Hussein, a Sunni, became the leader of Iraq.

34.      Muqtada al-Sadr's father, Ayatollah Muhammad Sadiq al-Sadr, was a prominent Shia figure in Iraq who openly opposed Saddam Hussein's rule.

35.      Sadiq al-Sadr built a movement, the "Sadrist Movement," with the goal of restoring Shia Islam's relevance to the spiritual and sociopolitical needs of the faithful.

36.      The Sadrist Movement's power base was in Najaf as well as what is now known as "Sadr City," a neighborhood located in eastern Baghdad.

**c.**      **The Rise of Shia Iran**

37.      Iran's Islamic Revolution in 1979 gave Shia cleric Ayatollah Khemeini the platform to implement a Shia government.

38.      Under Ayatollah Khomeini, Iran sought to create a Shia revival throughout the region and implemented a widespread foreign policy of supporting Shia militia organizations, including many operating within neighboring Iraq.

39.      On January 19, 1984, due to a history of providing financial and military support to terrorist organizations, Iran was officially designated as a state sponsor of international terrorism within the meaning of the Export Administration Act of 1979, 50 U.S.C. § 2405(j), and the Foreign Assistance Act of 1961, 22 U.S.C. § 2371(b).

40.      To support terrorism, the Iranian government primarily funnels its resources through the government's Islamic Revolutionary Guard Corps – Quds Force ("IRGC-QF") which operates under the Iranian Islamic Revolutionary Guard Corps ("IRGC"). The IRGC-QF is used to implement foreign policy, provide cover for intelligence operations, create instability

in the Middle East, and fund Shia militias and terrorist organizations. The IRGC has its own

separate ministry and is one of the most powerful organizations in Iran. The IRGC exerts

considerable influence on the foreign policy of Iran, and is dedicated to exporting the principles

of Shia Islam through whatever means necessary, including the funding of terrorism.

41.     IRGC and its agencies are subsidiaries of Iran and act on behalf of Iran.

**d.     The Rise of Muqtada al-Sadr & Iraq's Shia Militias**

42.     In 1991, after the United States expelled the Iraqi army from Kuwait, the Shia

population rose up against Saddam Hussein anticipating assistance from the United States which

never materialized.

43.     Thereafter, Sadiq al-Sadr became overtly hostile to the United States. Sadiq al-

Sadr would begin each Friday sermon with "No, no to America! No, no to Israel!"

44.     Sadiq al-Sadr and his two sons were assassinated in 1999 in Najaf, immediately

leading to an unsuccessful Shia uprising against Saddam Hussein.

45.     Muqtada al-Sadr assumed leadership over the Sadrist Movement following these

events. This cause was further aided by the invasion of Iraq and overthrow of Saddam Hussein

by international coalition forces in 2003.

46.     Muqtada al-Sadr's popular appeal stemmed from his Shia-based nationalism and

his anti-American sentiment.

47.     President Bush declared on May 1, 2003, that "major combat operations in Iraq

have ended" and on May 23, 2003, the interim Iraqi government disbanded the Iraqi military.

48.     To fill this power vacuum on behalf of the Sadrist Movement, Muqtada al-Sadr

formed the Mahdi Army, also referred to as Jaysh al-Mahdi ("JAM"), in June of 2003. JAM

quickly became the largest Shia militia in Iraq.

49.     Iran, through the IRGC-QF, has played a primary role in establishing several other militias in Iraq, including Asaib Al al-Haq, Badr Organization, and Kata'ib Hezbollah.

50.     Asaib Al al-Haq was founded in 2006 and is commanded by IRGC-QF commander Qasem Soleimani. Iran has continued to provide millions of dollars monthly and trained Asaib Al al-Haq fighters in Iran in modern urban warfare tactics.

51.     Badr Organization was founded in 1983 with the express intention of duplicating the Iranian Revolution in Iraq. Badr has received as much as three million dollars a month from Iran in addition to weapons and supplies. It serves as a liaison between Iran and more aggressive insurgent groups and militias within Iraq.

52.     Kata'ib Hezbollah was founded in 2006 or 2007 and is overseen by Qasem Soleimani, the IRGC-QF commander. One senior leader is Abu Mahdi al-Muhandis, a known advisor of Soleimani. The majority of the training for this organization is performed by the IRGC directly or by its proxy, Lebanese Hezbollah.

53.     When the United States created the Iraqi Governing Council on July 13, 2003, although rival Shia and secular leaders joined, Muqtada al-Sadr did not.

54.     Thousands of JAM fighters travelled to Lebanon for extensive training with Hezbollah operatives in 2003. This relationship was encouraged and facilitated by Iran through the IRGC and IRGC-QF.

55.     On April 18, 2004, JAM led the first major armed confrontation against coalition forces in Iraq by the Shia community.

56.     The United States Department of State ("State Department"), in its April 27, 2005 Country Reports on Terrorism, stated that "Iran provided funding, safe transit, and arms to insurgent elements [within Iraq], including Muqtada al-Sadr's forces."

57.     The security forces in Baghdad began to be rebuilt in 2005.

58.     Shia political parties were responsible for the rebuilding of the Iraqi security forces and predominantly recruited Shia Muslims to these forces. Many of these men were Sadrists and loyal to Muqtada al-Sadr.

59.     In 2005, Qais Khazali, one of Muqtada al-Sadr's top Lieutenants collaborated directly with IRGC-QF to form JAM "Special Group."

60.     "Special Group" is a designation given by the United States military to the cell based Shia paramilitary organizations operating in Iraq, but backed by Iran.

61.     Iran transferred large quantities of weapons, explosives, and specialized equipment to militia and insurgent groups in Iraq such as JAM and JAM "Special Group."

