**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| TAMMIE FROST *et al.*,<br><br>    *Plaintiffs*,<br>    v.<br><br>ISLAMIC REPUBLIC OF IRAN *et al.*,<br><br>    *Defendants*. | Civil Action No. 17-603 (TJK) |

**MEMORANDUM OPINION AND ORDER**

In January 2016, Waiel El-Maadawy, Amr Mohamed, and Russell Frost—U.S. citizens serving as private defense contractors in Baghdad, Iraq—were kidnapped and detained for a month by the militant group Saraya al-Salam. That group was controlled by Muqtada al-Sadr, an Iraqi insurgent, politician, and cleric, and supported by Iran. El-Maadawy, Mohamed, and Frost sued Iran for its material support for their kidnapping under the terrorism exception to the Foreign Sovereign Immunities Act. After proper service and an entry of default, they moved for default judgment against Iran. For the reasons explained below, the Court will grant Plaintiffs' Motions for Default Judgment (ECF Nos. 27, 32).

## I.    Legal Background

The Foreign Sovereign Immunities Act (FSIA), 28 U.S.C. § 1602 *et seq.*, provides a general grant of immunity to foreign governments in U.S. courts, *id.* § 1604. The FSIA also includes many exceptions to that immunity. *See id.* §§ 1605, 1605A. The state-sponsored terrorism exception, *id.* § 1605A, "create[s] a judicial forum for compensating the victims of terrorism, and in so doing [may] punish foreign states who have committed or sponsored such acts and deter them from doing so in the future." *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 88–89 (D.C. Cir. 2002). This exception furnishes federal courts with

subject-matter jurisdiction to hear plaintiffs' claims and provides plaintiffs a cause of action. *See* 28 U.S.C. § 1605A(a)(1), (c).

## II.     Procedural Background

El-Maadawy, Mohamed, and Frost, along with several of their family members, (collectively, "Plaintiffs") filed this suit in April 2017. They brought three counts under 28 U.S.C. § 1605A(c) against the Islamic Republic of Iran—one for the torture and hostage-taking of each of the three victims.[1] ECF No. 1 at 22–25. That June, pursuant to 28 U.S.C. § 1608(a)(3), the Clerk of the Court mailed a copy of the summons and complaint, along with a translation of each, to the head of Iran's foreign ministry through an international courier. ECF No. 10. The next month, pursuant to 28 U.S.C. § 1608(a)(4), the Clerk sent the same materials to the State Department to effectuate diplomatic service. ECF No. 12. In October of that year, Iran was served through diplomatic note. ECF No. 13.

Iran never responded to the complaint. In January 2018, at Plaintiffs' request, the Clerk of the Court entered default against Iran. ECF Nos. 14, 15. Plaintiffs filed an amended complaint the next month, containing the same substantive claims as their original one.[2] ECF No. 17. In June 2018, all Plaintiffs except for Brenda Mohamed, Drew Rowe, Lori Wendel, and

---

[1] Plaintiffs also sued, and later dismissed, al-Sadr as an individual defendant. ECF No. 47.

[2] Because Plaintiffs amended their complaint after service was complete, the Court ordered them to address whether they were required to re-serve Iran with their amended complaint. *See* July 25, 2018 Minute Order. The Court is satisfied that Plaintiffs did not need to re-serve Iran with the amended complaint because their amendments were not substantial and Iran was on notice of the allegations against it. *See* ECF No. 30 at 2–3; *see also Blais v. Islamic Republic of Iran*, 459 F. Supp. 2d 40, 46 (D.D.C. 2006) ("Even were these changes characterized as substantive, [the defendants] had fair notice of the allegations and relief sought, because the changes to the third amended complaint were not substantial. . . . Accordingly, this Court will not require plaintiff to serve the amended complaint." (citation omitted)).

Megan Martin moved for default judgment against Iran. ECF Nos. 27, 28. In August 2018, the remaining Plaintiffs, represented by separate counsel, did the same. ECF No. 32.

In February 2019, the Court held a two-day evidentiary hearing on Plaintiffs' motions for default judgment. The Court received testimony from El-Maadawy, Mohamed, and Frost's widow, as well as two expert witnesses. The first, Stuart Bowen, served as Special Inspector General for Iraq Reconstruction. The Court qualified him as an expert on the history of Shia militias in Iraq, including al-Sadr's role in those militias, and Iranian influence in Iraq. The second, Michael Pregent, is a senior fellow at the Hudson Institute, as well as a former intelligence officer and visiting fellow at the National Defense University. Pregent served in Iraq as an embedded advisor to the Iraqi government and as an adjunct fellow and contributor to the Chief of Staff of the U.S. Army's Operation Iraqi Freedom Study Group, which researched and wrote an operational history of the Army's experience in Iraq from 2003 to 2011. The Court qualified him as an expert on, among other things, Iranian influence in Iraq.

## III. Findings of Fact

In FSIA cases, the Court may "accept as true the plaintiff's uncontroverted evidence." *Elahi v. Islamic Republic of Iran*, 124 F. Supp. 2d 97, 100 (D.D.C. 2000). Although the Federal Rules of Evidence apply, "the Supreme Court has 'recognize[d] very realistically' that courts have the authority—indeed, we think, the obligation—to 'adjust [evidentiary requirements] to . . . differing situations.'" *Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1048 (D.C. Cir. 2014) (alterations in original) (quoting *Bundy v. Jackson*, 641 F.2d 934, 951 (D.C. Cir. 1981)). "This lenient standard is particularly appropriate for a FSIA terrorism case, for which firsthand evidence and eyewitness testimony is difficult or impossible to obtain from

an absent and likely hostile sovereign." *Owens v. Republic of Sudan*, 864 F.3d 751, 785 (D.C. Cir. 2017).

