IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - - x
RUSSEL FROST, et al.,                    CV No. 1:17-cv-00603-TJK

                Plaintiffs,
                                         Washington, DC
v.                                       Tuesday, February 12, 2019
                                         9:30 a.m.


        ISLAMIC REPUBLIC OF IRAN, et al.,

                Defendants.
- - - - - - - - - - - - - - - - x
_____
                EXCERPT OF EVIDENTIARY HEARING
        HELD BEFORE THE HONORABLE TIMOTHY J. KELLY
                UNITED STATES DISTRICT JUDGE
_____

APPEARANCES:

For the Plaintiffs:      Randy D. Singer, Esq.
                         Kevin A. Hoffman, Esq.
                         SINGER DAVIS, LLC
                         1209A Laskin Road
                         Virginia Beach, VA 23451
                         (757) 301-9995

                         Christopher Peele, Esq.
                         ASHCROFT LAW FIRM
                         919 Congress Avenue
                         Suite 1100
                         Austin, TX 78701
                         (512) 370-1800

Court Reporter:          Timothy R. Miller, RPR, CRR, NJ-CCR
                         Official Court Reporter
                         U.S. Courthouse, Room 6722
                         333 Constitution Avenue, NW
                         Washington, DC 20001
                         (202) 354-3111


Proceedings recorded by machine shorthand; transcript
produced by computer-aided transcription.

# C O N T E N T S

**WITNESS:**                                                          **PAGE:**

STUART BOWEN:   Direct Examination by Mr. Singer.........3

* * * * * * * * * * * * *

# E X H I B I T S

**NUMBER:**                                              **PAGE ADMITTED:**

50                                                            31
26                                                            46
31                                                            52
32                                                            52

1   **P R O C E E D I N G S**

2   * * * * * * * * * * * *

3   THE COURT:  All right.  You may call your first

4   witness.

5   MR. SINGER:  Thank you, Judge.  Plaintiff calls

6   Stuart Bowen.

7   **STUART BOWEN, WITNESS FOR THE PLAINTIFF, SWORN**

8   THE WITNESS:  Good morning, Judge.

9   THE COURT:  Good morning.  Welcome.

10   THE WITNESS:  Thank you.

11   THE COURT:  You may proceed.

12   DIRECT EXAMINATION

13   BY MR. SINGER:

14   Q.  Good morning, Mr. Bowen.

15   A.  Good morning.

16   Q.  Please state your name for the record.

17   A.  Stuart W. Bowen, Jr.

18   Q.  And where do you presently live?

19   A.  I live in Austin, Texas.

20   Q.  And have you given us a résumé --

21   A.  I have.

22   Q.  -- as part of this case?

23   Were you retained as an expert witness in this

24   case?

25   A.  I have been.

1          MR. SINGER:  Can we show the witness Exhibit-67.

2     BY MR. SINGER:

3     Q.  Mr. Bowen, is Exhibit-67 a true and accurate copy of

4     your most recent résumé?

5     A.  It is.

6          MR. SINGER:  Judge, we would like to submit that

7     as an exhibit, and we'll go through it.

8          THE COURT:  All right.  It certainly shall be

9     marked for identification.

10    BY MR. SINGER:

11    Q.  All right.  Mr. Bowen, I want to ask you some questions

12    about your qualifications to be an expert.  So let's start

13    with your educational background.  Can you please tell the

14    Court about your educational background.

15    A.  Yes.  I was thinking about it this morning.  I'm a

16    graduate of Episcopal High School in Alexandria.  We're just

17    down -- staying down the hill from it over in -- over at the

18    Embassy Suites.  I got my undergraduate from the University

19    of the South in Sewanee, Tennessee, and attended Vanderbilt

20    Law School for a year and got my J.D. from St. Mary's Law

21    School in San Antonio, Texas.

22    Q.  Have you ever served in the military, sir?

23    A.  I have.  I was -- I'm also a graduate of the Officer's

24    Training School in San Antonio.  I was commissioned a Second

25    Lieutenant in June of 1984 and served on active duty as an

1    intelligence officer three years in Germany studying the

2    Warsaw Pact and was in the Reserves through 1992.

3    Q.  All right.  Tell the Court briefly about your legal

4    career.  When did that start?  And what type of work were

5    you doing?

6    A.  After I graduated from St. Mary's, I clerked for the

7    Texas Supreme Court, Senior Associate Justice Raul Gonzalez,

8    and then was a civil prosecutor as an Assistant Attorney

9    General of Texas for two-and-a-half years, and then was on

10   Governor Bush's legal staff for six years, first as

11   Assistant General Counsel and then as Deputy General

12   Counsel.

13          Then, after 35 days in Florida -- part of the

14   recount team -- I spent 2 years in the White House, 3 months

15   as Associate Counsel to the President and then 2 years as

16   Deputy Assistant to the President and Deputy Staff

17   Secretary.

18          Briefly was at Patton Boggs as a partner here in

19   Washington, D.C., and then spent almost 10 years as the

20   Special Inspector General for Iraq Reconstruction.

21   Q.  Before we move to the Iraq reconstruction, can you tell

22   the Court just a little bit about the types of duties you

23   had when you worked in the Bush administration at the White

24   House.

25   A.  Yes.

1         Well, as Associate Counsel, I did judicial -- I

2    was on the Judicial Nominee Committee, and so I spent three

3    months writing lots of memos about Circuit Court -- federal

4    Circuit Court judges for potential appointment and -- to the

5    highest court, and then I -- as Deputy Staff Secretary, I

6    lived at the White House, just managed all of the

7    President's paperwork from his schedule to correspondence to

8    proclamations to messages to bills.  It was a 24/7 job.

9    Q.  All right.  Now, let's move to your time as Special --

10   A.  It also involved heavy intel engagement, too.  I should

11   point that out.

12   Q.  What do you mean by heavy intel engagement?

13   A.  Well, every day, I read the senior executive

14   intelligence brief which is the product from Langley that

15   goes out to the senior executives across -- that need to

16   know across government.  So I was, throughout my time as

17   Deputy Staff Secretary, very focused on all matters

18   intelligence -- especially what was going on in the Middle

19   East, because after -- I was in the West Wing on 9/11 and,

20   from that point forward, our focus was on the Middle East.

21   Q.  All right.  So tell us about your time, then, as Special

22   Inspector General in Iraq.  That -- and I guess you use the

23   acronym SIGIR.

24   A.  SIGIR, yes.

25   Q.  S-I-G-I-R?

```
1     A.  That's right.

2     Q.  And what is -- what did you do -- what was the, kind of,

3     overall role as SIGIR?

4     A.  Our mission was to audit, investigate and inspect all

5     funds appropriated for the reconstruction of Iraq.  And that

6     means I operated two offices, one here in Crystal City and

7     one in Baghdad on the embassy grounds, first at the

8     Republican Palace and then at the massive embassy compound

9     that was built, and overseeing investigators, auditors and

10    inspectors, of course.  The highest number we ever had in

11    Iraq was 40, and we produced quarterly reports which was

12    unprecedented in the IG community -- it's -- semi-annual is

13    the standard -- and notably reported to 8 committees on the

14    Hill which is also unprecedented because of the scope of our

15    work.  We -- I was jointly appointed by the Secretary of

16    State and the Secretary of Defense, also unprecedented.  So

17    lots of things about Iraq was -- were unprecedented,

18    including how the oversight mission was executed.

19    Q.  Now, Mr. Bowen, have you worked with us to put together

20    a PowerPoint presentation to help illustrate your testimony

21    today?

22    A.  I have.

23         MR. SINGER:  And, Judge, we'd like to use that

24    throughout Mr. Bowen's testimony.  We'll submit it to the

25    Court as just illustrative exhibits.
```

```
 1              THE COURT:  All right.  You may proceed.

 2              MR. SINGER:  Thank you.

 3    BY MR. SINGER:

 4    Q.  Did you -- did the scope of your responsibilities

 5    include over $63 billion in relief and reconstruction?

 6    A.  In U.S. taxpayer money as well as 20 billion in Iraqi

 7    money that the Coalition Provisional Authority managed.

 8    Q.  And did you have responsibility to do audits and

 9    inspections of any contracts that you thought might involve

10    fraud or waste or any kind of abuse?

11    A.  Continuously.

12    Q.  And how many of those did you do, sir?

13    A.  As I recall, 220 audits, 170 inspections and hundreds

14    and hundreds of investigations.

15    Q.  And from your -- did you put together a final report

16    based on your experience as SIGIR?

17    A.  Yes, Learning From Iraq.  It came out in March of 2013.

18    Q.  I'd like to take you to one of the tables that were

19    produced in that report, Figure 1.2.  Can you tell us what

20    this is.

21    A.  It's a breakout of how the value of the projects that we

22    inspected across sectors fell.

23    Q.  All right.  Now, I see that there's 363 -- is that

24    billion -- 363 billion?

25    A.  No, that's 363 --
```

```
 1    Q.  Oh, I see.

 2    A.  -- million.

 3    Q.  This is -- these are the ones that you actually

 4    inspected?

 5    A.  Yes.

 6    Q.  Okay.  For Security & Justice, what kinds of projects

 7    were those?

 8    A.  Prisons; police stations -- we built lots and lots of

 9    police stations all over Iraq -- all forms of training

10    academies; detention facilities; all -- and military

11    barracks.  Everything that had to do with the police and the

12    military forces.

13              MR. SINGER:  All right.  Let's skip the next

14    exhibit, Kevin.

15    BY MR. SINGER:

16    Q.  We'll go to the Khan Bani Saad prison.

17    A.  Khan Bani Saad.

18    Q.  Khan Bani Saad prison.  Is this --

19    A.  Yes --

20    Q.  -- an example of --

21    A.  -- the Whale.

22    Q.  -- the kind of contract that you would inspect?

23    A.  It is.  This was the worst one.  I would say this was --

24    Q.  That's why --

25    A.  -- the worst --
```

1   Q.  -- I picked it.  So --

2   A.  Yeah.

3   Q.  -- tell the Court about this one.

4   A.  The -- on -- virtually every project fell short.  That's

5   not surprising in a war zone, and especially in a program of

6   unprecedented scope like the Iraq rebuilding effort.  But

7   this one stood apart in that nothing was ever completed, and

8   I believe over 20 million spent on it, and it was just --

9   activity ceased and there was no effort to pursue it, but it

10  had the underlying problem which surfaced as we did our

11  closing audit repeatedly, and that is the Iraqis didn't want

12  it, and that, you know -- one of the lessons learned from

13  Iraq is that be sure that what you're building, the host

14  nation wants.

15  Q.  And has this been built to this day?  This prison.

16  A.  No, it -- it's -- it was just a pile of rubble all

17  eventually carted off.

18  Q.  Did you also have responsibility for investigations that

19  resulted in indictments?

20  A.  Many.

21        MR. SINGER:  All right.  Let's go to the next

22  slide.

23  BY MR. SINGER:

24  Q.  What is this a figure -- what does this show?

25  A.  This shows our results which were substantial, given our

 1    relatively small footprint, you know?  We had 5 to 10

 2    investigators maximum on the ground in Iraq at any one time.

 3    And we had -- one of the innovative things we did within our

 4    program was hire our own prosecutors, and at the table is

 5    one of them.  Chris Peele was part of my SIGIR Prosecution

 6    Initiative.  And once we started that, we quintupled our

 7    outcomes, because we were able to place our own prosecutors

 8    to address our unaddressed cases sitting at -- in DOJ Fraud

 9    Section and, suddenly, people were going to jail and money

10    was being recovered, and that's why you see that spike after

11    2010.

12    Q.  I'd like to show you another slide that shows the total

13    dollar value of the financial benefits.

14            MR. SINGER:  Can you go back just two slides?

15            (Brief pause.)

16            Forward one more, if you would.  Keep going.

17    Sorry.  Next slide.  Right there.

18    BY MR. SINGER:

19    Q.  Can you tell the Court what the total financial benefits

20    were from your work as SIGIR and the work of your team.

21    A.  These are direct and conservative numbers, I would -- I

22    venture to say.  1.6 billion direct benefits from our audits

23    and 191 million recovered or court ordered recoveries from

24    our investigations, and that was as of 2013.  A lot of our

25    investigations were picked up by other agencies or continued

1    at DOJ after we left, and so that 191 is low.

2    Q.  As part of your work as SIGIR, did you have

3    relationships with and get to know the Iraqi political

4    leaders?

5    A.  Yes, I did.

6    Q.  And also, the leaders here in the United States that

7    were involved in the -- that were, you know, primarily

8    involved in the Iraq war?

9    A.  I did.

10   Q.  I would like to show just a few of the folks that you

11   interviewed and ask what you learned from these folks.  This

12   is the first person.  Who is this and what did you learn

13   from him?

14   A.  This is Nouri al-Maliki.  He served two terms as Prime

15   Minister of Iraq.  Prior to that, he had exiled in Syria for

16   five years and, prior to that, in Iran for five years.  He

17   fought in the Badr Brigades for Iran against Iraq in the

18   Iran-Iraq War.  He was a default candidate after Ibrahim

19   al-Jaafari vetoed himself through imprudent comments to

20   the -- to President Bush, and so a back venture jumped to

21   the front.

22            A couple of interesting things about him is he's

23   fluent in Farsi, and so Farsi was frequently spoken in his

24   office.  He regularly traveled to Iran.  And it -- but the

25   most interesting thing about my interview for Learning From

1    Iraq with him was that he blamed the United States for

2    corruption in Iraq.  He said if we hadn't dumped all that

3    cash into their laps, they wouldn't have been tempted to

4    commit all the crimes they did.

5    Q.  All right.  Let me show you the next gentleman.  Who is

6    this gentleman and what was his role?

7    A.  He is the Chief Justice of Iraq, and also, the head of

8    the entire judicial branch.  I mean, they have a different

9    structure.  So the Chief Justice is also the CEO of what we

10   would say Article III.  I mean, he runs everything,

11   rulemaking, lawmaking from the judicial perspective; very,

12   very close to Maliki and actually helped Maliki get his

13   second term by adjusting the constitution by letter to

14   permit Maliki -- or to prevent Ayad Allawi from trying to

15   form a government in 2010.

16   Q.  All right.  Let me show you the next man that you

17   interviewed.  And we're not going to go through all 44, but

18   these are just some of the --

19   A.  Yes.

20   Q.  -- higher points.  Who is --

21   A.  Bayan Jabr.

22   Q.  -- this man?

23   A.  Probably the longest and -- a senior Dawa Party member.

24   The Dawa Party is -- was -- Maliki was -- state of law

25   and -- supported by Dawa.  Abadi -- al-Abadi was Dawa.  The

1    current Prime Minister is not.  He's independent, so to

2    speak.  But Dawa, like all the Shia parties, but especially

3    Dawa, was supported by Iran.  Maliki worked for Bayan Jabr

4    in Syria actually in the Dawa Party headquarters in Damascus

5    and then Jabr -- who I got to know well; had masgouf at his

6    house a lot over at the Adnan Palace -- he lived at the

7    Adnan Palace.  He never left the Minister of Interior

8    Palace, even though he was no longer Minister of Interior.

9    And -- he was that way, but when he was -- he is infamous as

10   Minister of Interior because, relevant to the case you were

11   referring to regarding drilling as a method of torture, that

12   was something that, reportedly, he approved of.

13   Q.  And was the Badr Organization -- even during the time

14   that he was Minister of Justice [sic], was the Badr

15   Organization, of which he was the head, one of the Shia

16   militias that we hear so much talk about?

17   A.  Yes.  Yeah, and it's a -- the Badr Brigades date back to

18   the '80s and they are -- there were three Grand Ayatollahs,

19   now just -- in Iraq, now just one, because the other two

20   have been assassinated.  One is Muqtada al-Sadr's father,

21   Muhammed al-Sadr, and he was the patrilineage -- or the

22   lineage of the Jaysh al-Mahdi.  Ammar [ph] al-Hakim's

23   father, the Grand Ayatollah Hakim, was assassinated in 2003

24   in Najaf, and that's where the Badr Brigade line is.  Both

25   lines, of course, trace to Tehran.  And Grand Ayatollah

1    Sistani, currently the head of Shia in the world, the holy

2    Shia structure, is in Najaf.

3    Q.  All right.  And did your interviews -- I'm not going to

4    go through the Americans.  But did your interviews also

5    include notable Americans with both military and political

6    experience that were focused on Iraq?