62.     Iran provided these Shia militants with rockets, magnetic bombs, explosively formed penetrators, .50-caliber rifles, and portable surface to air missiles.

63.     The Iranian military provided support to these smuggling efforts by providing unmanned aerial vehicles, helicopters, visual surveillance, signals intelligence, and gunfire to intimidate and evade the already depleted Iraqi border patrols.

64.     IRCG-QF has provided advisors in Iraq for Shia militants, specifically for JAM and its progeny, in the construction, maintenance, and use of advanced weaponry.

65.     On November 10, 2005, two JAM members were taken into custody near the Iran border and admitted to trafficking explosive material from Iran.

66.     On November 28, 2006, JAM commander Ali al-Sa'idi met with Iranian officials at the Iraq/Iran border to pick up three shipments of rockets.

67.     In December of 2006, JAM planned to attack and kidnap United States soldiers who were travelling in two to three Humvee convoys. The plan was to use improvised explosive

devices and small arms fire to carry out the attacks. Any resulting captives were to be taken to Sadr City and held there to deter American raids. The person chosen to plan the operation, Shaykh Azhar al-Dulaimi ("Dulaimi"), was trained in Iran by Hezbollah operatives on how to conduct precision military style kidnappings, all under the supervision of IRGC-QF.

68.     In 2007, Dulaimi directly participated in the kidnapping and execution of five American soldiers from the Provincial Joint Coordination Center in Karbala.

69.     In a 2007 interview with Britain's *The Independent*, Muqtada al-Sadr admitted to working closely with Hezbollah.

70.     IRGC-QF has directed attacks on Iraqi government officials in Iraq through Iranian intelligence agents within JAM.

71.     On March 27, 2007, the United States reported that Iranian intelligence agents were planning an attack against the Ministry of Industry's officials using a member of JAM. These attacks were intended to be part of a media campaign designed by Iranian intelligence officers to show that the Baghdad security plan had failed to provide stability.

72.     In October 2007, the IRGC-QF was designated as a Specially Designated Global Terrorist pursuant to Executive Order 13224 for its terrorism-related activities.  The United States Treasury Department ("Treasury Department") issued a press release announcing the designation stated that "the Qods Force provides lethal support in the form of weapons, training, funding, and guidance to select groups of Iraqi Shi'a militants who target and kill Coalition and Iraqi forces and innocent Iraqi civilians."

73.     In 2008, Iran provided JAM leaders and fighters with support and refuge in response to territorial gains by coalition forces in Baghdad, Basra, and Sadr City.

74.     In August of 2008, Muqtada al-Sadr purported to disband JAM and transform them into a non-violent organization with a focus on educational and social projects.

75.     However, in November of 2008, Muqtada al-Sadr created the Promised Day Brigade ("PDB") to continue the fight against occupying troops.

76.     PDB was also a "Special Group" as defined by the United States military due to its Iranian support.

77.     PDB has taken responsibility for at least fifty-two attacks against Americans since its inception. For example, on June 28, 2011, PBD issued a statement claiming responsibility for ten mortar and rocket attacks against United States military convoys in which United States officials confirmed that three soldiers were killed.

78.     From 2008 until 2011, Iran harbored Muqtada al-Sadr in Qom, Iran and allowed him to run JAM and PDB from its territory.

79.     On July 2, 2009, the Treasury Department issued a press release announcing that it had designated an Iran based individual, Abu Mahdi al-Muhandis, under Executive Order 13438 as threatening the peace and stability of Iraq and its government.

80.     The July 2009 Treasury Department press release further outlined JAM's terrorist activities and relationship with Iran through Abu Mahdi al-Muhandis, the release stated:

> As of early 2007, al-Muhandis formed a Shia militia group employing instructors from Hizballah to prepare this group and certain Jaysh al-Mahdi (JAM) Special Groups for attacks against Coalition Forces. The groups received training in guerilla warfare, handling bombs and explosives, and employing weapons--to include missiles, mortars, and sniper rifles. In another instance as of September 2007, al-Muhandis led networks that moved ammunition and weapons--to include explosively formed penetrators (EFPs)--from Iran to Iraq, distributing them to certain JAM militias to target Coalition Forces. As of mid-February 2007, al-Muhandis also ran a weapons smuggling network that

moved sniper rifles through the Iran-Iraq border to Shia militias that targeted Coalition Forces.

Al-Muhandis also provided logistical support for attacks against Iraqi Security Forces and Coalition Forces conducted by JAM Special Groups and certain Shia militias. In one instance, in April 2008, al-Muhandis facilitated the entry of trucks--containing mortars, Katyusha rockets, EFPs, and other explosive devices--from Iran to Iraq that were then delivered to JAM Special Groups in Sadr City, Baghdad. Additionally, al-Muhandis organized numerous weapons shipments to supply JAM Special Groups who were fighting Iraqi Security Forces in the Basrah and Maysan provinces during late March-early April 2008.

In addition to facilitating weapons shipments to JAM Special Groups and certain Shia militias, al-Muhandis facilitated the movement and training of Iraq-based Shia militia members to prepare them to attack Coalition Forces. In one instance in November 2007, al-Muhandis sent JAM Special Groups members to Iran to undergo a training course in using sniper rifles. Upon completion of the training course, the JAM Special Groups members had planned to return to Iraq and carry out special operations against Coalition Forces. Additionally, in early March 2007, al-Muhandis sent certain Shia militia members to Iran for training in guerilla warfare, light arms, marksmanship, improvised explosive devices (IED) and anti-aircraft missiles to increase the combat ability of the militias to fight Coalition Forces.

81.     In 2010, the United States ambassador to Iraq, James Jeffrey, stated in an interview that Iranian-supported Shia militias and insurgent groups may have been responsible for up to one quarter of all United States combat casualties in Iraq.