Based on the evidence received at the hearing, the Court finds that Iran provided funding, weapons and training to Saraya al-Salam to advance its goals in Iraq, including through torture and hostage-taking; Saraya al-Salam carried out the kidnapping and mistreatment of El-Maadawy, Mohamed, and Frost; and it did so to increase Iran's leverage over the imminent implementation of the Joint Comprehensive Plan of Action (JCPOA), commonly known as the Iran nuclear deal.

### A. Iran's Support for Shia Militias in Iraq, Including Saraya al-Salam

Since Iran's revolution in 1979, it has operated the Islamic Revolutionary Guard Corps (IRGC), a branch of its armed forces.[3] Rough Tr. Feb. 12 at 54–55 (Bowen);[4] *see also Flanagan v. Islamic Republic of Iran*, 87 F. Supp. 3d 93, 104–05 (D.D.C. 2015).[5] Iran projects its

---

[3] In 1984, the State Department designated Iran as a state sponsor of terrorism. *See* State Sponsors of Terrorism, U.S. Dep't of State, https://www.state.gov/state-sponsors-of-terrorism/ (last visited May 24, 2019).

[4] Citations to the February hearing are to a rough draft of the transcript, since no final transcript is yet available. Discrepancies may exist between page numbers in the rough draft and the final transcript. The final transcript will be posted on the docket when available.

[5] Courts may "judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). Under this Rule, the Court may take judicial notice of evidence presented in prior FSIA proceedings. *Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163, 172 (D.D.C. 2010). "Taking judicial notice of the facts, though, does not mean automatically 'accepting the truth of the earlier court's findings and conclusions.' Instead, courts in this district rely on the evidence presented in the earlier litigation and make their own independent findings of fact based on that evidence . . . ." *Opati v. Republic of Sudan*, 60 F. Supp. 3d 68, 73 (D.D.C. 2014) (citation omitted) (quoting *Rimkus*, 750 F. Supp. 2d at 172). As noted throughout this opinion, the Court takes judicial notice of evidence reflected in findings

influence and advances its interests through one of the IRGC's components, the Quds Force, which supports militias beyond its borders. Rough Tr. Feb. 12 at 56 (Bowen). The Quds Force, although it operates independently from the rest of the IRGC, is responsible to and directed by the Supreme Leader of Iran. *Id.*; *see also Flanagan*, 87 F. Supp. 3d at 104–05 ("[The Quds Force] reports directly to the Supreme Leader, rather than being subordinate to the IRGC command structure.").

Shia and Sunni Islam are the two major branches of that religion, both of which claim followers in Iraq. Rough Tr. Feb. 12 at 58–59 (Bowen). Iran is mainly Shia, and because it aims to promote Shia power and influence relative to other religious groups, the militias that the Quds Force supports tend to be Shia as well. Rough Tr. Feb. 13 at 92 (Pregent); *Flanagan*, 87 F. Supp. 3d at 104. Over the years, one of the primary beneficiaries of Iran's support has been the Shia Lebanon-based terrorist organization Hezbollah. *See* Rough Tr. Feb. 12 at 63–64 (Bowen); *see Elahi*, 124 F. Supp. 2d at 101 n.5 (describing Hezbollah as Shia); *see also Ben-Rafael v. Islamic Republic of Iran*, 540 F. Supp. 2d 39, 44 (D.D.C. 2008) ("Iran played a pre-eminent role in the creation of Hezbollah by providing political, material, and financial assistance, including the funding of Hezbollah since the mid-1980's." (internal quotation marks omitted)). Hezbollah acts mainly at the direction of Iran. Rough Tr. Feb. 12 at 63 (Bowen); *see also Peterson v. Islamic Republic of Iran*, 264 F. Supp. 2d 46, 51 (D.D.C. 2003) ("Hezbollah is

---

of fact in other cases in this Circuit about the flow of weapons, training, and money from Iran to the terrorist group Hezbollah and to Shia militias in Iraq. Those cases include *Fritz v. Islamic Republic of Iran*, 320 F. Supp. 3d 48 (D.D.C. 2018), *Flanagan v. Islamic Republic of Iran*, 87 F. Supp. 3d 93 (D.D.C. 2015), *Ben-Rafael v. Islamic Republic of Iran*, 540 F. Supp. 2d 39, 44 (D.D.C. 2008), and *Peterson v. Islamic Republic of Iran*, 264 F. Supp. 2d 46, 51 (D.D.C. 2003). The Court relies on that evidence, along with related evidence received in this case, to make its own independent findings of fact. *See Opati*, 60 F. Supp. 3d at 73.

largely under Iranian orders. It's almost entirely acting . . . under the order of the Iranians and being financed almost entirely by the Iranians."). The Quds Force trains, equips, and finances Shia militias in Iraq and throughout the Middle East both directly and through Hezbollah. Rough Tr. Feb. 12 at 157–58 (El-Maadawy); Rough Tr. Feb. 13 at 73, 75, 89, 119–20 (Pregent); *see also Flanagan*, 87 F. Supp. 3d at 105.

Al-Sadr is a prominent Shia insurgent, politician, and cleric in Iraq who has received funding and other support from Iran since at least the early 2000s. Rough Tr. Feb. 12 at 71, 134–35 (Bowen); *see also Fritz v. Islamic Republic of Iran*, 320 F. Supp. 3d 48, 62 (D.D.C. 2018). The Quds Force, directly and through Hezbollah, has provided him funding and military support, which he has used to create and sustain various Shia militia groups. Rough Tr. Feb. 12 at 67, 77, 85 (Bowen). Throughout the U.S. presence in Iraq after 2003, those militias took different forms and names, depending on Iran's goals at the time. *Id.* at 91–92; Rough Tr. Feb. 13 at 117–18 (Pregent); *see also Fritz*, 320 F. Supp. 3d at 62.