7    A.  Yes.

8    Q.  And can you give the Court an example of some of those.

9    A.  Well, I interviewed -- well, here, we've got some, but I

10   interviewed all of the ambassadors and all of -- the

11   Secretary of Defense, Secretary of States and Deputy

12   Secretary of States and Secretary of Defenses and every

13   ambassador; every commanding General that served in Iraq.

14   And Ryan Crocker, I got to know very, very well, and David

15   Petraeus.  Christopher Hill was just there for a little

16   while.  He was -- he's more of a Far East-focused career

17   diplomat.  John McCain, I was fortunate to get to know very

18   well, and he was -- and Claire McCaskill, as well.  She was

19   very focused on recoveries -- on investigations and

20   recoveries, and she was a strong supporter of our -- we had

21   a somewhat narrow jurisdiction at the beginning.  By the end

22   of SIGIR -- or half-way through, we covered all money being

23   spent in Iraq.

24   Q.  Why --

25              THE COURT REPORTER:  (Indicating.)

```
 1              MR. SINGER:  Yes, sir?

 2              THE COURT REPORTER:  Just one second, please.

 3              (Brief pause.)

 4              THE WITNESS:  She was a --

 5              MR. SINGER:  Just one second.  Okay?  We're --

 6              Court reporter, are you good?

 7              THE COURT REPORTER:  Yes.

 8              MR. SINGER:  Yes.

 9              THE WITNESS:  She was a great supporter, but I do

10      want to say, our number one supporter on Capitol Hill was

11      Senator Susan Collins.

12      BY MR. SINGER:

13      Q.  Now, sir, was it important to your work as SIGIR to know

14      the politics of the -- Iraq intimately at that time?

15      A.  Yes.  Absolutely.

16      Q.  And why is that -- why was that important?

17      A.  Well, because corruption and politics are two sides of

18      the same coin in Iraq, and if you wanted to begin to change

19      one you had to change the other -- or understand the other.

20      And as Maliki's statement to me in Learning From Iraq shows,

21      he was fully cognizant and, frankly, a participant in the

22      corruption.  And, indeed, the billions of dollars lost in

23      corruption -- the -- most of it went to the political

24      parties.

25      Q.  And as part of your gaining information about the
```

1   political parties, interacting with political leaders, did

2   you come to follow the career of Muqtada al-Sadr?

3   A.  Yes.

4   Q.  And was he an important political and military figure

5   during the entire time that you were in Iraq?

6   A.  Yes, he was.

7   Q.  Could you possibly have done your work as SIGIR without

8   knowing about him and understanding what motivated him?

9   A.  No, but one of the interesting things about him was his

10  refusal ever to meet with any American.

11  Q.  Now, in addition to knowing Iraqi politics, did you also

12  interact with military leaders in Iraq?

13  A.  Yes.

14  Q.  And was security and rule of law an important part of

15  what you were doing as part of the reconstructive process --

16  A.  The most important part.

17  Q.  And if -- we have in front of us a chart which shows the

18  obligations and expenditures of the major U.S.

19  reconstruction funds by area of use.  Out of the $49 billion

20  obligated, how much of that was obligated to security and

21  rule of law efforts?

22  A.  27 billion, over half -- over half of the ultimate

23  amount was for that area.

24  Q.  And so as part of your oversight efforts, did you get

25  into the details and some of the weeds of how we were

1    training the Iraqi forces?

2    A.  I did, every trip.  I went every quarter to Iraq for

3    9-and-a-half years, 36 trips, and every single trip I got

4    into the weeds on security.

5    Q.  And did that include both the military forces and the

6    police forces?

7    A.  It did.

8    Q.  What -- who does the military report to under the Iraqi

9    cabinet?

10   A.  Minister of Defense.

11   Q.  And who does the -- who did the police departments

12   report to?

13   A.  The Minister of Interior.

14   Q.  And who was the Minister of Interior during most of the

15   time that you were in Iraq?

16   A.  Bayan Jabr -- well, there were four, and I'm blanking on

17   the successors right now.  I can picture them.  I

18   interviewed two of them.  But I can't -- I'm not pulling up

19   their names --

20   Q.  But Jabr was essentially both the head of a militia and

21   he ended up with a role in the Iraqi government as Minister

22   of Interior?

23   A.  That's right.

24   Q.  Now, did you -- you mentioned quarterly reports where

25   you would report to Congress every quarter; is that right?

1    A.   That's right.

2    Q.   And how many times do you estimate that you testified

3    before Congress during --

4    A.   Thirty-six.

5    Q.   In addition to that, did you put together one final

6    report?

7    A.   Learning From Iraq.  There it is.  (Indicating.)

8    Q.   All right.  And have you reviewed Exhibit-29 as you were

9    preparing for this case which is the Learning From Iraq

10   document?

11   A.   Yes.

12   Q.   Is that a true and accurate copy -- was it a true and

13   accurate copy of the report that you put together during

14   your time as SIGIR?

15   A.   Yes.

16   Q.   And was this part of your official duties?

17   A.   It was.

18   Q.   And that report was widely distributed to Congress and

19   others?

20   A.   It was.

21            MR. SINGER:  Your Honor, we would move Exhibit-29

22   into evidence.

23            THE COURT:  All right.  I will -- and you're

24   moving it as a public record --

25            MR. SINGER:  Yes, Your Honor.

1          THE COURT:  -- correct?

2          All right.  I'll conditionally admit that,

3     Exhibit-29.

4     BY MR. SINGER:

5     Q.  All right.  Now, I just want to briefly go through not

6     all the lessons that were learned, but you -- we've got a

7     report here called Learning From Iraq which I know received

8     a lot of feedback.  Can you tell the Court what the primary

9     points were in this lessons learned document.

10    A.  Well, threefold.  One was to tell the people of America

11    how their money was spent in Iraq; two was to tell them what

12    effect it had or lack thereof; and three was to identify for

13    the government, you know, how we might be able to do

14    stabilization and reconstruction operations better in the

15    future.

16    Q.  All right.  And the document will be into evidence and

17    the Court can read it at the appropriate time.  But if you

18    were to give the Court just the top two or three lessons

19    learned, what would they be?

20    A.  First, we have to plan for stabilization and

21    reconstruction operations in an integrated fashion and not

22    begin to figure out how to do them once we land in the

23    affected country.

24          Two, we have to ensure that we put rule of law

25    first when we go in.  Stabilize the country before you start

1    rebuilding.  We appropriated $18 billion in 2003 that became

2    available for obligation in the spring of 2004, the same

3    month that Fallujah blew up, and so there -- they -- it was

4    -- we were -- we did planning for a setting about which we

5    knew very little and that was in constant flux for --

6    because of lack of stability.

7              And three is be sure that before you pursue such

8    operations that you have sensible regulatory systems in

9    place for the execution of contracts because ultimately

10   everything that happens in a rebuilding program is the

11   product of a contract, and that means IDIQs ahead of time

12   where large contractors can be ready to go from day one

13   rather than a year after you start because of the hiccups in

14   the bidding process.

15   Q.  As part of your investigation into corruption and waste

16   and abuse in Iraq and the oversight of the military and rule

17   of law contracts, did you study the Iranian influence on

18   that country?

19   A.  Yes, I was aware of it, and it was a specter constantly

20   haunting the political and thus the corrupt components of

21   Iraqi governmental life.

22   Q.  Now, after you left as Special Inspector General in

23   2013, what did you do next?

24   A.  I worked for Jones Group, General Jim Jones, and also,

25   for the U.S. Chamber of Commerce through the Jones Group as

1     their Iraq advisor and traveled to Iraq in that context

2     twice, and then I also became a senior advisor at the Center

3     for Strategic and International Studies.

4     Q.  And has your work in Iraq continued to the present time?

5     A.  Yes.

6     Q.  In what ways?

7     A.  Well, since -- well, in 2017 -- the spring of 2017, I

8     traveled there as a guest of the United Nations to speak at

9     an anti-corruption conference and while there, I spent -- I

10    had 90 minutes with Haider al-Abadi, the Prime Minister, one

11    on one to discuss what I had learned, essentially, in my

12    three-day informal review of the anti-corruption system and

13    its continuing failings, and we had what I thought was a

14    very productive brainstorming session about how to -- how he

15    could pursue some repair which ultimately he didn't do.

16    Q.  Are you also consulting with various companies that have

17    businesses in Iraq and business interests there?

18    A.  Yes.

19    Q.  And what is that -- in what capacity are you doing that?

20    A.  Just -- well, right now, the rebuilding round three,

21    I'll call it, in Iraq is in somewhat stasis because of the

22    transition in the government and the footing that they're

23    gaining, but I'm working with essentially one major Middle

24    East client who is engaged in pursuing potential contracts

25    there.

1   Q.  And do you still have sources inside the country that

2   you can call and ask about --

3   A.  I do.

4   Q.  -- political events or other events?

5   A.  Yes, I do.

6          MR. SINGER:  Your Honor, based on Mr. Bowen's

7   testimony, experience, training and expertise, I would

8   proffer him as an expert in the following areas:  Number

9   one, Iraqi politics after the overthrow of Saddam Hussein,

10  including the Iraqi political factions and the influence of

11  Shia militias; secondly, the history of the Shia militia

12  insurgencies in post-invasion Iraq; third, the Iranian

13  influence in Iraq, particularly through the Shia proxies;

14  and last, the political history of Muqtada al-Sadr and his

15  militias.

16         THE COURT:  All right.  I will accept him as an

17  expert on those areas as you describe.

18         MR. SINGER:  Thank you, Your Honor.

19  BY MR. SINGER:

20  Q.  Mr. Bowen, please give us just a little background --

21  the Court, as you heard earlier, is aware of the other cases

22  involving Iran, the IRGC and the Qods Force.  But can you

23  please tell us briefly what the role of the IRGC is in Iran

24  and then how that relates to the Qods Force.

25  A.  Well, the IRGC is a political, military, special forces,

1    intelligence organization all merged into one with -- driven

2    by an ideological backbone shaped by what happened 40 years

3    ago yesterday.  I mean, just amazing we're here talking

4    about this now on this anniversary.  It is the radical arm,

5    I would say, within Iran executing, I would say, the most

6    vicious aspects that Ruhollah Khomeini envisioned and

7    implemented, frankly, in 1979 when he came back and refuted,

8    by his actions, his moderate soundings out of Paris, and

9    they have engaged in the unremitting export of violent

10   Iranian interests through terroristic support and

11   activities, particularly across the Middle East.  That's

12   their focus, and their focus is on the Shia Crescent which

13   we'll talk about in a minute, but they defend the revolution

14   that began 40 years ago yesterday.

15   Q.  All right.  Now, I'm going to show you some bullet

16   points on the PowerPoint presentation that this Court has

17   previously found to be the role of the IRGC.  Can you

18   address whether or not, in your experience, the IRGC was

19   doing each of these things on the screen.

20   A.   Well, I should say that in my 36 trips to Iraq, I always

21   attended the battle update assessment as well as

22   intelligence briefings as well as reviewing intelligence,

23   and that's where I garnered substantial insight into the

24   continuous influence of Iran from the inception of our

25   effort in 2003 in Iraq, and their influence is -- has

```
 1    been -- and as is revealed in the Khazali interviews --
 2    widespread and financially driven.  I mean, the delivery of
 3    millions of dollars a month to those who will carry out
 4    their interests, execute their activities and engage in
 5    lethal terrorist actions is evident in Iraq from the
 6    intelligence reports; from the Khazali interviews, public
 7    record now supporting what was classified previously, but
 8    also, as I'm aware, is their practice through the Shia
 9    Crescent in Lebanon, for example, which is why Hezbollah and
10    the Jaysh al-Mahdi were so closely linked, because they had
11    the same masters.
12    Q.  All right.  Now, let me ask you, what is the role -- in
13    the bullet points on the screen in front of you, the last
14    one -- by the way, it -- the second to last one mentions
15    that they control Iran's ballistic missile program.  Is that
16    your understanding of part of the role of the IRGC?
17    A.  Yes, and that is why they were -- there was so much
18    friction in Iran about the JCPOA.  Prior to its approval,
19    there was a fall -- a break -- clear, distinct, evident,
20    public break -- that Iran itself recognized between Rouhani
21    and Qasem Soleimani, the head of --
22    Q.  All right.  Let me just --
23    A.  -- the IRGC.
24    Q.  Let me just ask you a couple questions about that.
25    Rouhani was in what role in Iran at the time of the --
```

1    A.  The Prime Minister.

2    Q.  -- JCPOA?

3    A.  Yeah.  He was the Prime Minister.

4    Q.  And what about Soleimani?  What role was he?

5    A.  He was the head of the IRGC --

6    Q.  All right.  Now, that was --

7    A.  -- and the Qods Force.

8    Q.  Right.  That -- what year was that when the JCPOA was

9    implemented?

10   A.  Well, it was approved in 2015 and then began in 2016.

11   Q.  And I know I mentioned it in the opening statement, but

12   that's not evidence.  Can you explain just briefly --

13   because we're going to get to this in more detail later --

14   what JCPOA -- what the JCPOA was.

15   A.  The Joint Comprehensive Plan of Action -- a very

16   UN-sounding name -- that was a product of what's called the

17   P5+1: China, Russia, the U.K., France and Germany, plus the

18   United States.  Really -- I mean, an international effort to

19   try and put the lid on uranium-enrichment processes in Iran

20   in order to foreclose their apparent pursuit of the

21   acquisition of a nuclear weapon.

22   Q.  All right.  Now, let me show you a picture of Qasem

23   Soleimani.  Who is this --

24   A.  Qasem.  Yes.

25   Q.  -- man?  And what is his role?

 1   A.  He is the head of the IRGC and the Qods Force Commander,

 2   and the Qods Force is their special forces operational arm.

 3   Q.  Now, you mentioned previously some -- the Shia Crescent

 4   and said we'll take --

 5   A.  Yes.

 6   Q.  -- a look at that.  I'd like to show you an illustrative

 7   exhibit of the Shia Crescent, and then we'll go to a map

 8   that's actually a little more detailed of where the -- where

 9   Shias and where the Sunnis are.  But explain to the Court

10   what you mean when you use that term "Shia Crescent."

11   A.  Well, this has 1,400-year roots, and it's traceable back

12   to 631 when Muhammad prematurely died and -- without a

13   succession plan, and there was a dispute between factions

14   within the Quraysh, the -- his tribe, about who should

15   succeed him, and it centered on his military leader, Abu

16   Bakr, or his nephew and son-in-law, Ali, and Abu Bakr

17   prevailed and then Uthman and Umar succeeded and then Ali

18   came, but the contingent within the Quraysh that supported

19   Ali became Shiasm and those that followed Abu Bakr, Uthman

20   and Umar became Sunni.  So that is where the break began.

21        So -- and in the Middle East, 80 percent of the

22   Middle East is Sunni.  Saudi Arabia is the home of the holy

23   sites and is a -- is the center of Sunni Islam, Jordan, but

24   Iran and the Shia, who -- believe the Sunni are apostates;

25   the Sunnis believe the Shia are apostates, you know?  Sounds

 1    like the 30 Years' War; right?  The old days of Protestant

 2    and Catholic.  Same notion.  It's present now, though, in a

 3    conflict setting in the Middle East, and Iran's long-term

 4    strategy is to build a Shia Crescent that -- and that

 5    picture captures it well -- that's, kind of, a pincer on

 6    Saudi Arabia and Jordan, also a very historic Sunni country

 7    and our best friend really in the region, and they are at

 8    this point more successful in that effort than in their

 9    history.

10    Q.  And in their -- in your view, are they trying to make

11    Iraq part of that Shia Crescent?

12    A.  Absolutely, and they've succeeded for the most part.

13    Q.  And what about Syria?

14    A.  Absolutely, and they've succeeded for the most part.

15    Q.  And what about Lebanon?

16    A.  Absolutely, and they've succeeded enormously there.

17             MR. SINGER:  All right.  Let's go to the next

18    slide.