82.     In the 2010 Iraqi elections, Muqtada al-Sadr's political party, "Sadrist Trend," won forty seats, a sizeable minority block.

83.     The United States withdrew the last of its combat forces from Iraq in December 2011.

84.     Following the withdrawal, Sunni militants began attacking Shia citizens in an attempt to undermine confidence in the Shia led government.

85.     The outbreak of the Syrian civil war in 2011 further exacerbated the sectarian conflicts inside Iraq. Many fighters on both sides crossed the border and became involved in the civil war.

86.     Muqtada al-Sadr's political party won provincial seats in both Baghdad and key areas of southern Iraq in 2014, maintaining its strong initial showing from 2010.

**f.      Security by Committee in Baghdad**

87.     In 2014, the Islamic State of Iraq and the Levant ("ISIL"), also known as the Islamic State of Iraq and Syria ("ISIS"), was formed as a fundamentalist Sunni group.

88.     On June 10, 2014, ISIL took possession of the city of Mosul.

89.     In response to these territorial gains by ISIL, Saraya al-Salam (aka *the Peace Brigades*) was formed by Muqtada al-Sadr from former members of JAM. In June of 2014, thousands of Saraya al-Salam fighters paraded through the streets of Baghdad armed with grenade launchers and accompanied by heavy military equipment.

90.     Saraya al-Salam claims to have hundreds of thousands of fighters and has fought against ISIL in the cities of Samarra, Jurf al-Sakhar, Dyala, Tikrit, and Babil.

91.     Struggling to maintain security within key cities, including Baghdad, the government of Iraq established the Popular Mobilization Forces ("PMF"). The PMF consists of multiple existing Shia militias because these groups, such as Saraya al-Salam, were already operative and had a vested interest in opposing the Sunni forces of ISIL.

92.     Despite the original intention that the PMF would be controlled by the Iraqi government, the leaders of the militias, such as Muqtada al-Sadr, retained various degrees of authority and control over their personnel.

93.     Within Baghdad, certain militias comprising the PMF were given specific areas or neighborhoods to police on behalf of the Iraqi government.

94.     By the end of 2014, the Dora district of Baghdad, a predominantly Sunni neighborhood, was controlled by the Iraqi Federal Police, a predominately Shia force. Sadr City was controlled by Shia supporters of Muqtada al-Sadr, including Saraya al-Salam.

95.     In January 2015, Muqtada al-Sadr held a press conference with the Iraqi Minister of Defense, Khaled al-Obaidi, announcing that his troops would be utilized at the discretion of the Iraqi army. Thereafter, the influence of his forces steadily grew, and by early 2016 the Dora neighborhood was also patrolled by groups loyal to Muqtada al-Sadr such as Saraya al-Salam.

96.     In its "Country Report on Terrorism 2015", the State Department found that Iran had increased its assistance to Iraq's Shia terrorist groups fighting ISIL and that Iran continues to fund, arm, and train Iraqi Shia terrorist groups through the IRGC-QF.

**g.      Russell, Waiel, and Amr's Role in Iraq**

97.     General Dynamics Corporation has many private defense contracts with the United States Department of Defense. One such contract, identified as W911S0-09-D-0006, was partially subcontracted to Blue Light. It was this contract that had Russell, Waiel, and Amr working in Baghdad in January 2016.

98.     Russell was hired as a Mechanical Instructor to train the Iraqi Special Forces Unit. His job entailed training Iraqi Cadets in driving, vehicle maintenance, and vehicle repair. He has

no prior military training or employment. After more than a decade of contract employment in Iraq, this latest job is the first time he was ever asked to carry a weapon.

99.     Waiel has prior military and law enforcement experience. He was especially valuable as a private contractor because of this work experience in combination with the ability to speak Arabic. Waiel was the Program Manager and the team supervisor. Waiel also taught classes such as firearms, explosives, and small unit tactics.

100.     Amr taught weapons repair and maintenance classes and well as assisting in the firearms training. He also has prior military experience and speaks Arabic.

101.     The men were embedded with the Iraqi military to conduct the training and were issued Ministry of Defense identification cards and weapons by the Iraqi Special Forces.

**h.     The Hostage Taking and Torture of Russell, Waiel, and Amr**

102.     While in Iraq, Russell, Waiel, and Amr utilized interpreters to facilitate communication with their Iraqi students. In early January 2016, the men lost confidence in one of these interpreters because he was asking too many unrelated questions and overcharging them for supplies. They stopped working with that interpreter and began seeking a replacement.

103.     Waiel reached out to a man named Abu Marina, who had assisted Waiel in the past. Abu Marina agreed to meet with them to discuss joining their team.

104.     On January 15, 2016, Russell, Waiel, and Amr met Abu Marina and shared a meal. Over the meal, he agreed to serve as their interpreter, but requested, per Iraqi custom, that the men return to his apartment to seal their new relationship over tea.  The apartment is located in the Dora neighborhood in southeastern Baghdad.

105.     After being in the residence for approximately thirty minutes, a militia commander entered the apartment and ordered the three Americans to stay.

106.     Initially, Russell, Waiel, and Amr were not concerned because they were on official business and had paperwork from the Iraqi Special Forces approving their movements within the City of Baghdad.

107.     Eventually ordered outside of the apartment, the men were confronted by about forty heavily armed individuals. There were men standing in doorways, looking around corners, pointing guns at them from apartment windows, and the parking lot exit was blocked.

108.     Russell, Waiel, and Amr initially thought the militants may be Sunni Muslim extremists connected with ISIL. Based on this assumption, all three men believed that they would be better off trying to fight their way out rather than being taken captive and executed.