Al-Sadr formed Saraya al-Salam to counter the influence of the Islamic State in Iraq and the Levant ("ISIS"), a rising Sunni terrorist group. Rough Tr. Feb. 12 at 97–98 (Bowen). Saraya al-Salam, like previous Sadrist Shia militias, received training, weapons, and money from Iran through Hezbollah and the Quds Force to advance Iran's interests in Iraq up through the time that El-Maadawy, Mohamed, and Frost were kidnapped. *Id.* at 56–63; Rough Tr. Feb. 13 at 73, 75, 89, 115–20 (Pregent). And Iran-sponsored militias in Iraq routinely use these resources to further Iran's goals through kidnappings and violence. *Fritz*, 320 F. Supp. 3d at 62. Saraya al-Salam made its headquarters in the Sadr City neighborhood of Baghdad and, at the time of the kidnapping, it exerted exclusive control over that area. Rough Tr. Feb. 12 at 104 (Bowen).

**B.** **Saraya al-Salam's Kidnapping of El-Maadawy, Mohamed, and Frost**

On January 15, 2016, El-Maadawy, Mohamed, and Frost were working in Baghdad as military contractors, training Iraqi security forces.[6]  Rough Tr. Feb. 12 at 148, 150 (El-Maadawy).  El-Maadawy and Mohamed spoke fluent Arabic, but Frost did not.  *Id.* at 166–67.  In need of another translator for their team, the three men met a candidate in Baghdad, hired him, and then agreed to join him at his apartment for tea.  *Id.* at 171–74.  Although El-Maadawy did not realize it at the time, the apartment was in Sadr City.  *Id.* at 175.

When El-Maadawy, Mohamed, and Frost tried to leave the translator's apartment, they found dozens of armed men waiting for them outside; one stepped forward to block their exit.  *Id.* at 178–79.  The man received a call on his cell phone, which lit up to reveal a picture of al-Sadr.  *Id.* at 179.  To El-Maadawy, this meant that the armed men were part of a Shia militia rather than ISIS.  As a result, he believed that surrendering was the group's best chance to survive.  *Id.* at 183.  To that end, El-Maadawy handed over his weapon and persuaded Mohamed

---

[6] El-Maadawy, Mohamed, and Frost were U.S. citizens at that time, and their Plaintiff-family members are all now U.S. citizens.  Rough Tr. Feb. 12 at 142–43 (El-Maadawy); Rough Tr. Feb. 13 at 9 (Mohamed); Rough Tr. Feb. 13 at 7–8 (Frost); ECF No. 28-1, Declaration of Waiel El-Maadawy, ¶ 4; ECF No. 28-3, Declaration of Amr Mohamed, ¶ 2; ECF No. 28-8, Declaration of Tammie Frost, ¶ 3; ECF No. 28-8, Declaration of Amanda Frost, ¶ 3; ECF No. 28-8, Declaration of Crystal Frost, ¶ 3; ECF No. 28-8, Declaration of M.F., ¶ 3; ECF No. 28-9, Declaration of Zeinab El-Maadawy, ¶ 3; ECF No. 28-9, Declaration of Ihab El-Maadawy, ¶ 3; ECF No. 28-9, Declaration of Mohammed El-Maadawy, ¶ 3; ECF No. 28-9, Declaration of Mustafa El-Maadawy, ¶ 3; ECF No. 28-9, Declaration of Tamer El-Maadawy, ¶ 3; ECF No. 28-9, Declaration of Latasha El-Maadawy, ¶ 3; ECF No. 28-9, Declaration of BilQis Aidara Adjei, ¶ 3; ECF No. 32-2, Declaration of Brenda Mohamed, ¶ 3; ECF No. 32-3, Declaration of Lori Wendel, ¶ 3; ECF No. 32-4, Declaration of Megan Martin, ¶ 3; ECF No. 32-5, Declaration of Drew Rowe, ¶ 3.  Latasha El-Maadawy is the mother of Plaintiffs A.G., M.E., and G.E., the latter two of whom are her biological children with Waiel El-Maadawy.  Although Latasha El-Maadawy asserts only her own U.S. citizenship, the Court accepts this as satisfactory evidence that her children are also U.S. citizens.

and Frost to do likewise. *Id.* at 182–83; Rough Tr. Feb. 13 at 22 (Mohamed). The armed men then forced them into vans. Rough Tr. Feb. 12 at 183 (El-Maadawy).

El-Maadawy, Mohamed, and Frost were driven to a nearby building in Sadr City and interrogated about who they were and what they were doing in Iraq. *Id.* at 185. There were portraits of al-Sadr, as well as the flags of both Saraya al-Salam and Iran, on the walls. Rough Tr. Feb. 13 at 23–24 (Mohamed); *see also* Rough Tr. Feb. 12 at 184 (El-Maadawy). The three of them were then forced back into the vans and driven to another compound, also in Sadr City. Rough Tr. Feb. 12 at 185 (El-Maadawy); Rough Tr. Feb. 13 at 25 (Mohamed). They were blindfolded tightly, handcuffed around their wrists and ankles, and crammed into cells so small they could not stand up or lie down. Rough Tr. Feb. 12 at 191–93 (El-Maadawy); Rough Tr. Feb. 13 at 28 (Mohamed). El-Maadawy estimated that his cell was only about four feet high and four feet wide. Rough Tr. Feb. 12 at 194–95 (El-Maadawy).