19    BY MR. SINGER:

20    Q.  Is this --

21    A.  And Yemen.

22    Q.  And Yemen?

23    A.  Yemen is the other piece to that.

24    Q.  All right.  Well, this next slide, kind of, illustrates

25    that.  So can you explain what we're looking at here with

1    the next slide with the breakdown between the Sunnis and the

2    Shia.

3    A.  Yes.

4         Well, you can see that the Shia live in Iran and

5    in southern Iraq.  Bahrain is the only other majority Shia

6    Arab country, but it's tiny.  It's an island.  There are --

7    there's a -- the Houthis, a substantial number in Yemen, and

8    the -- Lebanon is -- the Islamic community in Lebanon is

9    majority Shia substantially, and Christians in Lebanon are

10   now 40 percent versus 50 percent 25 years ago, and Syria,

11   the Alawites are relatively small.  I think this -- there's

12   an example of the reverse of what was in Iraq where you had

13   a minority Sunni leader dominating a Shia majority country.

14   In Syria, you have a minority Alawite -- which is an

15   offshoot of Shia -- dominating a largely Sunni country.

16   Q.  Let me ask you to -- I'm going to just name some

17   organizations and leaders, and tell the Court whether they

18   are Shia or Sunni.

19   A.  Mm-hmm.

20        MR. SINGER:  And, Your Honor, did you have a

21   question?  It looked like you were --

22        THE COURT:  Well, I would say, for something --

23   for a slide like this, you know -- this isn't his report.

24   This isn't a summary of any -- I don't know whether this is

25   from his report or whatnot, but I guess I would --

```
 1                    THE WITNESS:  It's not.

 2                    THE COURT:  Oh, okay.  I -- something like this

 3      where there's no -- it's certainly -- the slide is

 4      purporting to tell certain facts, it might be helpful just

 5      to answer -- ask the witness, is this -- does this appear

 6      accurate to you based on --

 7                    MR. SINGER:  Thank you, Judge.

 8                    THE COURT:  -- your knowledge?  But, you know --

 9                    MR. SINGER:  Yes, sir.

10                    THE COURT:  -- because we have -- it's a slide

11      that -- and to this point, we've had slides that, sort of,

12      summarized other aspects of his background --

13                    MR. SINGER:  Yes, sir.

14                    THE COURT:  -- and things like that, but for this

15      you may want to ask him if it's a fair and accurate

16      depiction of where Sunnis versus Shia live in the Middle

17      East and --

18                    MR. SINGER:  Absolutely.

19                    THE COURT:  -- go from there.

20                    MR. SINGER:  Thank you, Judge.

21      BY MR. SINGER:

22      Q.  Mr. Bowen, looking at this slide -- and I believe that's

23      Exhibit-50 -- is that a fair and accurate representation of

24      the breakdown between Sunnis and Shia in the Middle East, as

25      you --
```

```
1    A.  It appears --

2    Q.  -- understand it?

3    A.  -- to be.

4             MR. SINGER:  Judge, we would move that into

5    evidence.

6             THE COURT:  Yeah, it -- for what it's worth, yes,

7    it can -- it will be admitted just as a demonstrative.

8             MR. SINGER:  Yes, Your Honor.  Thank you.

9    BY MR. SINGER:

10   Q.  And then I'd like to take you down through a list of

11   organizations and people just so we, kind of, know who's on

12   what side of the Sunni-Shia divide.

13   A.  Certainly.

14   Q.  Saddam Hussein?

15   A.  Sunni.

16   Q.  And he was basically dictator of a country that was by

17   and large Shia?

18   A.  That's right, thanks to the British, ultimately.  In

19   1932, the British left frustrated unable to find an adequate

20   Shia leader and installed a minority Sunni king, a monarchy,

21   in 1932.

22   Q.  And what about, you know, the terrorist group al-Qaeda?

23   A.  Sunni.

24   Q.  The group ISIS?

25   A.  Sunni.
```

1    Q.  And the militias that we've been talking about in this

2    case?  So for example, the Badr Organization.

3    A.  Shia.

4    Q.  Al-Haq?

5    A.  Shia.

6    Q.  Saraya al-Salam?

7    A.  Shia.

8    Q.  All right.  And what about Muqtada al-Sadr?

9    A.  Shia.

10   Q.  And I -- you mentioned Maliki earlier.  What was --

11   A.  Maliki, yes.

12   Q.  Maliki, yeah.  What was he?

13   A.  Shia.

14   Q.  Now, in previous opinions of this court, the court has

15   talked about Hezbollah and their role in spreading the

16   Iranian revolution.

17   A.  Yes.

18   Q.  What do you understand Hezbollah to be?

19   A.  It is a terrorist organization and a political party

20   that has substantial regional and even global reach in its

21   export of radical Shia ideology.

22   Q.  Where is it based?

23   A.  It's based in Lebanon.

24   Q.  All right.  They -- this court -- in Fritz v. Iran and

25   in Peterson v. Iran, two cases that the Court is taking

1    judicial notice of, the court has said that Hezbollah is an

2    Iranian proxy.  Do you agree with that?

3    A.  Yes.

4    Q.  In what ways?

5    A.  Their -- they receive the vast majority of their funding

6    from -- directly from Iran on a monthly basis.

7              MR. SINGER:  All right.  Next bullet point,

8    please.

9    BY MR. SINGER:

10   Q.  Also, in -- this court, in Peterson, said that Hezbollah

11   is almost entirely acting under the order of the Iranians.

12   Was that your experience, as well?

13   A.  That is my experience.

14   Q.  And were you familiar with Hezbollah's involvement in

15   Iraq?

16   A.  I'm -- yes, I am familiar with their involvement to the

17   extent that they were a close partner of Jaysh al-Mahdi.

18   Q.  And who is Jaysh al-Mahdi?

19   A.  That is the militant arm of Muqtada al-Sadr.

20   Q.  And sometimes that -- they're referred to as JAM --

21   A.  Yes.

22   Q.  -- the acronym for that?

23              And then the third bullet point says, Iran

24   provides Hezbollah with as much as 700 million to 1 billion

25   per year in the form of cash, training, intelligence and

1    weapons.  Is that consistent with your understanding as an

2    expert witness in this case?

3    A.  Yes, it is.

4    Q.  Now, shifting attention just for a second to the

5    post-Saddam Hussein Iraq, and I want to --

6              THE COURT:  Can I interrupt for one second.

7    Those -- the conclusions we just walked through about

8    Hezbollah being an Iranian proxy, Hezbollah almost entirely

9    acting under the order of the Iranians and then that amount

10   of money, what's the basis for your conclusion for agreeing

11   with those statements?

12             THE WITNESS:  From my --

13             THE COURT:  How -- what is the -- what either, you

14   know, your experience is, whether it's intelligence

15   briefings --

16             THE WITNESS:  Yes.

17             THE COURT:  -- other documents, etcetera, if you

18   could just expound a little bit about that.

19             THE WITNESS:  Yes.  My knowledge about that is

20   from intelligence briefings in Iraq and in the United States

21   as well as review of documents -- intelligence material, I

22   should say, online in the United -- in Iraq and in the

23   United States.

24             THE COURT:  All right.  You may proceed.

25             MR. SINGER:  Thank you, Judge.

1    BY MR. SINGER:

2    Q.   What -- shifting our attention to 2003 and forward -- so

3    in post-Saddam Iraq -- what were the goals, as you

4    understood them, of Iran with their involvement?

5    A.   To exert hegemony over the new government in Baghdad.

6    Q.   And in what ways?

7    A.   To have influence over who was selected.  And I think

8    their first goal was to -- was the departure of the United

9    States forces, and that became the breaking point in the

10   beginning of what I would call the civil war -- the

11   Sunni-Shia civil war and the war against the United States

12   presence when the United States decided in May of 2003 to

13   form the Coalition Provisional Authority -- late April,

14   May -- and began operating as the legislative, judicial and

15   executive branch of the -- of Iraq.

16   Q.   And Iran's goal with regard to that provisional

17   authority was what?

18   A.   It became the chief funder, trainer, supporter, equipper

19   of the resistance --

20   Q.   All right.  Now, I'm going to show you --

21   A.   -- excuse me, "resistance" is the wrong word.  The

22   terrorists that attacked us.

23   Q.   I'm going to show you a picture of Muqtada al-Sadr and

24   ask a little bit about his background.  Can you tell us how

25   he rose to power in Iraq following the overthrow of Hussein.

1    A.  He comes -- well, lineage is his chief path to power.

2    He comes from a very -- perhaps the most respected Shia

3    cleric -- clerical family in Iraq.  Hakim -- al-Hakim is

4    a -- is similar to it, but I would say that Muhammed al-Sadr

5    was the most respected Grand Ayatollah.  And with his

6    father's murder by Saddam Hussein's regime, he was pitched

7    to the forefront at -- he was 26, I believe, when that

8    happened and, by all accounts, really hasn't risen to the

9    mantle that his father left him.

10   Q.  Was there a military group that became loyal to him

11   following the overthrow of Saddam?

12   A.  Well, he -- the Jaysh al-Mahdi -- the Mahdi Army was --

13   were -- was the militarized part of his movement and became

14   the spearhead of his efforts once the Coalition Provisional

15   Authority declared its intent to stay.

16   Q.  And did the al-Mahdi Army control any part of Baghdad?

17   A.  Yes.  The southeast portion of the city is called Sadr

18   City -- previously called Saddam City, ironically -- and it

19   is an infamous part of the city.  Now, it is where the

20   Minister of Interior is located, where so much torture

21   occurred and where the plaintiffs were held in Sadr City,

22   and it -- and tortured.  Torture has become a hallmark of

23   that part.  And it is also a launching pad -- it was a

24   launching pad for attacks on the U.S. Embassy grounds, and

25   it was -- I know we're going to talk about this a little

1    bit.  It was -- but it was the launching pad for an Iranian

2    rocket fired by Jaysh al-Mahdi militants at the Republican

3    Palace on March 23rd, 2008, that resulted in the death, on

4    March 24th, of one of my auditors, Paul Converse.

5    Q.  In the years following the overthrow of Saddam, did the

6    al-Mahdi Army engage in terrorist actions and torture?

7    A.  Yes.

8    Q.  And what is your basis for that opinion?

9    A.  Both intelligence briefings, intelligence reports that

10   I've read, but also it is widely discussed in open-source

11   material, as well.

12   Q.  Did Hezbollah pay -- play any role in the rise of -- and

13   training of the al-Mahdi Army?

14   A.  Yes, they were partners, very similarly situated.  I

15   think the vision that Muqtada al-Sadr had for his

16   organization was to be the arm, if not the sibling, of

17   Hezbollah.

18   Q.  Very early in the war, did al-Sadr make any statements

19   regarding his relationship with Hezbollah?

20   A.  Yes, he said, as is recited in this slide, that,

21   Hezbollah can consider me their striking hand in Iraq

22   whenever there is necessity and whenever there is a need.

23   Q.  Did the Qods Force also play a role in the arming and

24   training of the al-Mahdi Army?

25   A.  Yes, just as they have with Hezbollah.

1   Q.  And how do you know that information?

2   A.  From battle update assessment briefings, from

3   intelligence briefings and from reading intelligence

4   reports.

5   Q.  I want to show you a picture of another man.  Who is

6   this man?  And what was his role in post-Saddam Iraq?

7   A.  Qais Khazali was part of the offshoot from Jaysh

8   al-Mahdi.  Shia Special Groups, they were called, to carry

9   out special missions, but also when they had ideological

10   differences of -- the Shia are infamous for intra-Shia

11   arguments and even fighting, even killing one another, and

12   that's not the case, the killing part, between Ahl al-Haq --

13   Asaib Ahl al-Haq which he headed, but -- for a short time

14   before he was taken into captivity, but he was -- he, along

15   with Badr Brigade, Jaysh al-Mahdi, Asaib Ahl al-Haq, were

16   lethal terrorist organizations that inflicted great harm

17   upon U.S. forces and Iraqis -- and Sunnis especially -- from

18   2004 to 2007.

19   Q.  Now, before you arrived in 2004, you -- were you aware

20   that Muqtada al-Sadr had been interviewed by 60 Minutes?

21   A.  I think so.  I'm aware of that interview.  I think I

22   was -- I was aware of it before I arrived.

23   Q.  I want to show you a statement that he made during that

24   interview where he said, The little serpent has left and the

25   great serpent has come.  Do you see that on the screen?

1    A.  Yes.

2    Q.  Have you watched that interview?

3    A.  I have.

4    Q.  And were you aware of these statements?

5    A.  Yes.

6    Q.  Who did he consider, by his words in that interview, to

7    be the big serpent?

8    A.  America.

9    Q.  And who was the little serpent?

10   A.  Saddam.

11   Q.  Anything else from that interview that struck you or

12   stuck out to you?

13   A.  Well, the fact that he did it, because he's otherwise

14   not spoken to Westerners.

15   Q.  And that interview was actually conducted in Baghdad; is

16   that correct?

17   A.  Yes.

18   Q.  Early in your tenure, did you become aware that al-Sadr

19   and the other special groups funded by Iran were conducting

20   terrorist activities?

21   A.  Yes, I was.

22   Q.  I want to show you Exhibit-25, please, and ask if you

23   can identify that document.

24   A.  Yes, this is a diagram --

25   Q.  No, I'm sorry.  We're going to turn to Exhibit-25.  We,

1     kind of, have to switch the screen over to it.

2     A.  Okay.

3     Q.  So we'll show you the cover --

4     A.  Oh.

5     Q.  -- of Exhibit-25.

6     A.  Okay.  Yes.

7     Q.  Can you identify for the Court what this document is.

8     A.  Yeah.  This is one of -- a report typical of the

9     Department of State from the Office of the Coordinator for

10    Counterterrorism and, in this case, a Country Report from

11    2004.

12    Q.  All right.  Does the State Department produce these

13    reports -- Country Reports on Terrorism -- every year?

14    A.  Yes, they do.

15    Q.  And as part of your work in Iraq and your training and

16    education as an expert, do you look at these reports and

17    treat them as official documents?

18    A.  I do.

19    Q.  And have you had a chance to glance through some of the

20    excerpts that we have pulled from this report?

21    A.  Yes.

22    Q.  Does Exhibit-25 contain a true and accurate copy of

23    excerpts from this report?

24    A.  It does.

25              MR. SINGER:  And, Your Honor, on all these

1    reports, of course, we'd be happy to submit the entire

2    thing, but we've tried to just pull the excerpts to keep the

3    exhibit binders manageable.

4            THE COURT:  All right.  Thank you.

5    BY MR. SINGER:

6    Q.  All right.  Could you please turn to Page 89 of the

7    excerpts we have there --

8    A.  Yes.

9    Q.  -- for that report.

10   A.  Yes.

11   Q.  And on Page 89, I believe I've highlighted some excerpts

12   which I'd like for you to read into the record, then I'm

13   going to ask you an opinion about that.

14   A.  Okay.  Right there.

15           Iran pursued a variety of policies in Iraq during

16   2004, some of which appear to be inconsistent with Iran's

17   stated objectives regarding stability in Iraq as well as

18   those of the Iraqi interim government and the coalition.

19   Senior IIG officials have publicly expressed concern over

20   Iranian interference in Iraq, and there were reports that

21   Iran provided funding, safe transit and arms to insurgent

22   elements, including Muqtada al-Sadr's forces.

23   Q.  All right.  Now, this would have been 2004.  This would

24   have been during your first year in the country?

25   A.  That's right.

1    Q.  And was that -- what you just read from the State

2    Department Country Reports on Terrorism -- consistent with

3    what you were seeing on the ground?

4    A.  Yes.  Muqtada al-Sadr -- when I -- my first trip was

5    February of 2004, and one of the first things I learned was

6    he was public enemy number one for the Coalition Provisional

7    Authority.

8    Q.  And it indicates here that IIG officials -- who are IIG

9    officials?

10   A.  It was a 14-member council that was appointed by the

11   Coalition Provisional Authority to serve as a transitional

12   governing element during the tenure of the CPA.