109.     Before a fight could break out, however, the militia commander opened his cell phone and Waiel immediately recognized the image on the phone as that of Muqtada al-Sadr.

110.     Knowing that the United States was working closely with militia groups loyal to Muqtada al-Sadr in the fight against ISIL, Waiel determined they had a chance of surviving. Waiel encouraged Russell and Amr to lower their weapons and obey their captors.

111.     Waiel and Amr spoke in Arabic to their captors, asking if they were part of the Iraqi government. The men replied that the Iraqi government paid them to be in charge of the neighborhood.

112.     After Russell, Waiel, and Amr reluctantly surrendered their weapons, Russell and Waiel were forced at gunpoint inside their own van and their captors drove away from the apartment complex. Amr and Abu Marina were placed in a separate vehicle. They were all taken to a nearby villa and led into a room with portraits of Muqtada al-Sadr on the walls. These walls were lined with crates of AK-47 ammunition and rocket-propelled grenades. While in this room, they were interrogated and stripped of their cell phones and other personal items.

113.    They were then placed back in the vehicles and taken to Sadr City. Once inside a secured compound in Sadr City, the hostages were pushed into a room adorned with prayer carpets and cushions. On one end of the room was an elevated area, similar to a stage, beneath a wall adorned with a large mural of Muqtada al-Sadr. Waiel and Amr each recognized several banners hanging from the walls bearing the insignia of Saraya al-Salam.

114.    The hostage takers kicked the legs out from underneath their hostages, forcing them to kneel before the mural of Muqtada al-Sadr, taped dirty rags over their eyes, bound their hands and feet, and taped rags over their mouths so tightly that the men could barely breathe.

115.    Russell was placed in plastic handcuffs because his wrists were too large for the metal handcuffs. These plastic handcuffs tore into his skin and were so tight that his hands and feet went numb. Those bindings were eventually replaced with tractor chains.

116.    The three men remained blindfolded and shackled in stress positions for an unknown, but lengthy, period of time.

117.    Each hostage was ushered into a small concrete cell inside of an old factory with a makeshift roof. They initially slept on a concrete floor in near freezing temperatures. After about a week, they were given items such as cardboard or very thin foam to serve as a mattress.

118.    Every day for the next three weeks, they underwent psychological and physical torture. For instance, the men quickly learned to urinate in empty water bottles in order to avoid the beating they would receive whenever they asked to use a bathroom.

119.    The only light they could see was the light seeping through their blindfolds when they looked down.

120.    They were allowed a single shower after about two weeks in captivity and it took several minutes for them to be able to open their eyes and see.

121.     Waiel had a gun placed against his head and the trigger pulled so he heard the click, blades and hands were placed on his throat, and he was struck so hard that he would fly out of his chair. His fingers were placed between metal shears intimating that his fingers were going to be cut off. In one instance, a captor referenced Waiel's muscular build and stated that it was too bad "all that was about to be worm food." Russell and Amr underwent similar treatment from time to time throughout their captivity.

122.     Russell and Amr each had knives placed against their throats and dragged in a cutting motion. On two different occasions, Russell was told that if he did not do as he was told, his captors would cut off his head.

123.     The guards repeatedly discussed with Waiel and Amr that they were members of Saraya al-Salam and that they were loyal to Muqtada al-Sadr.

124.     The guards bragged to Waiel and Amr about their Iranian military training and the time they had spent with Hezbollah in Lebanon. They also told Waiel about how their financial resources, weapons, and equipment came directly from Iran.

125.     All three hostages endured repeated threats of beheading, and, in regular interrogations, the captors attempted to get them to turn on one another and falsely admit to being spies and operatives of the Central Intelligence Agency.

126.     Prior to their release, the three hostages were placed into what appeared to be United States military uniforms. They were informed that they had been freed by Muqtada al-Sadr and were forced to film a video in front of a large portrait of Muqtada al-Sadr thanking him for being a great leader. The men were also told to warn the United States that the Shia militias were prepared to resist if America tried to invade Iraq again. The backdrop for the video was flanked by Saraya al-Salam banners.

127.     On February 16, 2016, after thirty-one days in captivity, Russell, Waiel, and Amr were driven to the edge of a remote highway, their blindfolds were removed, they were turned over to Iraqi government officials, and taken to an Iraqi intelligence office for questioning. United States Special Forces arrived shortly thereafter to take possession of the men and to transport them to the United States Embassy in Baghdad.

128.     On July 17, 2016, Muqtada al-Sadr posted on his personal website that United States individuals are targets for his militias. This stance was re-affirmed in a televised interview with Muqtada al-Sadr's official spokesman who stated "(w)e are thirst [sic] for Americans' blood."

129.     Russell, Waiel, and Amr were detained by Saraya al-Salam under inhumane conditions, incommunicado, without access to a consular officer or a lawyer, and without the right to challenge the lawfulness of their detention, in violation of international norms and laws such as, but not limited to, the Vienna Convention on Consular Relations, the Universal Declaration of Human Rights, the International Covenant on Civil and Political Rights, and the United Nations Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (collectively, "International Law").

130.     Under the definition found in Article 1 of the International Convention Against the Taking of Hostages, as referenced in 28 U.S.C. § 1605A, Russell, Waiel, and Amr were taken hostage by Saraya al-Salam over a period of thirty-one days from January 15, 2016, until February 16, 2016.

131.     All three men continue to suffer severe mental, emotional, psychological, and physical affects from the hostage taking and torture.

132.     Russell suffers from nerve damage to both feet, pain in his back, shoulder and elbow, Tarsal Tunnel Syndrome in both ankles, kidney damage due to dehydration, hearing loss, a chronic cough and breathing problems, vision loss, and permanent scarring on his face and wrists. Russell also suffers from Post-Traumatic Stress Disorder, anxiety, anger, insomnia, and a general lack of energy and loss of stamina.