El-Maadawy, Mohamed, and Frost would remain in Saraya al-Salam's captivity for the next month. During the first week, El-Maadawy was kept naked and blindfolded, his hands and feet bound behind his back. *Id.* at 195–196, 204. His captors sometimes allowed him to use the bathroom. *Id.* at 195. One time, though, his shackles caused him to fall into the toilet, and his captors forced him to lick feces from his hands. *Id.* at 196. After a week, his captors gave him cardboard to sleep on, some clothes, and a blanket. *Id.* at 197. But they continued to keep his shackles so tight that his hands and feet turned purple. *Id.* at 205. El-Maadawy was interrogated several times every day, and he was beaten when his captors were dissatisfied with his answers. *Id.* at 196. His captors often struck him with the butts of their rifles, kicked him, and punched him. *Id.* at 199, 218–19. They tried to cut his fingers off with shears, but he resisted by balling

up his fist until they gave up.  *Id.* at 199.  They put him through mock executions by pressing an unloaded gun against his head and pulling the trigger.  *Id.* at 203–04.  Twice, they used a car battery to inflict electric shocks on him.  *Id.* at 207–08.  And at times, they held knives and machetes against his throat, threatening to behead him and upload the video to the internet so his children could see it.  *Id.* at 204.

Mohamed was also stuffed into a tiny cell and provided cardboard on which to sleep. Rough Tr. Feb. 13 at 29–30 (Mohamed).  He was shackled and blindfolded during most of his captivity.  *Id.* at 32.  Twice his captors hung him from the wall by his shackles—one time from those binding his hands, and another time from those binding his feet.  *Id.* at 35.  Mohamed also endured two mock executions in which his captors placed unloaded guns against his head and pulled the trigger.  *Id.* at 34.  His captors beat him many times, including with a pipe.  *Id.* at 40, 51.  He shared a cell with Frost for part of their captivity, and their captors gave them both water bottles filled with urine to drink.  *Id.* at 37–39, 53.  Mohamed heard Frost being beaten, too, and often heard him groan with pain.  *Id.* at 53, 60.  Their captors bound Frost with flex cuffs cinched so tightly around his hands and feet that his extremities turned blue.  *Id.* at 54.

Throughout their captivity, El-Maadawy and Mohamed were interrogated about American weapons, military strategy, and intentions toward Iraq and Iran.  Rough Tr. Feb. 12 at 200–01, 206 (El-Maadawy); Rough Tr. Feb. 13 at 41 (Mohamed).  Shortly before they were released, their captors forced all three men to record a video in which they wore American military-style uniforms, sat in front of Saraya al-Salam flags, thanked al-Sadr for their release

and warned the United States not to invade Iraq again.[7]  Rough Tr. Feb. 12 at 201–03 (El-Maadawy); Rough Tr. Feb. 13 at 42 (Mohamed).

On February 16, 2016, El-Maadawy, Mohamed, and Frost were removed from their cells and driven to a meeting with Iraqi government officials.  Rough Tr. Feb. 12 at 211–12 (El-Maadawy).  Then U.S. soldiers arrived and took them into custody.  *Id.* at 213–14.  They were flown to a U.S. military base in Germany for medical treatment and debriefing, and after a week or so, back to the United States.

All three men continued to suffer from pain, flashbacks, and other medical problems because of their treatment in captivity.  Rough Tr. Feb. 13 at 44–49 (Mohamed); *see* Rough Tr. Feb. 12 at 218–20 (El-Maadawy).  In November 2017, Frost passed away, still suffering from injuries to his feet and other after-effects from his detention.  Rough Tr. Feb. 13 at 50 (Mohamed).

---

[7] Both El-Maadawy and Mohamed testified that during their interrogations, their captors told them directly that they were members of Saraya al-Salam and that they had received training and weapons from Iran.  *See* Rough Tr. Feb. 12 at 201 (El-Maadawy); Rough Tr. Feb. 13 at 28 (Mohamed).  The Court need not decide whether these statements are admissible under the Federal Rules of Evidence for purposes of this proceeding.  In light of the other evidence in the record, the Court need not—and does not—rely on them for any purpose, including to conclude that Saraya al-Salam kidnapped the three men.  Plaintiffs offered ample other evidence of that.  The flags of both Saraya al-Salam and Iran were present in various buildings in which they were held.  Rough Tr. Feb. 12 at 184 (El-Maadawy); Rough Tr. Feb. 13 at 23–24 (Mohamed).  Pictures of al-Sadr were prominently displayed in those same buildings, and another photo of al-Sadr appeared on the phone of one of their kidnappers.  Rough Tr. Feb. 12 at 179, 184 (El-Maadawy); Rough Tr. Feb. 13 at 24 (Mohamed).  The men were forced to record a video thanking al-Sadr for their impending release.  Rough Tr. Feb. 12 at 201–03 (El-Maadawy); Rough Tr. Feb. 13 at 42 (Mohamed).  And Saraya al-Salam was the only group that exercised control over Sadr City at the time.  Rough Tr. Feb. 12 at 104 (Bowen); *see also* Rough Tr. Feb. 13 at 26 (Mohamed).

### C. The Purpose Behind the Kidnapping

The JCPOA was an agreement between Iran, the United States, and other countries to lift sanctions against Iran in exchange for limits on Iran's nuclear program. Rough Tr. Feb. 12 at 115 (Bowen). The JCPOA's implementation was a highly sensitive moment in the relationship between Iran and the United States in which Iran was jockeying for leverage. *Id.* at 115, 123. That implementation was scheduled within a day or so of Saraya al-Salam's kidnapping of El-Maadawy, Mohamed, and Frost. *Id.* at 130–31.

Both experts testified that in their opinion, Saraya al-Salam abducted El-Maadawy, Mohamed, and Frost to further Iran's objectives, and increase its political leverage, as the JCPOA's implementation drew near. The Court credits these opinions, which it found credible, considered, and persuasive.