13   Q.  In addition to al-Sadr basically declaring war on

14   America and its allies and his JAM militia conducting

15   terrorist activities, were his men also able to infiltrate

16   aspects of the provisional Iraqi government?

17   A.  Yes, they were.

18   Q.  How and when did that occur?

19   A.  Well, they -- it was -- the "how" was through Iranian

20   training in those components of how to use subterfuge and

21   covert political activities in order to secure positions of

22   influence within the government, and it began to occur from

23   the beginning, from even during the era of the CPA.

24   Q.  Are you involved in another case pending in this court,

25   Marwan Sweedan v. the Republic of Iran?

1    A.  Yes, I am.

2    Q.  Can you tell the Court -- not in any detail, but

3    roughly -- what that case is about and how it ties into

4    this.

5    A.  Well, it's -- it echoes this case in the sense that it

6    involves egregious torture carried out by terroristic

7    components within -- operating within or under the aegis of

8    the Ministry of Interior that engaged in outrageous torture

9    and killing of persons that were seen as sympathetic to the

10   United States.

11   Q.  And are you aware not just from that case but from your

12   work on the ground in Baghdad at that time that that was

13   going on?

14   A.  Yes, I was -- it was -- I guess I learned about that in

15   '05 and '06 that that kind of activity was allegedly being

16   practiced.

17   Q.  What was done to try and stop it?

18   A.  I presume -- I mean, I don't have firsthand knowledge of

19   that, but I presume that the Commanding General and the

20   Ambassador engaged with the Iraqi officials, chastising them

21   for their -- for breaking international law.

22   Q.  Now, in post-Saddam Iraq when the American forces are

23   still on the ground with other coalition forces, was there

24   active engagement between the Shia militias and the American

25   forces?

1    A.  You mean conflict?

2    Q.  Let me -- yeah, let me rephrase the question.

3           Did the Shia militias use terrorist acts to attack

4    American forces on the ground?

5    A.  Regularly.

6    Q.  And were part of those terrorist activities the use of

7    EFPs?

8    A.  Eventually.  It started out as IEDs, and with the

9    development of what was called the MRAP -- which was an

10   up-armored vehicle that could resist the explosion of an IED

11   which is just a bomb sitting on the side of the road usually

12   in trash or an animal's carcass -- the Iranians imported --

13   or exported to the terrorist organizations in Iraq this

14   shaped charge -- chemical shaped charge called an EFP which

15   could -- which continued this chess match between us and

16   them of we would upgrade to address the latest lethal

17   threat, and then they would upgrade the lethality of the

18   threat, and this was especially lethal because it would --

19   it could impact -- it was -- it wasn't just a Hummer that

20   could -- that you could take out.  It was an armored

21   vehicle, an MRAP, and that required us to amp up our

22   defensive technological capacity to defeat the EFP, but lots

23   of people died because of these, and they were -- the

24   technology was developed, constructed, exported in and from

25   Iran.

1    Q.  And what is the basis of that opinion that the

2    technology came from Iran?

3    A.  My briefings in Iraq on EFPs.

4    Q.  Okay.  Now, I want to turn your attention to Exhibit-26

5    which is in that big binder.  It's another of the Country

6    Reports on Terrorism, this one from 2007.

7    A.  Mm-hmm.

8    Q.  So it's published, of course, in 2008, but it's looking

9    at activities that happened in 2007.  Have you had a chance

10   to review this before your testimony today?

11   A.  Yes.

12   Q.  And are the excerpts from that a true and accurate copy

13   of the State Department's Country Reports on Terrorism for

14   2007?

15   A.  Yes, they are.

16   Q.  And are these the kinds of documents that you rely upon

17   as an expert in this field?

18   A.  Yes.

19          MR. SINGER:  Your Honor, we would move that into

20   evidence as our next exhibit.

21          THE COURT:  All right.  Is that -- I assume that's

22   also -- the State Department is under a legal obligation to

23   report these --

24          THE WITNESS:  Yes.

25          THE COURT:  -- make these reports.

1              All right.  It will be admitted as a public record

2      conditionally.

3              MR. SINGER:  Thank you, Your Honor.

4      BY MR. SINGER:

5      Q.  Please turn to Page 172 and 173 in the excerpts behind

6      that.

7      A.  Okay.

8      Q.  And, again, in preparing for your testimony, we've

9      marked some pages -- or some statements on those pages.

10     Could you please read those into the record.

11     A.  Which --

12             MR. SINGER:  May I approach the witness, Your

13     Honor?

14             THE WITNESS:  Which --

15             THE COURT:  Yes.  Yes, you may.

16             MR. SINGER:  Thank you.

17             THE WITNESS:  What paragraph number is it?

18             MR. SINGER:  (Indicating.)

19             (Brief pause.)

20             THE COURT:  And what exhibit are we on right now?

21             MR. SINGER:  That's Exhibit-26, Your Honor.

22             THE COURT:  All right.

23             MR. SINGER:  I think we gave him the unmarked

24     version.  So I apologize.

25             THE COURT:  That's all right.

1          THE WITNESS:  All right.  Thank you.  Okay.

2          Despite its pledge to support the stabilization of

3     Iraq, Iranian authorities continued to provide lethal

4     support, including weapons, training, funding and guidance

5     to some Iraqi militant groups that target coalition and

6     Iraqi security forces and Iraqi civilians.  In this way,

7     Iranian government forces have been responsible for attacks

8     on coalition forces.  The Islamic Revolutionary Guard Corps

9     Qods Force continued to provide Iraqi militants with

10    Iranian-produced advanced rockets, sniper rifles, automatic

11    weapons, mortars that have killed thousands of coalition and

12    Iraqi forces and explosively-formed projectiles, EFPs, that

13    have a higher lethality rate than other types of improvised

14    explosive devices, IEDs, and are specially designed to

15    defeat armored vehicles used by coalition forces.  The Qods

16    Force, in concert with Lebanese Hezbollah, provided training

17    outside Iraq for Iraqi militants in the construction and use

18    of sophisticated IED technology and other advanced weaponry.

19    BY MR. SINGER:

20    Q.  Now, are the statements made in that report on the

21    Iranian -- Iran providing the advanced weaponry consistent

22    with the knowledge you were obtaining on the ground from

23    intelligence briefing and personal experience?

24    A.  They are.

25    Q.  And was the fact that they were trained in using these

1    weapons in Iran by the IRGC Qods Force consistent with the

2    briefings that you were getting on the ground at the time,

3    as well?

4    A.  Yes.

5    Q.  And did, in fact, the EFPs that were planted throughout

6    the city impact your own ability to travel and move around

7    in Baghdad at that time?

8    A.  It did.  It was an extremely dangerous and very complex

9    process to move from point to point outside the Green Zone.

10   Q.  In addition to the EFPs impacting you, did the rockets

11   that were provided by Iran to the special groups, and

12   particularly to the al-Mahdi Army, Muqtada al-Sadr's group,

13   impact you and your team?

14   A.  Yes, they did.  As I mentioned, in the spring of 2008,

15   out of the blue -- I mean, things had gotten somewhat quiet.

16   They weren't quiet, quiet, like they got later, but it

17   had -- whereas in my trips from 2004 to -- through 2007,

18   every trip, woken up at night by rockets coming in, but they

19   were relatively small rockets and they were launched from

20   flatbed pickup trucks by, you know, mortars that, you know,

21   sometimes hit their mark but were not extraordinarily

22   lethal, as became the case on -- in -- on March 24th of 2008

23   when Paul Converse was killed, and that's when -- and I

24   think it was, sadly, the first rocket -- I mean, the very

25   first launch of this barrage -- this effort.

1            As we -- as I learned later, Sadr just wanted to

2      show what they could do if they wanted to which was his

3      mistake because this -- one of the reasons Sadr left and

4      declared a ceasefire was our response into Sadr City.  I'll

5      talk about that in a minute.  But they launched a rocket and

6      it -- and Paul had just come back from the gym; was in his

7      trailer.  There he is.  He's from Corvallis, Oregon, and an

8      auditor, and it hit -- direct hit.  He survived for 10

9      hours, but massive head trauma.  Thankfully, the only one

10     that we lost, but -- had 5 others wounded, similar attacks,

11     previous year, but then that barrage continued for about 6

12     weeks, and it wasn't publicly reported, but 31 people --

13     Iraqis and Americans, contractors, public servants -- were

14     killed, and then -- and Petraeus recognized this right away

15     and then launched a massive attack with MRAPs into Sadr City

16     just leveling and hitting -- inflicting huge damage and they

17     stopped.

18            And, indeed, after that, Sadr declared a

19     ceasefire; disbanded the Jaysh al-Mahdi; declared that he

20     was going to Iran to study, and so it had the effect,

21     Petraeus's response, because of what the Sadrists did --

22     that Jaysh al-Mahdi did to Paul and 30 others over a 6-week

23     period.  Everybody moved into the Republican Palace.  It was

24     one of Saddam's palaces.  We were all living in these

25     trailers out in the -- but it was just jammed because it

1    was, you know, solid concrete, granite, and you would

2    survive there, but it was the worst -- overall, the worst 6

3    weeks of my professional life.

4              THE COURT:  And what time was this again?  What

5    time frame?

6              THE WITNESS:  This was March 24th, 2008.

7    BY MR. SINGER:

8    Q.  Now, I'm going to go into the sanctuary in Iran part of

9    al-Sadr's life story in just a second, but before I do that

10   I want to ask you to look at Exhibits -- at Exhibit-32 --

11   actually, 31 and 32.  Just look at --

12   A.  Right here.

13   Q.  -- the cover of those two exhibits, please.

14              (Brief pause.)

15   A.  Okay.

16   Q.  And as we do that, are you aware that the U.S. Army

17   published an official history of the Iraq war?

18   A.  I am.  I know the writer -- the writers.

19   Q.  And how was that history put together?

20   A.  It was an assignment from General Ray Odierno.  He

21   wanted to capture what happened.  The Brits had done a --

22   their own study, and I think General Odierno -- or they were

23   doing their own study.  They launched their own significant

24   study.  And he recognized that there was no major

25   government-driven study of what happened in Iraq and what we

1    could learn from it ongoing within the U.S. Government, and

2    so he pursued it.

3    Q.  Was it done under the auspices of the War College?

4    A.  Yes, it was assigned to personnel at the Army War

5    College.

6    Q.  And was this an official government investigation and

7    report from which the U.S. could learn lessons about its

8    history in Iraq?

9    A.  Yes.

10   Q.  And have you had a chance to review -- well, let me ask

11   you this first.  When was it declassified?  When did the

12   report become public?

13   A.  A month ago.

14   Q.  And since it was released a month ago, have you had an

15   opportunity to look at the portions that would be relevant

16   to the case that we're discussing today?

17   A.  Yes, I have.

18   Q.  And are they true and accurate to the best of your

19   knowledge regarding the events that are recorded in that --

20   A.  Yes --

21   Q.  -- war --

22   A.  -- they are.  It's very well written.

23              MR. SINGER:  All right.  Your Honor, I would move

24   Exhibits 31 and 32 into evidence.

25              THE COURT:  All right.  Let me just ask, these are

1    reports that were legally authorized by the United States

2    Government?

3              THE WITNESS:  That's right.

4              THE COURT:  All right, then.  They will be

5    admitted both as public records and -- well, they will be

6    admitted as public records conditionally.

7              MR. SINGER:  Thank you, Your Honor.

8              THE COURT:  Please proceed.

9    BY MR. SINGER:

10   Q.  When were they published?  I mean, they were

11   declassified a month ago.  But when were they actually

12   published, do you know?

13   A.  You mean for the public consumption?

14   Q.  No.  I mean, when were they actually printed and --

15   A.  I mean, it was a month ago.  It was closely held and --

16   because of arguments over some of the conclusions in-house.

17   Q.  Okay.  I've excerpted on the screen a couple statements

18   from this report regarding the event that you just talked

19   about.  Could you read those into the record, please.

20   A.  The rockets launched at the Green Zone yesterday were

21   Iranian-provided, Iranian-made rockets.

22   Q.  All right.

23   A.  General David Petraeus, March 24th, 2008.

24   Q.  And to your understanding, was that referring to the

25   attacks on the Green Zone that you discussed a few minutes

1   ago?

2   A.  The ones that killed Paul Converse.  That's right.

3   Q.  And please read the second excerpt there.

4   A.  Sadr City, in effect, had become not only a Shia militia

5   safe haven, but also an instrumental staging area for an

6   Iranian proxy war against the coalition.

7   Q.  And are both of these statements consistent with what

8   you were seeing on the ground in Baghdad at the time?

9   A.  From personal experience.  Absolutely.

10  Q.  And were they also consistent from the briefings you

11  were getting at the time?

12  A.  Yes.

13  Q.  Now, in 2008, after these bombings took place, did the

14  Americans capture a leader of one of the Shia militias?

15  A.  Yes.

16  Q.  And who was that?

17  A.  Qais al-Khazali.

18  Q.  And did they also capture his brother?

19  A.  Yes.  Was it the Americans or the British who captured

20  them?  I can't remember.

21  Q.  I'll ask you the questions since I don't know the

22  answer.  Let me ask it this way.  Did the coalition forces

23  capture --

24  A.  Coalition forces did, yes --

25  Q.  -- the Khazali brothers?  Okay.

1    A.  -- in Basra.  The British were controlling Basra, and I

2    think they were nabbed down there by the Brits.

3    Q.  All right.  Thank you for correcting that.

4         And have you had an opportunity to review the

5    interrogation reports that were recently declassified from

6    the interrogation of those two?

7    A.  Yes, I have.

8    Q.  And, again, turning your attention to the exhibit which

9    is the history of the Iraq war, there are two excerpts from

10   the screen -- that are shown on the screen.  Can you please

11   read those into the record for the Court.

12   A.  Yes.

13        On March 20th, 2008, in Basra, coalition troops

14   captured Qais al-Khazali and his brother, Laith al-Khazali,

15   based on evidence that the two men and their Asaib Ahl

16   al-Haq group had been behind the January 2007 killing of

17   U.S. military advisors at the police compound in Karbala.

18   Once talking, they revealed extensive details about their

19   Iranian-sponsored operations.

20   Q.  All right.  And then the next page as well from Page 224

21   of Exhibit-32.

22   A.  Khazali's statement, along with those of his brother and

23   other detainees, provides incontrovertible evidence that

24   Iran is arming, funding, training, equipping and advising

25   Shia extremists operating in Iraq.  The statements are

```
1    buttressed by dozens of documents taken from captured

2    laptops.

3    Q.  All right.  Now, at the time that these interviews were

4    done -- these interrogations were done, did you have access

5    to the interrogations?

6    A.  No.

7    Q.  But since they have been declassified, have you reviewed

8    the interrogations themselves?

9    A.  I have.

10   Q.  And was your review of those interrogations as an expert

11   witness consistent with this conclusion written up in the

12   U.S. Army's history of the Iraq war that Iran was arming,

13   funding, training, equipping and advising Shia extremists

14   operating in Iraq?

15   A.  Yes, it is.

16   Q.  And did that apply to the al-Haq organization that Qais

17   al-Khazali was head of?

18   A.  Yes.

19   Q.  Did it also apply to the JAM organization that Muqtada

20   al-Sadr was head of?

21   A.  Yes, it did.

22   Q.  What, if anything, did you learn in those interrogations

23   as an expert witness that would indicate Iran's funding and

24   training of these organizations?

25   A.  Well, Qais was very specific about the distribution of
```

1    money from Iran to the terrorist groups in Iraq, and it was

2    sometimes 750,000, sometimes 3 million a month in cash --

3    U.S. dollars, always in dollars -- and it always went to

4    Muqtada al-Sadr, and then he decided on its distribution

5    among Jaysh al-Mahdi and the special groups.

6    Q.  All right.  Now, why is that an important piece of

7    information for this time period?  Which is 2008.  Why is

8    that an important piece of information?