133.     Waiel suffers from constant and ongoing pain in his lower back, wrists, elbows, knees, ankles, and shoulders. He also experiences intermittent numbness in his extremities and has permanent scarring on his ankles and nose as a result of the restraints placed on him during his captivity. Waiel also suffers from Post-Traumatic Stress Disorder, frequent nightmares, and difficulty sleeping.

134.     Amr suffers from severe nerve damage that requires surgical repair in his ankles and wrists. The permanency of these injuries remains unknown at this time and will remain that way until the surgeries are performed. He continues to experience significant pain in his back, neck, and head as a result of how he was treated. Amr also suffers from Post-Traumatic Stress Disorder. This mental condition is severe enough that at one point while Amr was hospitalized in February 2017 he awoke to the sound of gunfire, fully believing that he was in the midst of a warzone in Iraq and fearing for his life. He then blacked out, and the next thing he remembers is waking up in a local jail. Amr does not remember any of the events that occurred after he blacked out, but, despite a long history of public service and law-abiding behavior, he was accused of allegedly assaulting a hospital security guard.

135.     In addition to the injuries listed above, Russell, Waiel, and Amr live under the fear and threat of future illness and injuries as a result of the unsafe conditions in which they were forcibly held. For example, they were primarily held in an abandoned factory building with

evidence of exposed asbestos all around them. The degree or effect of this exposure is unclear.

Furthermore, the men discovered evidence of brain matter, body tissue, and other human remains

throughout the area where they were being kept. They were blindfolded at all times and spoon-

fed by their captors. They do not know which of the above-mentioned contaminants, or perhaps

unknown others, may have entered their body.

**i.     Actions and Inactions of the United States Government**

136.     In 2013, a State Department official stated that Iran was planning to increase its

kidnapping operations against Americans through the use of "an obscure Islamist group" and its

regional proxies.

137.     On July 14, 2015, the Joint Comprehensive Plan of Action ("JCPOA") was

announced. Negotiations for JCPOA were largely driven by the State Department. The stated

goal of JCPOA is "to ensure that Iran's nuclear program will be exclusively peaceful."

138.     JCPOA was officially adopted on October 18, 2015.

139.     On January 16, 2016, one day after Russell, Waiel, and Amr were taken hostage,

the International Atomic Energy Agency verified that Iran was meeting its nuclear commitments

under JCPOA.

140.     The next day, two days after Russell, Waiel, and Amr were taken hostage, five

American hostages were released and the United States delivered $400,000,000 in cash to Iran.

141.     Upon information and belief, an anonymous State Department source stated that

in the week prior to the kidnapping of Russell, Waiel, and Amr, the United States Embassy in

Baghdad received intelligence information that an Iranian-backed Shia militia group wanted to

seize American personnel.

142.     No increased security threats or additional safety measures were communicated to Russell, Waiel, or Amr as a result of that intelligence information.

143.     Russell, Waiel, and Amr entered Dora, a Shia-militia-controlled neighborhood, on January 15, 2016, acting within the scope of their duties on behalf of the United States, without any knowledge of an increased security threat from Shia militias.

144.     The same State Department source indicated that the United States "had hoped the Iranian government would tell the militia group to hold off because of all the negotiations," but, in retrospect, fears "that one of the groups might have 'gone off the reservation.'"

## COUNT I – THE PROVISION OF MATERIAL SUPPORT FOR THE HOSTAGE TAKING AND TORTURE OF RUSSELL FROST (28 U.S.C. § 1605A(c))

145.     Plaintiffs repeat and re-allege each allegation of the foregoing paragraphs as if fully set forth herein.

146.     Iran has provided material support to JAM, Saraya al-Salam, and Muqtada al-Sadr for the purpose of supporting, enabling, advancing, and benefiting from the general unrest in Iraq, the on-going fight with ISIL, and to provide resistance to the United States by attacking members of the military, taking hostages, and generally forcing the United States out of Iraq.

147.     As such, Iran's provision of material military and economic support to JAM, Saraya al-Salam, and Muqtada al-Sadr is intentional, wanton, and willful, with the understanding that violence against Americans such as Russell is an expected and welcomed result of such support.

148.     As a direct and proximate result of Iran's willful, wrongful, and intentional acts, Russell was taken hostage and tortured.

149.     As a direct and proximate result of Iran's actions, Russell endured severe pain and suffering during his period of captivity and continues to do so today.

150.     As a direct and proximate result of Iran's actions, Tammie Frost, Amanda Doss, Crystal Frost, and M.F. have experienced significant solatium damages including, but not limited to, severe mental anguish and harm caused by the loss of Russell's society and comfort.

151.     Iran's continuing provision of material support to those willing to commit murder, hostage taking and torture is criminal, outrageous, extreme, wanton, willful, malicious, and a threat to the public warranting an award of punitive damages.

152.     Such conduct violates 28 U.S.C. § 1605A.

153.     A private right of action is established under 28 U.S.C. § 1605A(c) for violations of that section leading to injuries that "may include economic damages, solatium, pain and suffering, and punitive damages."

## COUNT II – THE PROVISION OF MATERIAL SUPPORT FOR THE HOSTAGE TAKING AND TORTURE OF WAIEL EL-MAADAWY
### (28 U.S.C. § 1605A(c))

154.     Plaintiffs repeat and re-allege each allegation of the foregoing paragraphs as if fully set forth herein.

155.     Iran has provided material support to JAM, Saraya al-Salam, and Muqtada al-Sadr for the purpose of supporting, enabling, advancing, and benefiting from the general unrest in Iraq, the on-going fight with ISIL, and to provide resistance to the United States by attacking members of the military, taking hostages, and generally forcing the United States out of Iraq.