Bowen testified that the kidnapping was intended to increase Iran's leverage over the negotiation and subsequent implementation of the JCPOA.[8] *Id.* at 128–34. He based his opinion on several factors. First, in his view, Iran and its proxies know that U.S. hostages are valuable bargaining chips because the United States places a high value on recovering its citizens if they are detained abroad. *Id.* at 131–32. Indeed, he noted, on the day the JCPOA was implemented, Iran released five American hostages. *Id.* at 117, 128. Second, to Bowen, the timing was telling. *Id.* at 134. The kidnapping of El-Maadawy, Mohamed, and Frost was the first abduction of U.S. citizens in Iraq in five years, and it came within a day or so of the JCPOA's implementation. *Id.*

---

[8] The jockeying between Iran and other parties to the JCPOA did not end on the day it was implemented. Rather, the agreement contemplated that disputes and compliance questions would arise, such that Iran would have opportunities to use the leverage that Bowen described well after that date. *See* Joint Comprehensive Plan of Action ¶¶ 36–37 (July 14, 2015), *available at* https://2009-2017.state.gov/documents/organization/245317.pdf.

at 130–31.  And just the week before, apparently in a similar effort, the IRGC had briefly

detained U.S. sailors whose boat had strayed into Iranian waters in the Persian Gulf.  *Id.* at 128–

29.  Third, Iran closely controls its proxies when it comes to their insurgent activities.  In

Bowen's view, a Shia militia in Iraq under the direction of al-Sadr would not have abducted an

American unless so directed by Iran.  *Id.* at 135–36.  And finally, Bowen relied on the U.S.

Intelligence Community's Worldwide Threat Assessment presented by then-Director of National

Intelligence James Clapper to the Senate Armed Services Committee on February 9, 2016—

during the very time the three men were being held.  ECF No. 49-1 at 1.  At that time, the

Intelligence Community assessed that Iran might "use American citizens detained when entering

Iranian territories as bargaining pieces to achieve financial or political concessions in line with

their strategic intentions."[9]  Exhibit 34, James Clapper, Worldwide Threat Assessment of the

U.S. Intelligence Community, Statement for the Record before Senate Armed Services

Committee, at 24.

Pregent testified similarly.  Rough Tr. Feb. 13 at 104–08 (Pregent).  In his view, the

abduction of El-Maadawy, Mohamed, and Frost was motivated either by Iranian leverage-

seeking against the United States in connection with the JCPOA's implementation, or by the

IRGC or Quds Force's desire to compel the United States to withdraw from the agreement

---

[9] During the hearing, Plaintiffs moved to admit Director Clapper's testimony under the public records exception to the rule against hearsay, and afterward, submitted an affidavit by Bowen in support of their motion.  *See* ECF No. 49.  The Court need not resolve whether this testimony is admissible under this or any other theory, though; it is recounted here solely because it helped form the basis for Bowen's expert opinion.  *See Owens*, 864 F.3d at 789–90.  Similarly, to the extent that either expert relied on other potentially inadmissible evidence in reaching his opinion, the Court refers to that evidence solely "in order to explain why it admitted and credited" the opinion.  *Id.* at 790.

entirely. *Id.* at 107–08, 114–15. He, like Bowen, also based his opinion on the timing and boldness of the kidnapping and Iran's careful advancement of its interests through Shia militias in Iraq. *Id.* Pregent pointed out that the agreement had received a mixed reception in Iran, with some elements within the Iranian government, including the IRGC and the Quds Force, reportedly opposed to it. *Id.* at 104–05, 107–08. And, like Bowen, he noted that the IRGC had taken several actions widely interpreted as at least potentially intended to undermine the JCPOA, including briefly detaining the U.S. sailors the week before. *Id.* at 104–05.

## IV.  Conclusions of Law

The plaintiff bears the burden of production to establish subject-matter jurisdiction in an FSIA case. *Owens*, 864 F.3d at 784  "[I]f a plaintiff satisfies [her] burden of production and the defendant fails to present any evidence in rebuttal, then jurisdiction attaches." *Id.* Once the plaintiff has met her jurisdictional burden, "the plaintiff must 'establish' her right to relief, which does not 'relieve[] the sovereign of the duty to defend' but, nonetheless, requires that the plaintiff offer admissible evidence sufficient to substantiate the essential elements of her claim." *Fritz*, 320 F. Supp. 3d at 76 (alteration in original) (quoting *Owens*, 864 F.3d at 785–86). Generally, once a plaintiff has established that the court has subject-matter jurisdiction over her claims under the FSIA terrorism exception, she has established the elements of liability as well. *Id.* at 87.

The FSIA permits entry of default judgment where plaintiffs prove jurisdiction and liability "by evidence satisfactory to the court." 28 U.S.C. § 1608(e). "[T]he FSIA leaves it to the court to determine precisely how much and what kinds of evidence the plaintiff must provide." *Han Kim*, 774 F.3d at 1047. "In a FSIA default proceeding, a district court can find

that the evidence presented is satisfactory 'when the plaintiff shows "her claim has some factual basis," . . . even if she might not have prevailed in a contested proceeding.'" *Warmbier v. Democratic People's Republic of Korea*, 356 F. Supp. 3d 30, 43 (D.D.C. 2018) (quoting *Owens*, 864 F.3d at 785). This standard allows gaps in witnesses' first-hand knowledge to be filled with expert testimony about how a defendant government has acted in similar circumstances. *See Han Kim*, 774 F.3d at 1049 (upholding finding that North Korea tortured plaintiff, who had been sent to a forced labor camp, where only evidence was expert testimony that the government routinely tortured those in such camps).

As described below, the Court holds that it has subject matter jurisdiction over Plaintiffs' claims against Iran for its material support for Saraya al-Salam's torture and hostage-taking; it has personal jurisdiction over Iran; and Iran is liable for Plaintiffs' claims.

### A. Jurisdiction

#### 1. Subject-Matter Jurisdiction

The FSIA terrorism exception provides federal courts with subject-matter jurisdiction over cases "in which money damages are sought against a foreign state for personal injury or death that was caused by" an enumerated terrorist act. 28 U.S.C. § 1605A(a)(1). As threshold matters, however, the foreign state must have been "designated as a state sponsor of terrorism . . . or [been] so designated as a result of such act," *id.* § 1605A(a)(2)(A)(i)(I), and the "claimant or victim" must be either a U.S. national, a member of the U.S. armed forces, or an employee of the United States, performing on a contract awarded by the United States, *see id.* § 1605A(a)(2)(A)(ii)(I).