9    A.  Well, it substantiates that -- Iran's unrestrained

10   support of the Shia terrorist groups operating in Iraq of

11   Muqtada al-Sadr and it's -- it was at a crucial turning

12   point post-surge as the United States was realizing success

13   of its very, very difficult and bloody -- actually, the

14   surge was the bloodiest moment in the entire Iraq War; that

15   the -- it helped spell out why '05, '06, '07 were so awful,

16   because the -- without those resources -- not just the

17   funding, but the training and the weapons as well -- the

18   surge wouldn't have been necessary.  If you have to put

19   your -- place responsibility for the Iraq War's resurgence,

20   so to speak, and the necessary [sic] of the surge to

21   suppress it, here it is.

22   Q.  At the time that this -- that these interrogations were

23   done, on the surface, was -- al-Mahdi and Muqtada al-Sadr,

24   were they positioning themselves as separate from these

25   other special groups?  In other words, on the surface, was

1   Muqtada al-Sadr saying that the special groups had

2   splintered and they were different organizations that he

3   wasn't a part of anymore?

4   A.  Well, there was -- there were splintering of ideas and

5   control, but the funding reveals the unanimity of support

6   and effort, because Asaib Ahl al-Haq was not getting

7   independently funded.  It was receiving its money through

8   the Muqtada al-Sadr pipeline.

9   Q.  And did the interrogations also reveal any details

10  important to your opinion with regard to training of the

11  special groups and Jaysh al-Mahdi?

12  A.  Iranian effort, support, funding, equipping was the

13  repeated theme regarding all of them.

14  Q.  All right.  We're going to turn now to al-Sadr fleeing

15  to Iran for sanctuary at this time.

16          MR. SINGER:  Judge, I don't know if this would be

17  a good place to take a morning break or -- if you do that,

18  or if we should keep going through to lunch or --

19          THE COURT:  If you think -- we could take -- well,

20  I would want to stop for lunch, whenever we do stop.

21          MR. SINGER:  Okay.

22          THE COURT:  I don't know.  We could -- although we

23  could -- why don't we take -- how much more do you think you

24  have with this witness?  I don't want to --

25          MR. SINGER:  Yes, sir.

```
1              THE COURT:  I mean, if you think you can get him

2      done -- are we going to be here after lunch with this

3      witness?  I --

4              MR. SINGER:  Probably --

5              THE COURT:  All right.

6              MR. SINGER:  -- a little bit, Your Honor.  Yeah.

7              THE COURT:  So then why don't we just take a

8      15-minute break --

9              MR. SINGER:  Yes, sir.

10              THE COURT:  -- and then go from 12:00 to 12:30,

11      and then break for lunch at 12:30.

12              MR. SINGER:  Sounds great.

13              THE COURT:  All right.

14              THE DEPUTY CLERK:  All rise.  This Honorable Court

15      stands in recess for 15 minutes.

16              (Brief recess taken.)

17              THE COURT:  All right.  Mr. Singer, before we

18      begin, can I make one, just, observation about how we

19      proceed.

20              MR. SINGER:  Certainly.

21              THE COURT:  We need to have a record of -- to the

22      extent you're showing him slides, we need to, at a minimum

23      for the record purposes, have a record of what you're

24      showing him for potential appeal purposes or whatnot.

25              MR. SINGER:  Yes, Your Honor.
```

```
1              THE COURT:  So -- and the nature of those
2    slides -- I guess I would suggest, then -- the first thing I
3    would suggest is, so if you're showing him a slide that is
4    a -- whatever it is, I think you need to, if you would --
5    and for the most part, you've been doing this, although not
6    totally -- describe what you are showing him just so the
7    record has it and you all have in order -- and we can mark
8    them for identification later.  We can do whatever we need
9    to do later in terms of making sure we know what it is,
10   but --
11             MR. SINGER:  Yes, sir.
12             THE COURT:  -- for you to describe it, I think,
13   makes sense.
14             MR. SINGER:  Yes, sir.
15             THE COURT:  Depending on what it is, you know, if
16   you want move it into evidence, you can lay the foundation.
17   If it's something that he's just relied upon, then you don't
18   really have to do that.  If it's -- but even if it's, I
19   mean, something harmless like, Here's a photo of a
20   politician.  Who is this person and why are they relevant?
21   I mean, I, you know -- there's no reason to admit that, but
22   just --
23             MR. SINGER:  Yes.
24             THE COURT:  -- for the record, I think we need to
25   have --
```

1              MR. SINGER:  A description of it.

2              THE COURT:  -- a description -- just, Here's a

3    photo of -- I guess that's tough if you're using it in that

4    way, but we have to have a way of knowing in the record what

5    you're using and then for you to be able to provide -- I

6    don't know whether all the things you've used, you've

7    provided us as exhibits or not, but, again, just for the

8    record purposes, we need to have --

9              MR. SINGER:  Yes, sir.

10             THE COURT:  -- a copy of everything that we can

11   mark for identification purposes just so we have everything

12   you've used with every witness.  Does that make sense?

13             MR. SINGER:  Yes, sir.  It sure does, Your Honor.

14             THE COURT:  And, again, if it's something like,

15   you know, the Iraq war book, that -- I believe I admitted

16   that as a public record.  It doesn't -- the fact that --

17   again, I would just describe, Here we have an exhibit.  It's

18   an excerpt of Pages X to Y on this -- on whatever exhibit.

19   Would you, you know -- would you read those.  That's just

20   making it easier for him to --

21             MR. SINGER:  Yes, sir.

22             THE COURT:  -- have -- go through these whole

23   things.  But, again, just describing it and keeping all of

24   them and providing to us -- them to us at the end of the day

25   will help us make a record to make sure that we don't --

```
1                    MR. SINGER:  Yes, sir.

2                    THE COURT:  -- louse that up.

3                    So in any event, with that said, let's continue.

4                    MR. SINGER:  Thank you, Judge.  And probably, if

5       it's okay with the Court, we'll just file the entire slide

6       deck tonight, you know, on the Court's electronic exhibit,

7       and also, provide the Court with hard copies of the --

8                    THE COURT:  That would be --

9                    MR. SINGER:  -- slides.

10                   THE COURT:  That would be great.  And if that,

11      combined with your description and -- I don't know if the

12      slides have numbers or there's an easy way for you to just

13      say it's Slide 3.  I --

14                   MR. SINGER:  Right.

15                   THE COURT:  I don't know, but however we do it, I

16      think if somebody wants to reconstruct what you showed --

17                   MR. SINGER:  Yes, sir.

18                   THE COURT:  -- every -- each particular witness, I

19      imagine for a lot of the other witnesses there won't be

20      these kind of exhibits, but whether that's true or not, we

21      just -- we need to be able to -- we need to know that for,

22      you know -- for the purposes of the record.

23                   MR. SINGER:  Yes, sir.

24                   THE COURT:  All right.

25                   MR. SINGER:  Thank you, Judge.
```

```
 1    BY MR. SINGER:

 2    Q.  Mr. Bowen, when we took a break, we were talking about

 3    the time that Muqtada al-Sadr fled to Iran.  Can you tell

 4    the Court whether or not that was a result of him coming

 5    under increased pressure from the coalition forces.

 6    A.  I believe it was.  He didn't just flee to Iran.  He

 7    declared a ceasefire, disbanded the Jaysh al-Mahdi and

 8    retreated to Qom to begin lengthy theological studies in

 9    pursuit of some title which he's yet to acquire.

10    Q.  So that was going to be my next question, is, did he

11    complete those theological studies, to your knowledge, while

12    he was in Qom?

13    A.  Not to my knowledge.  I have read that it's a 12-year

14    course to become a Grand Ayatollah.  I don't think he's

15    pursuing that.

16    Q.  And during the time that he was in Qom, you mentioned,

17    before he left, that he disbanded Jaysh al-Mahdi.  Did any

18    other organization rise up to take its place and, if so,

19    what was the name of that organization?

20    A.  You mean following his return --

21    Q.  Under the direction of Muqtada al-Sadr.

22    A.  Muqtada -- okay.  After he returned?

23    Q.  Yes, sir.

24    A.  Saraya al-Islam [sic] --

25    Q.  All right.  Now --
```

```
1    A.  -- as I'm recalling it.  Saraya is how I refer to it.

2    Q.  Have you heard of the organization the Promised Day

3    Brigades?

4    A.  Yes.

5    Q.  And who are the Promised Day Brigades?

6    A.  Oh, that was a successor group post-Jaysh al-Mahdi.

7    Q.  And were the Promised Day Brigades actually conducting

8    militaristic and terrorist operations during the time that

9    Muqtada al-Sadr was exiled in Iran?

10   A.  Yes.

11   Q.  And was that under the direction, to your knowledge, of

12   Muqtada al-Sadr?

13   A.  Under his influence.

14   Q.  And was this during the time that you were on the ground

15   in Baghdad?

16   A.  Yes.

17   Q.  And once -- just so the Court is aware of the

18   progression, once Muqtada al-Sadr returned to Iraq, did the

19   Promised Day Brigades morph into another organization?

20   A.  Yes.

21   Q.  And what was that organization?

22   A.  Saraya.

23   Q.  Saraya al-Salam?

24   A.  Islam -- al-Salam.

25   Q.  And is that the organization, to your understanding from
```

1    reading the complaint and the other documents in this case,

2    that was responsible for the kidnapping of the plaintiffs?

3    A.  Yes.

4    Q.  And just so the record is clear on that, Mr. Bowen, have

5    you had the opportunity to read the complaint in this case?

6    A.  Yes, I have.

7    Q.  And have you had the opportunity to read the sworn

8    affidavits of Waiel El-Maadawy and Amr Mohamed?

9    A.  Yes, I have.

10   Q.  Have you also had an opportunity to read the deposition

11   of Russell Frost taken in a related DBA matter?

12   A.  Yes, I have.

13   Q.  Is there anything that you wanted to read in this case

14   that you were not able to do?  Any other information that

15   you felt like you needed in order to form your opinion?

16   A.  No.

17   Q.  How much do we know about the time that Muqtada al-Sadr

18   spent in Iran during that three years between 2008 and 2011?

19   A.  Not very much.  I mean, he was fairly quiescent during

20   that period.  He did occasionally come back to Iraq and

21   occasionally made public statements, but his -- compared to

22   the five years preceding where he was extraordinarily public

23   and active, he became quiescent.

24   Q.  Was his religious philosophy consistent with the

25   religious philosophy that underlined the Iranian Revolution

1    of 1979?

2    A.  Yes.

3    Q.  And did it continue to be after those three years that

4    he spent in Iran?

5    A.  Yes.

6    Q.  Was there any political organization that continued to

7    basically carry his banner or carry his name during the time

8    that he was away?

9    A.  Well, there were a variety of Iranian influenced

10   political organizations, but Dawa continued to carry forward

11   the -- was the primary avatar of Iranian interests in Iraq.

12   Q.  And is -- the Iranian elections, are they on four-year

13   cycles?

14   A.  Yes, they are.

15   Q.  And what were the years -- between 2010 and 2018, what

16   were the years where they held national elections?

17   A.  You said Iran or Iraq?

18   Q.  I'm sorry.  I -- if I said Iran, I meant Iraq.  Were the

19   Iraqi elections on four-year cycles?

20   A.  Yes, they are.

21   Q.  And what were the election years -- their national

22   election years?

23   A.  2010, 2014, and then the advent of ISIS forced an

24   unexpected change in the -- that is, the removal of Nouri

25   al-Maliki at Grand Ayatollah Sistani's insistence in August

66

1    of 2014 and his replacement in September with Haider

2    al-Abadi, then Abadi stood for formal reelection in 2018 and

3    he came third.

4    Q.  All right.  So we're going to get to that election in

5    just a minute, but let me go back to this time period that

6    al-Sadr was in Iran, 2008 to 2011.  What precipitated his

7    return to Iraq in 2011?

8    A.  He -- I think he was -- it -- the departure of the U.S.

9    forces which occurred in December and he saw, you know -- he

10   left because of, as we discussed earlier, the extraordinary

11   response that U.S. forces imposed upon Sadr City and upon

12   Jaysh al-Mahdi -- upon him personally, frankly -- and that

13   threat left in 2011.

14   Q.  Do you consider, as an expert witness, his time in Iran

15   to be a time of sanctuary from the U.S. efforts to combat or

16   capture him?

17   A.  Yes.

18   Q.  All right.  Turn to Exhibit-32, please.  I'm going to be

19   showing you a slide that is an excerpt from Exhibit-32 which

20   has already been admitted, and it is Page 619 and 620 from

21   Exhibit-32.

22   A.  Okay.

23   Q.  And I'll ask you to read that excerpt from the U.S.

24   Army's history of the Iraq war.

25   A.  From an early stage in the war, Syria and Iran played a

1    highly destabilizing role in Iraq.  They gave sanctuary and

2    strategic assistance to the Sunni and Shia insurgencies,

3    respectively, and contributed materially to the killing and

4    wounding of tens of thousands of Iraqis and hundreds, if not

5    thousands, of coalition troops.

6    Q.  All right.  Syria was a sanctuary for the Sunnis?

7    A.  That's right.

8    Q.  And then Iran was a sanctuary for the Shias?

9    A.  That's correct.

10   Q.  Did you consider -- this three years, in your expert

11   opinion, where Muqtada al-Sadr went to Iran supposedly to

12   study and get a theological degree, do you consider that to

13   be a time of sanctuary in Iran?

14   A.  In Iran?

15   Q.  Yes.

16   A.  Yes, I do.

17   Q.  And are you aware of other instances where Shia leaders

18   who were being hunted by United States forces or the Iraqi

19   government went to Iran to seek sanctuary?

20   A.  Well, Shia leaders regularly went to Iran for a variety

21   of reasons, including sanctuary.  I mentioned earlier that

22   Maliki went there.  He went there for a while after his

23   deposition in August of 2014.  He retreated to Iran for, I

24   guess, sanctuary.

25   Q.  When Muqtada al-Sadr returned to Iraq after this three

1    years of sanctuary in Iran, what was the focus of his energy

2    and ambitions at that point?

3    A.  Well, he transformed himself into a political figure

4    which he claimed to be previously, but his actions didn't

5    support that.  This time, he set his sights on securing

6    seats in parliament and beginning to influence the

7    government from inside as well as outside.  He didn't change

8    his militant posture.  He just -- he didn't use the gun as

9    often.

10   Q.  Now, how did he position himself politically, especially

11   with regard to outside influences such as the United States

12   and Iran?

13   A.  How did Muqtada al-Sadr position himself after he

14   returned to Iraq?

15   Q.  Yes, sir.  In 2011 and following, how did he position

16   himself politically?

17   A.  Well, he tried to reinvent his image as an Iraqi

18   nationalist and he made fighting corruption his number one

19   issue, and that resonated very much across the Iraqi

20   population because corruption just got -- has gotten

21   continuously worse since 2003 in Iraq and, arguably, is as

22   bad as it's ever been at -- even at this moment, and so he

23   -- I think he demonstrated his political acumen in choosing

24   a non-sectarian issue and, really, a -- not even an

25   ideological issue to garner support, and it worked.

1    Q.   Did his party gain seats in the 2014 elections?

2    A.   Yes, it did.

3    Q.   And how well did they do in the 2014 elections?

4    A.   I don't remember what their total number was, but they

5    were the top vote-getter in 2018, getting -- garnering 54

6    seats.  I think they got 25 in the 2014.

7    Q.   And during the years following his return to Iraq when

8    he's positioning himself as an Iraqi nationalist leader,

9    according to your sources on the ground, the intelligence

10   briefings you were part of, was he still getting funds from

11   Iran at the time?

12   A.   Yes.

13   Q.   And did he reconstitute his militia under the banner of

14   Saraya al-Salam?

15   A.   He did.

16   Q.   And did that militia have any part in the fight against

17   ISIS?

18   A.    It did.  And this is probably the most significant

19   security development of the last four years in Iraq, and

20   that's what's called the PMF, the Popular Mobilization Front

21   [sic], and it's a collection of generally Iranian-supported

22   militia, and it's not a new thing in Iraq.  There were

23   militia out there.  Nouri al-Maliki had his own militia, you

24   know, that supported him after he was deposed in August

25   2014.