156.     As such, Iran's provision of material military and economic support to JAM, Saraya al-Salam, and Muqtada al-Sadr is intentional, wanton, and willful, with the understanding

that violence against Americans such as Waiel is an expected and welcomed result of such support.

157.    As a direct and proximate result of Iran's willful, wrongful, and intentional acts, Waiel was taken hostage and tortured.

158.    As a direct and proximate result of Iran's actions, Waiel endured severe pain and suffering during his period of captivity and continues to do so today.

159.    As a direct and proximate result of Iran's actions, BilQis Aidara, A.G., M.E., G.E., Zeinab El-Maadawy, Ihab El-Maadawy, Tamer El-Maadawy, Mohammed El-Maadawy, and Mustafa El-Maadawy have experienced significant solatium damages including, but not limited to, severe mental anguish and harm caused by the loss of Waiel's society and comfort.

160.    Iran's continuing provision of material support to those willing to commit murder, hostage taking and torture is criminal, outrageous, extreme, wanton, willful, malicious, and a threat to the public warranting an award of punitive damages.

161.    Such conduct violates 28 U.S.C. § 1605A.

162.    A private right of action is established under 28 U.S.C. § 1605A(c) for violations of that section leading to injuries that "may include economic damages, solatium, pain and suffering, and punitive damages."

### COUNT III – THE PROVISION OF MATERIAL SUPPORT
### FOR THE HOSTAGE TAKING AND TORTURE OF AMR MOHAMED
### (28 U.S.C. § 1605A(c))

163.    Plaintiffs repeat and re-allege each allegation of the foregoing paragraphs as if fully set forth herein.

164.    Iran has provided material support to JAM, Saraya al-Salam, and Muqtada al-Sadr for the purpose of supporting, enabling, advancing, and benefiting from the general unrest in

Iraq, the on-going fight with ISIL, and to provide resistance to the United States by attacking members of the military, taking hostages, and generally forcing the United States out of Iraq.

165.   As such, Iran's provision of material military and economic support to JAM, Saraya al-Salam, and Muqtada al-Sadr is intentional, wanton, and willful, with the understanding that violence against Americans such as Amr is an expected and welcomed result of such support.

166.   As a direct and proximate result of Iran's willful, wrongful, and intentional acts, Amr was taken hostage and tortured.

167.   As a direct and proximate result of Iran's actions, Amr endured severe pain and suffering.

168.   As a direct and proximate result of Iran's actions, Brenda Mohamed, Lori Wendel, Megan Martin, and Drew Rowe have experienced significant solatium damages including, but not limited to, severe mental anguish and the harm caused by the loss of Amr's society and comfort.

169.   Iran's continuing provision of material support to those willing to commit murder, hostage taking and torture is criminal, outrageous, extreme, wanton, willful, malicious, and a threat to the public warranting an award of punitive damages.

170.   Such conduct violates 28 U.S.C. § 1605A.

171.   A private right of action is established under 28 U.S.C. § 1605A(c) for violations of that section leading to injuries that "may include economic damages, solatium, pain and suffering, and punitive damages."

## COUNT IV – ACTS OF INTERNATIONAL
## TERRORISM AGAINST RUSSELL, WAIEL, AND AMR
## (18 U.S.C. § 2333(a))

172.    Plaintiffs repeat and re-allege each allegation of the foregoing paragraphs as if fully set forth herein.

173.    Title 18, Section 2331 defines "international terrorism" for the purposes of this suit. The hostage taking and torture of Russell, Waiel, and Amr meets all aspects of that definition by:

      a.    Involving violent acts that would be criminal violations if committed within the jurisdiction of the United States. 18 U.S.C. § 2331(1)(A);

      b.    Intending to intimidate and coerce the civilian population of the United States. 18 U.S.C. § 2331(1)(B)(i);

      c.    Intending to influence the foreign policy of the United States by intimidation and coercion. 18 U.S.C. § 2331(1)(B)(ii);

      d.    Intending to affect the conduct of the United States government through the use of kidnapping. 18 U.S.C. § 2331(1)(B)(iii); and

      e.    Transcending national boundaries through a clear intention to intimidate and coerce individuals within the United States. 18 U.S.C. § 2331(1)(C).

174.    Muqtada al-Sadr, in his role as founder and leader of Saraya al-Salam, knowingly and willfully directed, caused, and participated in the hostage taking and torture of Russell, Waiel, and Amr.

175.    By engaging in these activities, Muqtada al-Sadr intended to initiate acts of international terrorism against Russell, Waiel, and Amr, and to coerce and intimidate individuals within the government and general populace of the United States.

176.    Such conduct violates 18 U.S.C. § 2333(a).

177.    Russell, Waiel, and Amr were severely damaged as a direct and proximate result of Muqtada al-Sadr's willful, wrongful, and intentional acts of international terrorism.

178.    Therefore, Muqtada al-Sadr is responsible for threefold the damages suffered by Russell, Waiel, and Amr, and the cost of this suit, including attorney's fees.

## COUNT V – THE PROVISION OF MATERIAL SUPPORT FOR THE ACTS OF INTERNATIONAL TERRORISM AGAINST RUSSELL, WAIEL, AND AMR (18 U.S.C. § 2339A)

179.    Plaintiffs repeat and re-allege each allegation of the foregoing paragraphs as if fully set forth herein.

180.    Muqtada al-Sadr provided material support to Saraya al-Salam, knowing and intending that such support would be used toward acts of international terrorism.