### a. State Sponsorship of Terrorism

The State Department designated Iran as a state sponsor of terrorism on January 19, 1984, and Iran has remained so designated since that time. *See* State Sponsors of Terrorism, U.S. Dep't of State, https://www.state.gov/state-sponsors-of-terrorism/ (last visited May 24, 2019). As a result, this element is satisfied. *See* 28 U.S.C. § 1605A(a)(2)(A)(i)(I).

### b. U.S. Citizenship

El-Maadawy and Mohamed testified that they were U.S. citizens at the time of their capture, and Frost's widow did the same for Frost. *See* Rough Tr. Feb. 12 at 142–43 (El-Maadawy); Rough Tr. Feb. 13 at 9 (Mohamed); Rough Tr. Feb. 13 at 7–8 (Frost). A U.S. citizen is a U.S. national for the purposes of the FSIA. 28 U.S.C. § 1605A(h)(5); 8 U.S.C. § 1101(a)(22). As a result, all three victims have the requisite connection to the United States. *See* 28 U.S.C. § 1605A(a)(2)(A)(ii)(I).

### c. Acts of Terrorism

The third element of subject-matter jurisdiction under the FSIA terrorism exception is that the foreign government must have committed at least one terrorist act enumerated in the statute, including "torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act . . . ." *Id.* § 1605A(a)(1). Plaintiffs allege that Iran provided material support for alleged acts of torture and hostage-taking by Saraya al-Salam. The Court will address torture, hostage-taking, and material support in turn.

### (i) Torture

In the FSIA context, the definition of "torture" is imported from the Torture Victim Protection Act. *Id.* § 1605A(h)(7). Under that statute,

(1) the term "torture" means any act, directed against an individual in the offender's custody or physical control, by which severe pain or suffering (other than pain or suffering arising only from or inherent in, or incidental to, lawful sanctions), whether physical or mental, is intentionally inflicted on that individual for such purposes as obtaining from that individual or a third person information or a confession, punishing that individual for an act that individual or a third person has committed or is suspected of having committed, intimidating or coercing that individual or a third person, or for any reason based on discrimination of any kind; and

(2) mental pain or suffering refers to prolonged mental harm caused by or resulting from—

(A) the intentional infliction or threatened infliction of severe physical pain or suffering;

(B) the administration or application, or threatened administration or application, of mind altering substances or other procedures calculated to disrupt profoundly the senses or the personality;

(C) the threat of imminent death; or

(D) the threat that another individual will imminently be subjected to death, severe physical pain or suffering, or the administration or application of mind altering substances or other procedures calculated to disrupt profoundly the senses or personality.

Torture Victim Protection Act of 1991, Pub. L. No. 102-256, 106 Stat. 73 (1992), *codified at* 28 U.S.C. § 1350 (note). The D.C. Circuit has clarified that the list of attendant purposes limits torture to "suffering [imposed] cruelly and deliberately, rather than as the unforeseen or unavoidable incident of some legitimate end." *Price*, 294 F.3d at 93.

Courts in this Circuit have long held that repeated beatings, threats, unsanitary conditions, and inadequate food and medical treatment in detention can meet this definition, both because these conditions are sufficiently severe, and because they support an inference of punishment for an illicit purpose. *See Hekmati v. Islamic Republic of Iran*, 278 F. Supp. 3d 145, 160–61 (D.D.C. 2017) (collecting cases). The D.C. Circuit has also held that torture includes "sustained systematic beating, application of electric currents to sensitive parts of the body, and

tying up or hanging in positions that cause extreme pain." *Price*, 294 F.3d at 92–93 (quoting S. Exec. Rep. No. 101-30, at 14 (1990)).

The Court has little trouble concluding that El-Maadawy, Mohamed, and Frost were subjected to torture. As in *Price*, El-Maadawy and Mohamed testified to being beaten repeatedly, Rough Tr. Feb. 12 at 199, 218–19 (El-Maadawy), Rough Tr. Feb. 13 at 40 (Mohamed); El-Maadawy testified to being shocked by electric currents, Rough Tr. Feb. 12 at 207–08 (El-Maadawy); and Mohamed testified to being hung by his shackles, Rough Tr. Feb. 13 at 35 (Mohamed). Both men were also held in cells so small they could not stand up or lie down, Rough Tr. Feb. 12 at 195, 204 (El-Maadawy), Rough Tr. Feb. 13 at 29–30 (Mohamed); and subjected to mock executions, Rough Tr. Feb. 12 at 203–04 (El-Maadawy), Rough Tr. Feb. 13 at 34 (Mohamed). El-Maadawy's captors threatened to behead him and upload the video to the internet so that his children could see it. Rough Tr. Feb. 12 at 204 (El-Maadawy). And this treatment caused them severe pain and long-lasting injuries. Rough Tr. Feb. 13 at 44–49 (Mohamed); *see* Rough Tr. Feb. 12 at 218–20 (El-Maadawy). El-Maadawy and Mohamed also testified about their captors' treatment of Frost. Although Mohamed was blindfolded during most of their captivity, he saw their captors force Frost to wear flex cuffs for extended periods that were so tight they caused his extremities to turn blue. Rough Tr. Feb. 13 at 54 (Mohamed). Mohamed also overheard Frost being beaten and groaning in pain. *Id.* at 53, 60. Frost, along with Mohamed, was given water bottles of urine to drink. *Id.* at 37–39, 53.

For all these reasons, the Court finds that the cruelty and duration of the three men's abuse was intended only to punish and intimidate them. They were the victims of "severe pain

and suffering" inflicted for no purpose attendant to a legitimate end, which qualifies their treatment as torture.