1          But these various Shia-supported, Shia-funded --

2     meaning, Iranian-funded -- militia, in response to Sistani's

3     fatwa which was all Shia must take a stand against the

4     invading ISIS, well, the structure that evolved from that

5     fatwa was already forming; was already -- the pieces of it

6     were already there.  It became formalized as the Popular --

7     Al-Hashd al-Shaabi, the Popular Mobilization Front [sic], of

8     which Sadr's group was a part of.  Hadi al-Amiri, who came

9     second in the 2018 election, is -- and is the most

10    Iranian-aligned leader in the Iraqi pantheon -- was the

11    Captain of the overall PMF.  And Muhandis, his Deputy --

12    this -- and this is why the United States has a significant

13    problem with the PMF -- is an internationally-wanted

14    criminal, a terrorist, and so the criminality/terrorism

15    component that infused the PMF has made them anathema to the

16    United States and to the west, but Muqtada is identified

17    with that -- less so than Amiri, but he is identified and

18    he's part of it -- and Abadi, in the parliament, sanctioned

19    them and actually, last year, gave them $2 billion to

20    support -- to pay their salaries, 120,000 members total in

21    the PMF, and -- among other things.

22    Q.  That was -- by "last year," you're referring to 2018 --

23    A.  Yes.

24    Q.  -- is that correct?

25    A.  That's right.

1    Q.  And -- but were the PMF -- the Popular Mobilization

2    Forces, were they ever answerable to and part of the Iraqi

3    national forces or did they retain their loyalty to their

4    militia leaders?

5    A.  They retained their loyalty to their militia leaders,

6    and that's the problem, is that they -- there -- those

7    militia leaders differed.  And there were, in fact, some

8    Sunni PMF and Kurdish in the mix, but it was an

9    Iranian-influenced organization and an Iranian movement --

10   an infiltration, I would even say -- into the Iraqi security

11   forces, and that infiltration is now legalized by the

12   parliament.

13   Q.  All right.  Now, you heard -- were you here for my

14   opening statement, sir?

15   A.  Yes, I was.

16   Q.  Did you hear me discuss the way that ISIS took over

17   major cities in Iraq in the 2014 time frame and the years

18   following that?

19   A.  Yes.

20   Q.  Tell us what you know at the end of your term as SIGIR

21   in Iraq -- what you know about the status, the training of

22   the Iraqi national forces, and particularly whether they

23   were ready for a war like the war that ISIS brought to them.

24   A.  Well, this is the -- a point of great frustration, I

25   think, for all Americans and the cause of collapse in Iraq,

1    and that is when the last U.S. troop left in December of

2    2011, Nouri al-Maliki's anti-Sunni push began.  He -- the

3    next day, he issues a warrant for the arrest of the most

4    senior Sunni official in his government, Tariq al-Hashimi.

5    Maybe he did some bad things.  Who didn't over there?  But

6    this is the top Sunni.  So he's sending a signal that he is

7    bringing the Sunni-Shia war to the top rung, and Tariq

8    al-Hashimi has never returned to Iraq.  He's in Ankara

9    still.  And then a year from that date almost exactly, he

10   orders his counterterrorism unit -- which he, then, had,

11   that year after we left, ordered to report directly to him,

12   the counterterrorism forces -- to kill the Minister of

13   Finance, who is a Sunni, driving back from Ramadi on his way

14   to Baghdad, and he'd gotten word.  He escaped and exiled.

15   That was symptomatic of, I think, an Iranian influence of

16   hyper-sectarianism into the governance of Iraq which we had

17   fought like hell to prevent, and that battle was lost when

18   the last troop left because his monitors were gone.

19        And the next step was his fear of a coup from the

20   Ministry of Defense.  The Ministry of Defense, traditionally

21   Sunni-run under Saddam.  I understand, maybe, he would want

22   others, but the Sunnis were the career Generals; right?

23   They ran the show, and that's who we invested in, all that

24   money, that 26 billion, and he replaced those Generals with

25   his cronies.  That sowed the seeds for the collapse

1  of Mosul.  I mean, when ISIS invaded Mosul, they were --

2  ISIS was outnumbered 10 to 1.  On paper, you know, why did

3  the Iraqis flee?  Well, their Generals fled.  And part of it

4  was that, as I've been told by my friends in Baghdad, Sunnis

5  don't want -- I mean, Shia don't want to die in Sunni

6  territory and Mosul is Sunni territory, and so they, almost

7  at the first shot, turn and flee and the second largest city

8  in Iraq goes into terrorist hands, you know, for the next

9  two-and-a-half years.

10  Q.  Was the American vision for postwar Iraq to always have

11  some kind of coexistence between the Sunnis and the Shias?

12  A.  That was it.  And it was the vision that was fought over

13  in 2005 with the adoption of the new constitution that --

14  and the formation of a ruling structure that included

15  Sunnis.  The Deputy Prime Minister was a Sunni; the Minister

16  of Finance was a Sunni; the Minister of Defense was a Sunni.

17  I mean, they assigned spots, and those unwritten rules --

18  those assignment rules were observed until 2011, and then

19  Nouri al-Maliki began his probably long-planned Shia

20  purge -- move to purge -- at least purge the power that --

21  limited power that the Sunnis had at that point.

22  Q.  And how did that actually affect the fighting on the

23  ground of the troops that were involved in the war against

24  ISIS?

25  A.  Well, it resulted in ISIS having enormous gains to the

1    extent that they eventually, at their high watermark,

2    controlled a third of Iraq's land mass; had -- and that's

3    shocking.  And before -- and it was -- and that led to

4    Maliki's deposition and the installment of Abadi, but also

5    the death of 2 Americans -- an aid worker and a reporter --

6    led to the re-entering of the United States into Iraq first

7    in the form of significant air power and then, eventually,

8    5,000 troops.

9    Q.  All right.  What year did the U.S. re-enter Iraq?

10   A.  Well, 2014.

11   Q.  And did the U.S. send people over to train the Iraqi

12   national forces?

13   A.  Yes.

14   Q.  Was -- were -- was the country of Iraq at that time with

15   their national forces recruiting people as fast as they

16   could to join this fight with ISIS?

17   A.  Yes.

18   Q.  Did Americans use both military personnel and civilian

19   contractors working for DOD to train them?

20   A.  Yes.

21   Q.  And is your understanding -- is it your understanding

22   that the plaintiffs in this case were part of that effort?

23   A.  That's right.  Yes.

24   Q.  Now, how did this coalition against ISIS come to --

25   well, first of all, let me ask this.  Who was in this

1    coalition against ISIS in the 2014 to 2016 time frame?

2    A.  Well, you had the Iraqi forces, of course; the United

3    States re-entering; there were also other coalition

4    countries that contributed forces and, in this case, Jordan,

5    for example.  I mean, in this case, Gulf countries; Arab

6    countries contributed military support in a way that

7    distinguishes this phase of coalition effort from the

8    previous one.

9    Q.  All right.  Now, I want to take your attention to

10   2016 -- January of 2016 when the three plaintiffs in this

11   case were training the Iraqi national forces and were taken

12   hostage, as you know from reading the complaint.  Okay?

13   A.  Yes.

14   Q.  All right.  In January of 2016, was -- did al-Sadr have

15   the Saraya al-Salam militia formed and operational in

16   January of 2016?

17   A.  Yes, he did.

18   Q.  And to your knowledge based on your briefings and your

19   contact with leaders in Iraq after you left as Inspector

20   General, were these the same men, essentially, that had

21   formed his earlier militias?

22   A.  Well, it was his tribe.  I mean, those that had been

23   following him continued to remain loyal to him despite his

24   exile.

25   Q.  And did they continue to operate from the same

1    headquarters in the Sadr City area of Baghdad?

2    A.  They did.

3    Q.  Did the Sadr City area of Baghdad remain under the

4    control of him and his militia in January of 2016?

5    A.  Yes.

6    Q.  What was al-Sadr himself doing in the early part of

7    2016?

8    A.  He was campaigning.  He was a -- someone that was

9    building his brand, I would say, with an eye on -- well, I'm

10   unsure he had decided yet -- with an eye -- being a

11   kingmaker, if not the king, come 2018, and he was also being

12   responsive to U.S.-Iranian developments vis-à-vis the JCPOA

13   and continuing to get his monthly payments, I'm sure.

14   Q.  All right.  I've put a slide in front of you that's

15   entitled, Early 2016, and then the first bullet point on

16   that slide indicates that the plaintiffs were taken hostage

17   by Saraya al-Salam.  And that was in January 2016; is that

18   correct?

19   A.  Yes.  All right.  That -- and that was coincident -- the

20   next month, I think, was the -- was his demonstration of

21   political power through militant sit-ins in Tahrir Square,

22   but also in crashing the parliament, you know, for a day and

23   shutting it down and with his -- just with his people.

24   Q.  All right.  I want to ask you about that in just a

25   minute.  But first, the second bullet point we've put up is,

1    Sadr leads a million-man demonstration in Tahrir Square.

2    Can you explain to the Court what that refers to and what

3    this second demonstration that you just mentioned refers to,

4    as well.

5    A.   Yeah.  It -- well, it was -- again, Sadr, his rhetoric

6    was about anti-corruption and the failure of the Abadi

7    regime to address the mafias that were robbing the country.

8    Sadr, like Nasrallah, you know, is the patron of the poor

9    and he speaks that rhetoric, and when he discusses the

10   anti-corruption issue, he discusses it in terms of the

11   billionaire mafioso who are carting the cash out of the

12   country for their own vile purposes.

13   Q.   And was al-Sadr, in fact, meeting with Nasrallah --

14   who's the head of Hezbollah -- during this time frame of his

15   hyper-political activity in early 2016?

16   A.   He was.  He employed the Hezbollah playbook in stirring

17   up the indigent masses into anger against the ruling

18   authorities.

19   Q.   All right.  Now, on the bullet points on the screen in

20   front of you, we've added two bullet points:  Sadr has the

21   plaintiffs record a video giving him credit for their

22   release; and Sadr travels to Lebanon to meet with Hassan

23   Nasrallah, the General Secretary of Hezbollah.  Are you

24   aware, from your review of the plaintiffs' affidavits --

25   and, by the way, Mr. Bowen, have you talked to the

```
1    plaintiffs as well about this time?

2    A.  I have.

3    Q.  And asked them questions about their capture

4    and treatment and release?

5    A.  I have.

6    Q.  And from that information as well as reading the

7    documents in this case, are you aware as to whether or not

8    the plaintiffs were forced to record a video while they were

9    in captivity?

10   A.  They were as a condition for their release.

11   Q.  And what was -- what were they told to do as part of

12   this video, to your understanding?

13   A.  To thank Muqtada al-Sadr for their liberation and to, I

14   think, speak condemning words of -- I don't remember the

15   details -- against the United States, but it was mainly to

16   credit Sadr for their liberty.

17   Q.  And does that fit -- is that consistent with what you

18   saw in Sadr's other political activities in early 2016?

19   A.  Yes.  It was about building his brand as a political

20   influencer.

21   Q.  All right.  Now, do we have the benefit of -- oh, excuse

22   me.  Before I move on to that point, you mentioned that

23   there was also a sit-in in the Green Zone that shut

24   parliament down.  Can you --

25   A.  Yes.
```

1    Q.  -- tell the Court what that was about.

2    A.  Well, again, he was angry with Abadi for not taking

3    action about -- on the corruption issue and, in order to

4    express that anger, he -- his people just stormed the

5    parliament and essentially disabled it for two days.

6    Q.  Now, do we have the benefit of fast-forwarding from 2016

7    to see where al-Sadr's political career ended up as we sit

8    here today?

9    A.  Yes.

10   Q.  And you mentioned some elections in 2018.  I want to

11   show you a slide from the election returns in 2018.  And on

12   that slide, I want to show you --

13          MR. SINGER:  Let's go to the slide.  Right there.

14   BY MR. SINGER:

15   Q.  I want to -- the slide shows you three leaders in 2018.

16   And I'm going to take you through each of these three

17   leaders and ask about these election results in 2018.  All

18   right?

19   A.  Okay.

20   Q.  So the leader on the left is Muqtada al-Sadr, who we

21   have been discussing; is that correct?

22   A.  That's right.

23   Q.  And under his name, it says, Parties, Sadrist Movement,

24   which is the general movement that he inherited from his

25   father.  Is that what you've been testifying to?

```
 1   A.  That's right.
 2   Q.  And what is the name of his party?  And what does
 3   that mean?
 4   A.  Saairun.
 5   Q.  What does that mean?
 6   A.  What's it translate --
 7   Q.  What does that stand for?  Yes.
 8   A.  Oh, I don't remember --
 9   Q.  Okay.
10   A.  -- its translation.
11   Q.  So how did his party do in the 2018 election?
12   A.  His party was the top vote-getter, 54 seats.
13   Q.  All right.  And the second person on this slide we have
14   shown is Hadi al-Amiri?
15   A.  Hadi al-Amiri.
16   Q.  Hadi al-Amiri.  And he was with the Badr Organization
17   which you've mentioned before.  And his party was the Fatah
18   Alliance?
19   A.  That's right.
20   Q.  How did they do?
21   A.  Came second, and that's a one-two win for Iran.  Those
22   are our -- the most Iranian-leaning leaders in Iraq, despite
23   Sadr's pretensions to being a nationalist.  His -- from 2003
24   forward, his funders have come from -- his funders have been
25   to the east.
```

1    Q.  All right.  Now, the third person on this slide, can you

2    please tell us who that is and what the -- what his party

3    was.

4    A.  Haider al-Abadi, who I know quite well, is -- was a

5    member of the Dawa Party which was the big loser in this

6    election.  They lost a number of seats in the parliament and

7    have lost influence after having exerted it for 12 years.

8    Q.  All right.  Now, this election was basically -- the war

9    with ISIS was drawing down at this time?  2018.

10   A.  That's right.

11   Q.  Was the election -- were there claims of fraud and abuse

12   in the election?

13   A.  Yes, widespread claims of fraud and abuse.  There --

14   from the -- my contacts in Baghdad, both people that were

15   running; people who were -- who -- from former leadership

16   positions, said there was widespread purchasing of votes.

17   That's happened before, but this was an unprecedented level,

18   and then there was ballot box stuffing in a way that was

19   also unprecedented.  It's happened before, but to the extent

20   that in certain precincts or regions there were many more

21   votes cast than people living in the province, and the

22   acknowledgement of that was -- by the government was

23   reflected in their order of a recount and -- which was -- as

24   you pointed out in your opening statement, was -- five days

25   after ordering the recount, the main warehouse holding the

1    ballots burned down.  Interestingly, they went ahead with

2    the recount anyway, the five-judge panel that Judge Medhat

3    appointed, and they reached the conclusion that the election

4    was accurate and valid.

5    Q.  All right.  And so these election results stood even

6    after the warehouse burned down that had half the ballots in

7    it?

8    A.  That's right.  And after the recount, it was validated

9    by the panel.

10   Q.  There are a total of 329 seats in the Iraqi parliament;

11   is that correct?

12   A.  That's right.

13   Q.  And so none of these parties had a majority of the seats

14   themselves?

15   A.  That's right.

16   Q.  And so presumably, then, Muqtada al-Sadr would have to

17   try and form a coalition government by uniting with other

18   parties; is that right?

19   A.  That's right.

20   Q.  At the time of this election, what was his public stance

21   with regard to Iranian influence in Iraq?

22   A.  He postured himself as an Iraqi nationalist, and I don't

23   think he disavowed Iran.  He -- but he instead focused on

24   anti-corruption and the need for Iraq to go -- to secure

25   Iraqi interests.

1    Q.  Based on your sources and your review of open sources in

2    reporting on the election, did people expect him to form an

3    alliance with al-Amiri?

4    A.  Hadi al-Amiri?  That's what happened.  Hadi al-Amiri was

5    an unapologetic pro-Iranian party leader and, as I said,

6    head of the Popular Mobilization Front [sic] and someone who

7    frequently sought sanctuary in Iran, as well.  And I think

8    it -- the truth is revealed by the fact that al-Sadr and

9    al-Amiri traveled to Beirut in August of 2018 to meet with

10   Nasrallah and Qasem Soleimani and, at that meeting, it was

11   decided that Adil would become the Prime Minister and Barham

12   Salih would be the President, but also I learned -- I've

13   learned -- I had a -- I was with a small group that met with

14   Javad Zarif, the Foreign Minister of Iran, in October and,

15   reflecting upon that, I -- that meeting, I remember he said,

16   quote, We already knew that, unquote, before the Beirut

17   meeting.