181.     Such material support included, but is not limited to, the provision of tangible property, currency, lodging, training, expert advice and assistance, facilities, weapons, personnel, and transportation.

182.    Such conduct violates 18 U.S.C. § 2339A.

183.    Russell, Waiel, and Amr were damaged as a direct and proximate result of Muqtada al-Sadr's willful, wrongful, and intentional provision of material support towards acts of international terrorism.

184.    Therefore, Muqtada al-Sadr is responsible for threefold the damages suffered by Russell, Waiel, and Amr, and the cost of this suit, including attorney's fees.

## COUNT VI – CONSPIRACY TO COMMIT ASSAULT AND BATTERY AGAINST RUSSELL, WAIEL, AND AMR

185.    Plaintiffs repeat and re-allege each allegation of the foregoing paragraphs as if fully set forth herein.

186.    Saraya al-Salam, acting through its members, is responsible for numerous acts of assault and battery upon Russell, Waiel, and Amr during their period of confinement and torture.

187.    Muqtada al-Sadr, in his role as founder and leader of Saraya al-Salam, knowingly and willfully conspired to direct, cause, and bring about these acts of assault and battery.

188.    By engaging in this conspiracy, Muqtada al-Sadr intended to initiate harmful or offensive contact with Russell, Waiel, and Amr, without their consent, and to otherwise create in Russell, Waiel, and Amr the apprehension of impending force.

189.    Such conduct included intentionally and repeatedly threatening the lives of Russell, Waiel, and Amr, threatening and inducing bodily injury, and repeated physical attacks.

190.    Therefore, Muqtada al-Sadr is responsible for the damages suffered by Russell, Waiel, and Amr as a direct and proximate result of these acts of assault and battery.

191.    Because the conspiracy to commit assault and battery was done in a willful and wanton manner, showing a conscious disregard for the rights of others, Russel, Waiel, and Amr request an additional award of punitive damages.

### COUNT VII – CONSPIRACY TO COMMIT FALSE IMPRISONMENT AGAINST RUSSELL, WAIEL, AND AMR

192.    Plaintiffs repeat and re-allege each allegation of the foregoing paragraphs as if fully set forth herein.

193.    Saraya al-Salam, acting through its members, is responsible for falsely imprisoning Russell, Waiel, and Amr by taking them hostage in January 2016.

194.    This hostage taking was completed by the intentional restriction of the freedom of movement of Russel, Waiel, and Amr through the use of force, words, and acts to which Russell, Waiel, and Amr reasonably believed they must submit.

195.    Muqtada al-Sadr, in his role as founder and leader of Saraya al-Salam, knowingly and willfully conspired to direct, cause, and bring about these acts of false imprisonment.

196.    By engaging in this conspiracy, Muqtada al-Sadr intended to cause Russell, Waiel, and Amr to be taken hostage and falsely imprisoned against their will.

197.    Therefore, Muqtada al-Sadr is responsible for the damages suffered by Russell, Waiel, and Amr as a direct and proximate result of these acts of false imprisonment.

198.    Because this conspiracy to commit false imprisonment was done in a willful and wanton manner, showing a conscious disregard for the rights of others, Russel, Waiel, and Amr request an additional award of punitive damages.

## COUNT VIII – CONSPIRACY TO COMMIT INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS AGAINST ALL PLAINTIFFS

199.    Plaintiffs repeat and re-allege each allegation of the foregoing paragraphs as if fully set forth herein.

200.    Saraya al-Salam's use of confinement, physical abuse, torture, intimidation, and isolation was intentional and reckless, extreme and outrageous, and caused Russell, Waiel, and Amr severe emotional distress.

201.    The treatment of Russell, Waiel, and Amr violated acceptable norms of humane treatment under the laws of the United States and International Law, thereby qualifying as extreme and outrageous.

202.    These actions severely impacted Plaintiffs emotionally and psychologically due to the abuses and the fear for the safety of intimately connected family members, notwithstanding the long-term consequences thereof.

203.    Muqtada al-Sadr, in his role as founder and leader of Saraya al-Salam, knowingly and willfully conspired to direct, cause, and bring about these acts of intentional infliction of emotional distress.

204.    The act of hostage taking is not only directed at those taken hostage, but is specifically intended to evince terror, apprehension, and distress from the loved-ones and countrymen of the victims. In undertaking a conspiracy to commit these acts, Muqtada al-Sadr intended to inflict, and did in fact succeed in inflicting, extreme emotional distress upon the immediate families of Russell, Waiel, and Amr. Furthermore, regardless of his intention, Muqrada al-Sadr acted with reckless disregard as to the impact of his actions and reasonably should have known the likely effect of such hostage taking on those closest to the victims.

205.    Therefore, Muqtada al-Sadr is responsible for the damages suffered by Plaintiffs as a direct and proximate result of this intentional infliction of emotional distress.

206.    Because this conspiracy to commit intentional infliction of emotional distress was done in a willful and wanton manner, showing a conscious disregard for the rights of others, Plaintiffs request an additional award of punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that the Court grant judgment against the Islamic Republic of Iran, on Counts I, II, and III:

For Count I, a total sum of $321,810,000, allocated accordingly:

a.  Damages for confinement of and attendant loss of liberty for Russell Frost for a thirty-one (31) day period in the amount of $310,000;

b.  Damages for pain and suffering, including torture, experienced by Russell in the amount of $10,000,000;

   c.  Solatium damages in a total amount of $11,500,000, comprised of the following sums:

- $4,000,000 on behalf of Tammie Frost, wife of Russell;

- $2,500,000 on behalf of Amanda Doss, stepdaughter of Russell;

- $2,500,000 on behalf of Crystal Frost, daughter of Russell;

- $2,500,000 on behalf of M.F., daughter of Russell;

   d.  Punitive damages on behalf of Russell in the amount of $300,000,000; and

   e.  Such other and further relief as the Court may determine to be just and equitable under the circumstances.