### (ii)    Hostage-Taking

The FSIA's definition of hostage-taking is imported from the International Convention Against the Taking of Hostages. *See* 28 U.S.C. § 1605A(h)(2). That definition reads,

> Any person who seizes or detains and threatens to kill, to injure or to continue to detain another person . . . in order to compel a third party . . . to do or abstain from doing any act as an explicit or implicit condition for the release of the hostage commits the offence of taking of hostages . . . within the meaning of this Convention.

International Convention Against the Taking of Hostages art. 1, U.N. GAOR, 34th Sess., Supp. No. 46, at 245, U.N. Doc. A/34/46 (1979). Hostage-taking thus has two elements: the abduction or detention, and the purpose behind it. *Simpson v. Socialist People's Libyan Arab Jamahiriya*, 326 F.3d 230, 234–35 (D.C. Cir. 2003) ("The essential element of the hostage-taking claim is that the intended purpose of the detention be to accomplish the sort of third-party compulsion described in the [C]onvention."). Even so, purported hostage-takers need not have communicated their purpose to the third party whose behavior they intend to compel. *Simpson v. Socialist People's Libyan Arab Jamahiriya*, 470 F.3d 356, 360–61 (D.C. Cir. 2006).

Political leverage in the context of a country's relationship with the United States is a sufficiently coercive purpose to establish hostage-taking. *See, e.g.*, *Warmbier*, 356 F. Supp. 3d at 51 (purpose of North Korea detaining an American man was to "gain leverage as North Korea engaged in highly publicized nuclear and long-range missile tests and the United States developed its North Korea sanctions policy"); *Stansell v. Republic of Cuba*, 217 F. Supp. 3d 320, 339 (D.D.C. 2016) (purpose of militant group detaining Americans was "to leverage concessions

from the Colombian and United States governments" such as the release of all imprisoned members of the group and creating a demilitarized zone).

Here, the Court finds that Saraya al-Salam kidnapped El-Maadawy, Mohamed, and Frost for a coercive purpose. As discussed above, Bowen and Pregent offered credible expert opinions that their kidnapping was timed to exert pressure on the United States right before the JCPOA's implementation, either to increase Iran's leverage or to compel the United States to withdraw from the agreement entirely. Their kidnapping thus qualifies as a hostage-taking.

### (iii)   Material Support

The FSIA terrorism exception derives its definition of material support from federal criminal law:

> the term "material support or resources" means any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials.

18 U.S.C. § 2339A(b)(1); 28 U.S.C. § 1605A(h)(3). And when an exception to the FSIA's sovereign immunity turns on a country's material support for an act of terrorism, its "provision of material support or resources [must have been] engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency." 28 U.S.C. § 1605A(a)(1).

The Court determines that Iran provided material support for the torture and hostage-taking of El-Maadawy, Mohamed, and Frost. Both experts testified at length about Iran's pattern of providing weapons, training, and funding to Shia militias run by al-Sadr, including Saraya al-Salam, to advance its interests in Iraq through violence—and that those efforts were ongoing

when El-Maadawy, Mohamed, and Frost were kidnapped.  Rough Tr. Feb. 12 at 56–63 (Bowen);

Rough Tr. Feb. 13 at 73, 75, 89, 115–20 (Pregent).  Moreover, Iran has a long-standing practice

of providing material support for the acts of torture and hostage-taking, undertaken by Shia

militias in Iraq under the direction of al-Sadr and the Quds Force.  *Fritz*, 320 F. Supp. 3d at 62,

84 (finding that Iran had continued this practice by providing the militia at issue there with

weapons, training, intelligence, and money for torture and hostage-taking).  Finally, because Iran

provided this support through the Quds Force, it was provided through Iranian officials or agents.

*Id.* at 85 ("The Quds Force is part of the IRGC, which is, in turn, an arm of the Islamic Republic

of Iran. Those findings are sufficient to satisfy the scope of office requirement.").

### d.     Personal Injury

Under the FSIA's terrorism exception, subject-matter jurisdiction and liability also

require that the damages sought are "for personal injury or death that was caused by" one of the

enumerated acts of terrorism, such as torture and hostage-taking.  28 U.S.C. § 1605A(a)(1).  As

described above, El-Maadawy, Mohamed, and Frost were all injured during their captivity.  And

in their amended complaint, Plaintiffs seek damages for the pain and suffering experienced by

each of the three victims and solatium for their family members.  ECF No. 17.  For these reasons,

Plaintiffs' suit is for damages arising out of personal injury caused by torture and hostage-taking.

### e.     Causation

The final prerequisite for subject-matter jurisdiction and liability under the FSIA

terrorism exception is that the plaintiff's personal injury must be "caused by" the defendant

government's acts of terrorism.  28 U.S.C. § 1605A(a)(1); *Kilburn v. Socialist People's Libyan

Arab Jamahiriya*, 376 F.3d 1123, 1127 (D.C. Cir. 2004) ("[C]ausation is indeed a jurisdictional

requirement.").  The plaintiff need not show that the defendant's material support was the but-for cause of his injuries, only that it was a proximate cause.  *Kilburn*, 376 F.3d at 1128–29.  As the Circuit further explained:

> [T]he inquiry into proximate cause contains two similar but distinct elements.  First, the defendant's actions must be a "substantial factor" in the sequence of events that led to the plaintiff's injury.  *Rothstein v. UBS*, 708 F.3d 82, 91 (2d Cir. 2013).  Second, the plaintiff's injury must have been "reasonably foreseeable or anticipated as a natural consequence" of the defendant's conduct.  *Id.*

*Owens*, 864 F.3d at 794.  Plaintiffs have provided sufficient evidence to satisfy both causation elements.  First, Iran's material support for Saraya al-Salam was a substantial factor in the torture and hostage-taking of El-Maadawy, Mohamed, and Frost.  As their experts testified, Iran provided Saraya al-Salam weapons and money through al-Sadr, and provided it training through Hezbollah and the Quds Force.  These resources were plainly a "substantial factor" in the kidnapping, which began with a group of armed Saraya al-Salam members surrounding the apartment in which the three men were meeting with the translator they had hired.  Moreover, Plaintiffs' experts testified that, in their view, Saraya al- Salam would not have kidnapped Americans without support for that tactic from Iran.  Rough Tr. Feb. 12 at 135–36 (Bowen); Rough Tr. Feb. 13 at 115 (Pregent).