18   Q.  Now, just to remind the Court again, the Beirut meeting

19   included Nasrallah.  And what position was he?

20   A.  He's the head of Hezbollah.

21   Q.  And also, includes Soleimani.  And what position was he?

22   A.  He's the head of the IRGC.

23   Q.  And after that meeting and this coalition is formed, did

24   that coalition, together, pick the next Prime Minister for

25   Iraq?

1    A.   They did.

2    Q.   And what is his stance -- who is it?  What is his stance

3    with regard to pro-Iranian or anti-Iranian?

4    A.   Adil Abdul-Mahdi is -- has branded himself as an

5    independent, not a part of any party, to -- I think, to

6    avoid what is true, and that is he has -- he's always been

7    an Iranian-influence-leaning/supported leader.  He was Vice

8    President for, I think, two years to Ayad Allawi in the

9    first government -- a little under two years -- and then he

10   was Oil Minister, again, for a little under two years in

11   Maliki's second term, and so he's -- I think the theme you

12   get in looking at Adil Abdul-Mahdi's public service career

13   is that he doesn't stay in his positions very long which,

14   for me, raises concerns about how long he might stay as

15   Prime Minister.  And, of course, that means, who's right

16   behind him?  An unapologetic Iranian-influenced leader, Hadi

17   al-Amiri, who wants to be Prime Minister.

18   Q.   By the way, can al-Sadr be Prime Minister?

19   A.   He has said he won't.  You mean, as a legal matter, can

20   he --

21   Q.   Well, no, as a matter of do clerics, under -- do Islamic

22   clerics run for political office and become Prime Ministers?

23   A.   As a general rule, they don't.  They're -- but the --

24   but I don't know if there's a law against that.

25   Q.   Okay.  I want to call your attention, again, to

1    Exhibit-32, the history of the U.S. Army war in Iraq, and

2    you'll see on the slides now an excerpt from Page 639 of

3    Exhibit-32.

4              (Brief pause.)

5              And I'm going to ask you to read that excerpt, and

6    then I have a couple of questions about it.

7    A.  Okay.

8              In terms of geo-strategic consequences, the Iraq

9    War produced profound consequences.  At the time of this

10   project's completion in 2018, an emboldened and expansionist

11   Iran appears to be the only victor.

12   Q.  All right.  Did you read that statement as you were

13   reviewing the Iraq War report?

14   A.  I did.

15   Q.  And do you agree with that statement?

16   A.  I do.

17   Q.  How did Iran end up being a victor in the Iraq War?

18   A.  They saw the removal of their chief antagonist, Saddam

19   Hussein, a Sunni, who launched an eight-year,

20   extraordinarily bloody war against them without provocation

21   in 1981, and they saw that Sunni, from their view, apostate

22   regime replaced with a Shia regime that was extraordinarily

23   friendly and populated by a Prime Minister and others who

24   had exiled in Iran.

25   Q.  And based on your sources and your experience and

1      understanding of the situation in Iraq, was Muqtada al-Sadr

2      continuing to be -- did he continue to get direction and

3      support from Iran all the way up from his return to Iraq in

4      2011 through this political campaign in 2018?

5      A.  Yes, he did.

6              MR. SINGER:  Your Honor, I'm going to turn to the

7      connection with the Iran deal, and I'm happy to complete

8      that or if the Court wants to break at this time for

9      lunch --

10             THE COURT:  Now, why don't we take a quick -- why

11     don't we take an hour break --

12             MR. SINGER:  Okay.  Thank you, Judge.

13             THE COURT:  -- if we can, for lunch.  So we can

14     return -- let's see.  Yeah, I'm glad you went a little

15     further to at least close off that line of questioning.  So

16     let's return at 2:00.

17             MR. SINGER:  Yes, sir.

18             THE COURT:  All right.

19             MR. SINGER:  Thank you.

20             THE DEPUTY CLERK:  All rise.  This Honorable Court

21     stands in recess until the return of Court at 2:00 p.m.

22             (Luncheon recess taken at 12:43 p.m.)

23             THE COURT:  All right.  I hope everyone was able

24     to get a little bit of lunch.

25             Please proceed with your examination.

1          MR. SINGER:  Thank you, Your Honor.

2     BY MR. SINGER:

3     Q.  Good afternoon, Mr. Bowen.

4     A.  Good afternoon.

5     Q.  I'd like to turn your attention now to the JCPOA and the

6     role it plays, if any, in this lawsuit.  Please explain what

7     the JCPOA was and what the respective sides were trying to

8     get out of that deal.

9     A.  It was a treaty, as we discussed earlier, to impose

10    limits on Iran's capacity to enrich uranium and pursue its

11    nuclear program in order to prevent it from advancing its --

12    well, I mean, the acknowledged intent of -- to acquire a

13    nuclear weapon, at least acknowledged by the world's

14    intelligence agencies, and it was negotiated --

15    internationally negotiated agreement involving what was

16    called the P5+1 -- Russia, China, France, Germany, the

17    United Kingdom, plus the United States -- and it was a quid

18    pro quo agreement, like these treaties are, and Iran had

19    specific things it wanted and it got in the course of

20    conceding its right -- or its interest to advance its

21    nuclear power industry or enrich uranium or pursue a

22    weaponizing of it, and those rights included the return of

23    $1.7 billion in a -- of a debt that was quite old -- over, I

24    think, from the Shah era -- and also, to free them up of the

25    limitations of the sanctioned regime that had constrained

1   their economy enormously and put the regime, you know,

2   under -- into great difficulty.

3   Q.  Now, with the reference to the P5+1, were the permanent

4   members of the UN Security Council all a part of that deal

5   on the P5+1 side?

6   A.  Were the -- were all of those members also members of

7   the Security Council?

8   Q.  Yes --

9   A.  Yes.

10  Q.  -- on the P5 -- yes, sir.

11  A.  Right.

12  Q.  And therefore, was the UN also a party to this

13  multilateral agreement?

14  A.  Yes.

15  Q.  And therefore, did it require some level of UN approval?

16  A.  Yes.

17  Q.  You mentioned the lifting of sanctions against Iran.

18  Was the lifting of those sanctions related to sanctions for

19  sponsoring, for example, terrorist activities?

20  A.  Yes.

21  Q.  And did it include lifting of sanctions on institutions

22  like Bank Melli, Bank Saderat and other banks in Iran that

23  had been financing terrorism?

24  A.  Yes, it did.

25  Q.  And to your knowledge, once this deal -- the JCPOA --

1    came into existence and was affirmed by all the sides, were

2    those sanctions actually lifted?

3    A.  Yes.

4    Q.  Now, at the time that the deal was being negotiated,

5    were there Americans being held hostage in Iran?

6    A.  Yes, there were.

7    Q.  I'm going to show you a slide that contains the pictures

8    of three men and their names underneath and their dates

9    of -- the dates that they were held hostage in Iran.  It's

10   entitled, Iranian Hostages Freed on January 17th, 2016.  Are

11   you familiar with who these three people are?

12   A.  Yes, I am, and they were released as part of the quid

13   pro quo of the JCPOA.

14   Q.  And released by what country?

15   A.  By Iran.

16   Q.  And are all three of these American citizens?

17   A.  Yes.

18   Q.  Did America also release prisoners that Iran wanted

19   released as part of the implementation of the JCPOA?

20   A.  Yes.

21   Q.  Do you recall how many that was?

22   A.  I don't remember how many.

23   Q.  And were some of those prisoners being held because of

24   the terrorist activities that they had participated in?

25   A.  Yes.

1   Q.  Now, if we look at the person on the left, Jason

2   Rezaian --

3   A.  Yes.

4   Q.  -- July 2014 is the date he was taken into captivity

5   until January 17th, 2016.  What do you know about

6   Mr. Rezaian?

7   A.  He was a Washington Post reporter.

8   Q.  And do you know why he was taken into captivity by --

9   A.  They accused --

10  Q.  -- Iran?

11  A.  -- him of spying.

12  Q.  All right.  Have you had an opportunity to -- strike

13  that.

14          Do you know whether or not Mr. Rezaian filed a

15  lawsuit in this court against the Republic of Iran?

16  A.  Yes, he has.

17  Q.  And have you had an opportunity to read the transcript

18  of his testimony in that case?

19  A.  I have, parts of it.

20  Q.  I'm going to refer you to Exhibit No. 35.

21          THE COURT:  And before you -- Counsel, if I could

22  just interrupt, with regard to the dates on the slide, just

23  because -- are -- do those appear to be, to the best of your

24  knowledge, the dates in which those individuals were held by

25  Iran?  I say only because --

```
1              MR. SINGER:  Yes, sir.

2              THE COURT:  -- we don't have that in --

3              THE WITNESS:  I believe that's correct.  Yes.

4              THE COURT:  All right.

5              MR. SINGER:  Thank you, Your Honor.

6    BY MR. SINGER:

7    Q.  If you would turn to Exhibit-35.

8    A.  Yes.

9              MR. SINGER:  And, Your Honor, with regard to

10   Exhibit-35, I know, under the judicial notice guidelines,

11   the Court can take judicial notice of testimony from other

12   litigation and give it the credibility that it finds due.

13   So we won't move this in as an exhibit, but we think it

14   falls under the judicial notice evidentiary standard.

15             THE COURT:  This is Exhibit-35?

16             MR. SINGER:  It is, Your Honor.

17             THE COURT:  Do I have -- I think the binder I have

18   in front of me seems to run out at 32.

19             MR. SINGER:  We have two binders, and this would

20   be in the second binder.

21             THE COURT:  Oh, I see.  I didn't realize -- okay.

22   Hold on one second, then.  I wasn't sure whether they

23   were -- ah, okay.  I wasn't sure whether they were

24   duplicates or -- okay.

25             MR. SINGER:  We only had one binder and then we
```

1    hired Mr. Bowen and now we have two.

2              THE COURT:  Understood.  So what -- I'm sorry.

3    What --

4              MR. SINGER:  Exhibit-35.

5              THE COURT:  All right.  And what I'd suggest,

6    then, is we'll -- I'll take under advisement your request to

7    take judicial notice of it.  Obviously, in addition to that,

8    to the extent that his -- he has relied -- your expert has

9    relied on this, if you can lay the foundation for that,

10   then, certainly, it -- while it may or may not come in, his

11   conclusions based on it, it would --

12             MR. SINGER:  Yes, sir.

13             THE COURT:  -- come in.  So --

14             MR. SINGER:  Yes, sir.

15             THE COURT:  -- please.

16   BY MR. SINGER:

17   Q.  As part of your training and qualifications as an expert

18   witness, and especially your time in Iraq as the Inspector

19   General and your review of the Iranian influence in Iraq, do

20   you look at things like sworn court testimony?

21   A.  Yes.

22   Q.  And was this some of the sworn court testimony that you

23   looked at?

24   A.  Yes, it is.

25   Q.  And did this form some of the basis of your opinions in

1      this case?

2      A.  Yes, it did.

3      Q.  If you could look at Page 51 of the excerpts that we

4      have there, and I'm going to ask you to read into the record

5      beginning on Line 15 and just to the first line on Page 52.

6      So the question is, Was there any rhyme or reason?  Do you

7      have that, sir?

8      A.  Let's see.  Page --

9      Q.  It's Page 51.  It's numbered in the top right corner.

10     A.  Yes.  Got it.

11     Q.  All right.  And on Line 15 -- if you can read from Line

12     15 on Page 51 to the first line on Page 52.

13     A.  Okay.

14             Question:  Was there any rhyme or reason to the

15     dates and to the way that the trial unfolded?

16             Answer:  Certainly.  I mean, if you go back and

17     look at all four of those dates, they're closely pegged to

18     key moments in the nuclear negotiations between Iran and the

19     world powers.

20             Question:  Did your captors ever tell you why you

21     were being held?

22             Answer:  As time went on, it became a mantra that,

23     You will be released when America gives us what we want.

24     They know what they [sic] want.  They just have to give it

25     to us and you'll go home.

1    Q.  All right.  I'm going to ask you to read into the record

2    three segments, then I'm going to ask you some questions

3    about those segments in their totality.  So if you would go

4    to Page 216 of the same exhibit.

5    A.  Yes.

6    Q.  And beginning with Line 16 through Line 22.

7    A.  Question:  Did they tell you in that -- in those 495

8    days that you were moved out of solitary confinement, did

9    they continue to say anything about why you were being held?

10          Answer:  Yeah, they continued to say that I was

11   being held for the purpose of being traded and that I would

12   be released once the United States of America gave Iran what

13   they wanted.

14   Q.  Thank you, sir.

15          And then the third segment begins on Page 217 of

16   the same exhibit --

17   A.  Yes.

18   Q.  -- and begins on Line 16 to the next page, 218, Line 7.

19   A.  So did you get any impression, either then or

20   afterwards, that --

21   Q.  Excuse me, Mr. Bowen.  I'm sorry to interrupt.  This is

22   the court asking the --

23   A.  Okay.  Yes.

24   Q.  -- question here, I believe.

25   A.  Yep.

1              The Court:  Okay.  So did you get any impression,

2       either then or afterwards, that, you know, you were being

3       released, so to speak, at the point in time as a consequence

4       or quid pro quo for the deal being implemented and going

5       through?

6              The Witness:  I had hoped throughout the entire

7       process that the negotiations might have some impact on when

8       and how I would be released; that this was a very difficult

9       thing to imagine, the country that I come from would engage

10      in such a set of negotiations while I and others were being

11      held in prison in that country.  And as we talked about

12      yesterday, each of my trial dates coincided with moments in

13      those nuclear negotiations.  So you know, I think that there

14      was a clear political component to the entire ordeal, but

15      during that period and up until the end, I was being told

16      that I was being traded for Iranian nationals in U.S.

17      prisons.

18      Q.  All right.  Now, based upon your knowledge as an expert

19      witness from both public reports, classified and

20      declassified information that you've been privy to, from

21      reviewing this trial testimony and from your expertise on

22      Iranian influence in Iraq, do you have an opinion as to

23      whether these prisoners -- these American prisoners who were

24      being held in Iran at the time were part and parcel of the

25      negotiations for the JCPOA?

1    A.   I think Mr. Rezaian's testimony substantiates that fact

2    to be true.

3    Q.   And what other basis do you have for that opinion?

4    A.   Well, the fact that Iran had leverage -- have used

5    leverage in the past to exercise its interests and to get

6    the quo it wants for the quid it gives.

7    Q.   Has Iran, as a country, shown a propensity to use

8    hostages as far as negotiations go to get what they want?

9    A.   Yes.

10   Q.   And what is the history of that, sir?

11   A.   Well, beginning with the Islamic Revolution 40 years ago

12   2 months from now was -- 51, 52 Americans were held for

13   400-some days, and those of us old enough to remember the --

14   Ted Koppel on Nightline know that that was probably the most

15   aggressive hostage negotiation in the history of mankind;

16   right?  I mean, it was a leverage that the United States

17   public was beaten about the head with on a nightly basis.

18   Q.   All right.  And a little while earlier before lunch, you

19   were talking about what you thought propelled the United

20   States to reengage in Iraq and send forces back into Iraq

21   during the time that ISIS was mounting its attacks.  What,

22   in your opinion, caused the United States to do that?

23   A.   Well, clearly, I think it -- the -- there was a cause

24   and effect between the aid worker and the reporter who were

25   publicly murdered on -- by ISIS in order to show their -- an

1    evil venting of their power, is how I would put it, and that

2    clearly led to President Obama's decision to reengage.

3    Q.  And as a person who's worked in -- at various levels of

4    foreign policy for the United States and been involved in

5    briefings and everything else, what, historically,

6    motivation has arisen from either Americans being held

7    captive or Americans being held captive and executed?  To

8    what extent does that motivate American foreign policy?

9    A.  It's central.  I think it's distinctive of our

10   democracy; that we value the individual human life and we'll

11   move heaven and earth to protect it.