For Count II, a total sum of $329,310,000, allocated accordingly:

   a.  Damages for confinement of and attendant loss of liberty for Waiel El-Maadawy for a thirty-one (31) day period in the amount of $310,000;

   b.  Damages for pain and suffering, including torture, experienced by Waiel in the amount of $10,000,000;

   c.  Solatium damages in a total amount of $19,000,000, comprised of the following sums:

- $4,000,000 on behalf of BilQis Aidara, fiancée and now wife of Waiel;

- $2,500,000 on behalf of A.G, daughter of Waiel;

- $2,500,000 on behalf of M.E., son of Waiel;

- $2,500,000 on behalf of G.E., son of Waiel;

- $2,500,000 on behalf of Zeinab El-Maadawy, mother of Waiel;

- $1,250,000 on behalf of Ihab El-Maadawy, brother of Waiel;

- $1,250,000 on behalf of Tamer El-Maadawy, brother of Waiel;

- $1,250,000 on behalf of Mohammed El-Maadawy, brother of Waiel;

- $1,250,000 on behalf of Mustafa El-Maadawy, brother of Waiel;

d. Punitive damages on behalf of Waiel in the amount of $300,000,000; and

e. Such other and further relief as the Court may determine to be just and equitable under the circumstances.

For Count III, a total sum of $321,810,000 allocated accordingly:

a. Damages for confinement of and attendant loss of liberty for Amr Mohamed for a thirty-one (31) day period in the amount of $310,000;

b. Damages for pain and suffering, including torture, experienced by Amr in the amount of $10,000,000;

c. Solatium damages in a total amount of $11,500,000, comprised of the following sums:

- $4,000,000 on behalf of Brenda Mohamed, wife of Amr;

- $2,500,000 on behalf of Lori Wendel, stepdaughter of Amr;

- $2,500,000 on behalf of Megan Martin, stepdaughter of Amr;

- $2,500,000 on behalf of Drew Rowe, stepson of Amr;

d. Punitive damages on behalf of Amr in the amount of $300,000,000; and

e. Such other and further relief as the Court may determine to be just and equitable under the circumstances.

WHEREFORE, Plaintiffs pray that the Court grant judgment against Muqtada al-Sadr on Counts IV through VIII:

For the intentional, willful, and wanton acts of international terrorism, the provision of material support for international terrorism, and for the conspiracy to commit assault, battery,

false imprisonment, and intentional infliction of emotional distress, Plaintiffs pray for an award

of compensatory damages in the amount of $72,000,000 and punitive damages in the amount of

$144,000,000, for a total award of $216,000,000, divided accordingly:

a.  Russell Frost:
-   $10,000,000 in compensatory damages; and
-   $20,000,000 in punitive damages.
b.  Tammie Frost:
-   $4,000,000 in compensatory damages; and
-   $8,000,000 in punitive damages.
c.  Amanda Doss:
-   $2,500,000 in compensatory damages; and
-   $5,000,000 in punitive damages.
d.  Crystal Frost:
-   $2,500,000 in compensatory damages; and
-   $5,000,000 in punitive damages.
e.  M.F.:
-   $2,500,000 in compensatory damages; and
-   $5,000,000 in punitive damages.
f.  Waiel El-Maadawy:
-   $10,000,000 in compensatory damages; and
-   $20,000,000 in punitive damages.
g.  BilQis Aidara:
-   $4,000,000 in compensatory damages; and
-   $8,000,000 in punitive damages.
h.  A.G.:
-   $2,500,000 in compensatory damages; and
-   $5,000,000 in punitive damages.
i.  M.E.:
-   $2,500,000 in compensatory damages; and
-   $5,000,000 in punitive damages.
j.  G.E.:
-   $2,500,000 in compensatory damages; and
-   $5,000,000 in punitive damages.
k.  Zeinab El-Maadawy:
-   $2,500,000 in compensatory damages; and
-   $5,000,000 in punitive damages.
l.  Ihab El-Maadawy:
-   $1,250,000 in compensatory damages; and
-   $2,500,000 in punitive damages.
m.  Tamer El-Maadawy:
-   $1,250,000 in compensatory damages; and
-   $2,500,000 in punitive damages.

n.  Mohammed El-Maadawy:
  - $1,250,000 in compensatory damages; and
  - $2,500,000 in punitive damages.
o.  Mustafa El-Maadawy
  - $1,250,000 in compensatory damages; and
  - $2,500,000 in punitive damages.

p.  Amr Mohamed:
  - $10,000,000 in compensatory damages; and
  - $20,000,000 in punitive damages.
q.  Brenda Mohamed:
  - $4,000,000 in compensatory damages; and
  - $8,000,000 in punitive damages.
r.  Lori Wendel:
  - $2,500,000 in compensatory damages; and
  - $5,000,000 in punitive damages.
s.  Megan Martin:
  - $2,500,000 in compensatory damages; and
  - $5,000,000 in punitive damages.
t.  Drew Rowe:
  - $2,500,000 in compensatory damages; and
  - $5,000,000 in punitive damages.


PLAINTIFFS DEMAND A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.


Dated:  April, 4, 2017                    Respectfully submitted,


                              _____/s/ Kevin A. Hoffman_____
                              Kevin A. Hoffman (D.C. Bar No. 1044559)
                              SINGER LEGAL GROUP, LLC
                              1209A Laskin Road
                              Virginia Beach, VA 23451
                              Phone: (757) 301-9995
                              Fax: (757) 233-1084
                              Email: khoffman@singerlegal.net