Second, Plaintiffs' injuries were a reasonably foreseeable consequence of Iran's material support.  To evaluate this element, the Court looks to the "broader context" of Iran's conduct.  *Owens*, 864 F.3d at 797; *Fritz*, 320 F. Supp. 3d at 86.  Iran, through the Quds Force, has provided training, weapons, and money to militant groups for decades for the express purpose of advancing its interests through violence and terrorism.  *See also Fritz*, 320 F. Supp. 3d at 86 ("Iran actively supported AAH by providing funding, weapons, training, and intelligence, and it

knew—and intended—that AAH would carry out attacks on coalition forces."). That Saraya al-Salam did what Iran trained and equipped it to do, at a politically advantageous moment for Iran, easily satisfies this element. Thus, both elements of proximate cause are met here, and Iran's material support for Saraya al-Salam bears the requisite causal connection to its torture and hostage-taking of El-Maadawy, Mohamed, and Frost.

For all these reasons, Plaintiffs have met all the requirements set out in the FSIA state-sponsored terrorism exception. The Court thus finds that Iran is not immune from suit for its material support for the torture and hostage-taking of El-Maadawy, Frost, and Mohamed, and that it has subject-matter jurisdiction over Plaintiffs' claims.

### 2.    Personal Jurisdiction

The Court is also satisfied that it has personal jurisdiction over Iran. Personal jurisdiction over a foreign government depends on (1) subject-matter jurisdiction under the FSIA, and (2) proper service under the FSIA. 28 U.S.C. § 1330(b). Having determined that it has subject-matter jurisdiction under the FSIA terrorism exception, the Court will examine whether Plaintiffs properly effectuated service under 28 U.S.C. § 1608.

Section 1608(a) lists four methods for serving a foreign government, in the order in which plaintiffs must attempt them:

> (1) by delivery of a copy of the summons and complaint in accordance with any special arrangement for service between the plaintiff and the foreign state or political subdivision; or
> (2) if no special arrangement exists, by delivery of a copy of the summons and complaint in accordance with an applicable international convention on service of judicial documents; or
> (3) if service cannot be made under paragraphs (1) or (2), by sending a copy of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a

signed receipt, to be addressed and dispatched by the clerk of the court to the head of the ministry of foreign affairs of the foreign state concerned, or

(4) if service cannot be made within 30 days under paragraph (3), by sending two copies of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the Secretary of State in Washington, District of Columbia, to the attention of the Director of Special Consular Services—and the Secretary shall transmit one copy of the papers through diplomatic channels to the foreign state and shall send to the clerk of the court a certified copy of the diplomatic note indicating when the papers were transmitted.

28 U.S.C. § 1608(a); *see also Fritz*, 320 F. Supp. 3d at 87 ("Section 1608(a) provides four methods of service in descending order of preference." (internal quotation marks omitted)). Because Iran does not have a special arrangement for service with Plaintiffs, nor is it party to an international convention on service, Plaintiffs did not need to attempt service in accordance with Section 1608(a)(1) or (a)(2). *See Fritz*, 320 F. Supp. 3d at 88; *Ben-Rafael*, 540 F. Supp. 2d at 52. Accordingly, Plaintiffs tried to serve Iran under Section 1608(a)(3) on June 26, 2017. Then, as required by Section 1608(a)(4), Plaintiffs initiated service through diplomatic channels 30 days later. The State Department served Iran on October 24, 2017. By then, Plaintiffs had fully complied with the service requirements of Section 1608. *Fritz*, 320 F. Supp. 3d at 89; *Ben-Rafael*, 540 F. Supp. 2d at 52.

Because the Court has subject-matter jurisdiction over Plaintiffs' claims, and because they properly served Iran under 28 U.S.C. § 1608(a), the Court has personal jurisdiction over Iran under 28 U.S.C. § 1330(b).

## B.     Liability

The private right of action in the FSIA terrorism exception provides that a foreign government is liable to a U.S. citizen "for personal injury or death caused by an act of torture,

extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act." 28 U.S.C. § 1605A(a)(1), (c). As a result, "a plaintiff that offers proof sufficient to establish a waiver of foreign sovereign immunity under § 1605A(a) has also established entitlement to relief as a matter of federal law" if the plaintiff is a citizen of the United States. *Fritz*, 320 F. Supp. 3d at 86–87.

Plaintiffs are citizens of the United States. And citizens are U.S. nationals for the purposes of the FSIA. 28 U.S.C. § 1605A(h)(5); 8 U.S.C. § 1101(a)(22). Therefore, Plaintiffs may rely on the cause of action in the terrorism exception to establish Iran's liability for their injuries. *See Owens*, 864 F.3d at 809. And because they have proven that the state-sponsored terrorism exception abrogates Iran's sovereign immunity and that this Court has jurisdiction over their claims, they have also proved liability for the acts of terrorism that established jurisdiction.

## V. Conclusion

For all of the above reasons, it is hereby **ORDERED** that Plaintiffs' Motions for Default Judgment (ECF Nos. 27, 32) are **GRANTED**. The Court will grant Plaintiffs' Joint Motion to Appoint a Special Master (ECF No. 41) in a separate order.


**SO ORDERED.**


/s/ Timothy J. Kelly
TIMOTHY J. KELLY
United States District Judge

Date: May 31, 2019

24