12   Q.  And do you have an opinion as to whether that dynamic

13   and whether that mindset was at play in the negotiations for

14   the JCPOA?

15   A.  Certainly, I believe it was, and I believe Iran knew

16   that and I believe Iran used these three Americans to play

17   upon those sympathies.

18   Q.  Were there any statements by Iranian officials even

19   before the release itself took place that they wanted to do

20   a hostage exchange as part and parcel to this deal?

21   A.  Yes.  Rouhani publicly stated that the exchange of

22   hostages or release of U.S. hostages -- he dangled that as

23   an opportunity to seal for the United States to pursue

24   accepting the JCPOA.

25   Q.  And I think you mentioned earlier that, as part of the

1   deal, there was a $1.7 billion payment made to Iran in --

2   A.  Yes.

3   Q.  -- multiple currencies.  Do you know the timing of that

4   with regard to the exchange of the hostages -- the American

5   hostages held in Iran versus the Iranian prisoners that we

6   had?

7   A.  Virtually simultaneous.

8   Q.  And do you know whether or not the Obama administration

9   said that that was a quid pro quo?  That is, the cash for

10  the hostages.  Did they admit or deny that that was a quid

11  pro quo?

12  A.  They denied.

13  Q.  Is it your opinion that that was a quid pro quo or a,

14  you know, this for that?

15  A.  Well, I think Mr. Rezaian's testimony indicates what it

16  is; that this quid would occur when the Iranians received

17  their quo, and we see what their quo is.  The -- there isn't

18  another one.  It -- well, it was the 1.7 billion and the

19  lifting of sanctions and, in exchange for that, they

20  received these benefits.

21  Q.  And during your work in Iraq as you were investigating

22  Iranian influence, corruption, terrorist acts and those

23  kinds of things, what role does money play -- by that, I

24  mean hard currency -- in the facilitation of the kind of

25  influence Iran had over the Shia militias?

1    A.  Central.  It is their chief tool of exercising authority

2    and power over the militias and, frankly, throughout the

3    Shia Crescent.  Iran has monthly deliveries of millions of

4    dollars of cash to its -- to those that will carry out its

5    interests and execute on behalf of its ends.

6    Q.  And now, I'd like to show you another slide that I'll

7    describe briefly for the record which is a timeline of the

8    Iran deal.  And on this slide, there are particular dates

9    I'm going to walk through with you on this timeline.  Did

10   you help put this slide together?

11   A.  Yes.

12   Q.  And do these dates show some of the critical dates with

13   regard to the timing of the Iran deal?

14   A.  Yes.

15   Q.  All right.  Let's begin on the left.  The first block is

16   entitled, July 14th, 2015.  It says, Iran and the P5+1

17   announce a deal.  What's the significance of that July 2015

18   date?

19   A.  Well, that was the kickoff point of the process

20   beginning.

21   Q.  All right.  And then we go to -- the next date is

22   July 20th, 2015, where the UN Security Council endorses the

23   deal.  Do you see that, sir?

24   A.  Yes, and now it's authorized.

25   Q.  And then -- and September 3rd of 2015, the speaker of

1    Iran's parliament suggests a potential prisoner swap.  What

2    were the --

3    A.  Yes.

4    Q.  What were the circumstances surrounding that?

5    A.  Well, I think echoing what Rouhani had said

6    simultaneously; that -- to exercise and exert leverage in

7    the negotiation process.

8    Q.  All right.  And then a month later in -- October 13th --

9    A.  Ah, there it is again.  Yes.

10   Q.  -- 2015, Rouhani hints at the prisoner exchange.  Is

11   this the public statement that you mentioned earlier?

12   A.  Yes, it is.

13   Q.  All right.  And then in October of that year --

14   October 18th, 2015 -- the next point on the timeline, Iran

15   and the P5+1 formally adopt the deal.  Were there some

16   pre-adoption requirements that Iran had to fulfill with

17   regard to its nuclear capabilities?

18   A.  Had to grant some inspection and review.

19   Q.  All right.  And following that inspection and review,

20   did they have this formal adoption of the deal in October of

21   2015?

22   A.  Yes.

23   Q.  All right.  And I'm going to skip the next one, July

24   12th of 2016, and come back to that in just a moment.  But

25   on January 16th of 2016, there was the UN verification.

1     What was the UN verifying at that point?

2     A.  That the requirements regarding the scaling down of

3     the -- their nuclear industry were being -- were

4     preliminarily satisfied.

5     Q.  All right.  And then it says January 17th, 2016, is the

6     implementation day and the prisoner swap.  Is that the day

7     that these American citizens who were held hostage in Iran

8     were freed and the $1.7 billion in cash exchanged hands?

9     A.  Yes, it is.

10    Q.  All right, then.  Let's go back to five days before that

11    on January 12th, 2016, on this same slide, the time of the

12    Iran deal.  It says, Two U.S. command boats captured by the

13    IRGC.  What is that event?  And what was the significance of

14    that event?

15    A.  Well, I think -- well, that event, first of all, was an

16    act of terrorism or war on the open seas by Iran, to which

17    there was limited response by the United States at the time,

18    but its timing clearly indicates that it played a role in

19    forcing forward decision -- the decision on the -- and

20    the -- finalizing the JCPOA.  I mean, another argument would

21    be it was -- may have been an attempt by the IRGC to blow it

22    up in order to -- because Qasem Soleimani was not in favor

23    of the JCPOA and he was -- he, obviously, has -- his

24    influence lost out to Rouhani and before the Supreme Leader.

25    Q.  All right.  Now, I think you mentioned earlier in your

1    testimony the conflict between the IRGC and not being in

2    favor of the JCPOA --

3    A.  Right.

4    Q.  -- and Rouhani and the moderates in Iran wanting the

5    deal.  In your expert opinion, why was the IRGC not in favor

6    of this deal?

7    A.  Well, first of all, Qasem Soleimani saw this as a

8    restriction of his military power or even a rolling back.

9    And, you know, arguably the most powerful Islamic country in

10   the world is Pakistan, and not because they have a good

11   army, only because they possess nuclear weapons, and so it's

12   certainly his dream and the dream of others, you know, in

13   the Arab world to eventually have one, and that's -- that

14   was the underlying reason for pushing the -- to forestall

15   progress on that front because since, you know -- it's

16   been -- for 20 years, this has been a major international

17   security concern, Iran's efforts, slow though they may be,

18   moving towards acquiring a weapon, but the main point is the

19   first one I said.  Soleimani saw the JCPOA as restricting

20   his military power.

21   Q.  Was the IRGC in charge of Iran's ballistic missile

22   program?

23   A.  Yes, and as far as -- that's the launching piece, and

24   that was -- that -- he felt restricted by the JCPOA in that

25   regard, as well.

1    Q.  But the Supreme Leader must have accepted the terms of

2    this deal or it would never have gotten through to the point

3    where it did and Rouhani had --

4    A.  That's right.

5    Q.  -- agreed to it; is that correct?

6            So in that case, Soleimani is losing out to

7    Rouhani with regard to the Supreme Leader?

8    A.  Correct.

9    Q.  Now, if we can go to the next slide, the next slide is

10   the timing of the Iran deal, and we've added one additional

11   box which is shaded in black.  On January 15th, 2016, the --

12   is when the three plaintiffs in this case were taken

13   hostage.  Do you see that?

14   A.  I do.

15   Q.  And what does the timing of that date tell you about the

16   relationship, if any, between the Iran deal and the fact

17   that the three plaintiffs in this case were taken hostage?

18   A.  Well, its -- given the careful process that Iran pursued

19   in its own steady advancement of the JCPOA internally and

20   it's an interest that it sought -- the 1.7 billion and the

21   release of its prisoners -- this precipitous event occurring

22   two days before implementation indicates that it might be

23   like the January 12th event, an attempt by the IRGC to blow

24   up the deal, because this was the first taking --

25   hostage-taking of Americans in Iraq for five years, and it

1    is counter-strategic and non-rational vis-à-vis the JCPOA to

2    think that it -- this could have advanced Iran's interest in

3    that context.

4    Q.  And if, in fact, Saraya al-Salam and Muqtada al-Sadr

5    were acting at the behest of Iran when they took the three

6    plaintiffs hostage, who in Iran did they get their marching

7    orders from?

8    A.  Qasem Soleimani.

9    Q.  And what was his stance with regard to the Iran deal?

10   A.  He opposed it.

11   Q.  Now, I want to show you the next slide which is a

12   statement that I'm going to have you read into the record

13   and then I'm going to ask you what -- to what extent this

14   forms some of the basis of your opinion.  This is a slide

15   entitled, James Clapper, who was the U.S. Director of

16   National Security, with regard to his February 9th, 2016,

17   testimony before the Senate Armed Services Committee.  Can

18   you please read what he said to the Senate Armed Services

19   Committee on February 9th, 2016.

20   A.  Iran might use American citizens detained when entering

21   Iranian territories as bargaining pieces to achieve

22   financial or political concessions in line with their

23   strategic intentions.

24   Q.  All right.  Now, does this statement by Mr. Clapper --

25   who was the U.S. Director of National Security -- form any

1    basis for your opinions in this case?

2    A.  It supports them.

3    Q.  In what way?

4    A.  In that Iran's seizure of Americans is done not just

5    arbitrarily but with strategic purpose.

6    Q.  And at the time that he made this statement in --

7    February 9th of 2016, were the three plaintiffs in this

8    case, in fact, in the custody of Saraya al-Salam and Muqtada

9    al-Sadr?

10   A.  They were -- no, no, wait.  No, that was February 9th.

11   So they were -- they had been released by that point.

12   Q.  Well, assume with me their release date is

13   February 16th.

14   A.  Oh, February 16th.  I'm sorry.  February 16th.  They

15   were -- yes, they were still in custody.  I'm sorry.

16   Q.  During your experience in the briefings and in the

17   various government positions that you had, would the

18   Director of National Security know about an incident like

19   three Americans being taken hostage by a Shia militia or a

20   militia --

21   A.  Yes.

22   Q.  -- of some kind?

23   A.  Yes, he would.

24             THE COURT:  Let me just jump in here really

25   quickly.  So this testimony of Director Clapper, before you

1   testified here today, it helped form the bases for some of

2   your opinions in this case; is that correct?

3              THE WITNESS:  Yes, it did.

4              THE COURT:  All right.  And that slide fairly and

5   accurately depicts the testimony, as you've read it?

6              THE WITNESS:  Yes.

7              THE COURT:  All right.

8              THE WITNESS:  And it did occur before the release.

9   I'm sorry.  I just -- I paused in inverting the numbers.

10  BY MR. SINGER:

11  Q.  Okay.  Now, Mr. Bowen, can you please summarize for the

12  Court whether or not you have an opinion that the taking of

13  these three plaintiffs was related to negotiations on the

14  JCPOA deal.

15  A.  I believe it was.

16  Q.  And do you believe, if it was related to the JCPOA deal,

17  it was done at the direction of someone in a position of

18  authority in Iran, whether General Soleimani or someone

19  else?

20  A.  That's right.

21  Q.  And do --

22  A.  And it may be the case -- I gave you my opinion that

23  it's more likely that it would have been Soleimani, as head

24  of the IRGC and an opponent of this deal, trying to blow it

25  up, given its precipitous positioning on the calendar, but

1    on the other hand it may have been an odd attempt to

2    strengthen their bargaining position, per Director Clapper's

3    point that they do use hostages as leverage.

4    Q.  How do we know this isn't just a random coincidence that

5    just happened to happen two days before the deal was

6    finalized and prisoners were exchanged?

7    A.  Because of past practice and General Clapper's point.

8    This is clearly connected to events outside the scope of

9    what was going on in Sadr City that day.

10   Q.  All right.  Now, I want to go back, then, and just

11   summarize your major opinions in this case for the Court so

12   we make sure that we've covered your major opinions.  We're

13   not going to retread every basis for them, but I want to

14   make sure we've got the opinions right.

15           Do you have an opinion to a reasonable degree of

16   certainty as to whether al-Sadr's rise to power was

17   facilitated by Iranian funding, training and direction?

18   A.  It was.

19   Q.  And what is the general basis for that opinion?

20   A.  The history of Iranian financial and other support

21   directly to Muqtada al-Sadr and to the Jaysh al-Mahdi and

22   its successor organizations.

23   Q.  Do you have an opinion to a reasonable degree of

24   certainty whether al-Sadr has been consistent in his

25   anti-American actions and in his Iranian backing despite the

1    various ways he held himself out to the public?

2    A.   Yes.  I mean, he, from the moment the Coalition

3    Provisional Authority was announced, has been anti-American

4    vocally and aggressively, you know?  From 2000 -- the late

5    spring of 2003 until his exile in 2008 -- mid-2008, his

6    self-conscious rebranding as an anti-corruption nationalist

7    can't disguise the fact that the support of the Promised

8    Land [sic] Brigades and Saraya al-Salam is Iranian.

9    Q.   And do you have an opinion as to whether Muqtada al-Sadr

10   eventually delivered to the Iranians the political power

11   that they desired in Iraq?

12   A.   He won the 2018 election.  So they -- and their

13   strongest supporter within the PMF -- the head of the PMF,

14   Hadi al-Amiri, came second.  So the winner of the 2018

15   elections in Iraq was Iran.

16   Q.   And do you have an opinion as to whether the timing of

17   the hostage-taking of the plaintiffs in this case against

18   the backdrop of the negotiations of the JCPOA deal supports

19   the proposition that Iran directed this hostage-taking?

20   A.   I'm sorry.  Can you ask --

21   Q.   Yes.

22   A.   -- the question again?

23   Q.   Do you have an opinion as to whether the timing of the

24   hostage-taking in this case juxtaposed against what was

25   happening in the JCPOA deal supports the proposition that

1    Iran not only provided funds and training but actually

2    directed this hostage-taking?

3    A.  Yes, and a number of components support that conclusion.

4    One is the timing in the context of the hostage-taking

5    itself.  Second is the history of Iran's practices,

6    evidenced in General Clapper's statement that this is what

7    they do.  And third is what the militia members said to the

8    hostages in the course of their experience; that they,

9    almost in a boastful fashion, claimed provenance -- Iranian

10   provenance of their weaponry; their training; their funding;

11   and the fact that there on the wall was the Iranian flag.

12   Q.  And finally, does the testimony of the plaintiffs in

13   this case, as conveyed to you through their affidavits and

14   through conversations with the plaintiffs -- does their --

15   the evidence that they're putting forth from their personal

16   knowledge in this case, is that consistent with your

17   understanding of how Iran funds, trains and directs Shia

18   militia groups like Muqtada al-Sadr's?

19   A.  Yes, it is.  And what it reveals is the Muqtada al-Sadr

20   of 2003 and '4 and '5 and '6 is the Muqtada al-Sadr of 2016.

21            MR. SINGER:  Thank you, Mr. Bowen.  Please answer

22   any questions the Court may have.

23            THE WITNESS:  Thank you.

24            THE COURT:  I have no questions.

25            MR. SINGER:  Thank you, Your Honor.

```
 1                    THE COURT:  All right.

 2                    THE WITNESS:  Thank you, Your Honor.

 3                    THE COURT:  You may step down.  Absolutely.  Thank

 4        you for being here.

 5                    THE WITNESS:  Thank you.

 6                    (Witness steps down.)

 7                         *  *  *  *  *  *  *  *  *  *  *  *

 8                    (Proceedings concluded at 5:04 p.m.)

 9                         *  *  *  *  *  *  *  *  *  *  *  *

10                CERTIFICATE OF OFFICIAL COURT REPORTER

11        I, TIMOTHY R. MILLER, RPR, CRR, NJ-CCR, do hereby certify

12        that the above and foregoing constitutes a true and accurate

13        transcript of my stenographic notes and is a full, true and

14        complete transcript of the proceedings to the best of my

15        ability, dated this 15th day of October 2019.

16                              /s/Timothy R. Miller, RPR, CRR, NJ-CCR
                                Official Court Reporter
17                              United States Courthouse
                                Room 6722
18                              333 Constitution Avenue, NW
                                Washington, DC 20001
19

20

21

22

23

24

25
```